**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
ELI R. GREENSTEIN (Bar No. 217945)
egreenstein@ktmc.com
STACEY M. KAPLAN (Bar No. 241898)
skaplan@ktmc.com
PAUL A. BREUCOP (Bar No. 278807)
pbreucop@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff Arkansas*
*Teacher Retirement System and*
*Plaintiff John A. Prokop and*
*Lead Counsel for the Putative Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM and JOHN A. PROKOP, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> OSI SYSTEMS, INC., DEEPAK CHOPRA, ALAN EDRICK, and AJAY MEHRA <br><br> Defendants. | Case No. 17-cv-08841-VAP(SKx) <br><br> **CONSOLIDATED CLASS ACTION** <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Judge: Hon. Virginia A. Phillips |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................... 2

II.   JURISDICTION AND VENUE ................................................................ 8

III.  PARTIES .................................................................................................. 8

      A.   Plaintiffs ......................................................................................... 8

      B.   Defendants ...................................................................................... 9

           1.   Corporate Defendant OSI ....................................................... 9

           2.   Individual Defendants ............................................................ 9

      C.   Relevant Non-Parties ................................................................... 12

IV.   BACKGROUND AND OVERVIEW OF DEFENDANTS' SECURITIES
      LAW VIOLATIONS ............................................................................... 13

      A.   Prior to the Class Period, OSI's Core Business Was Under Pressure .... 14

           1.   Under Defendant Mehra's Leadership, Rapiscan Is Repeatedly
                Accused of Defrauding the U.S. Government ............................ 14

           2.   OSI Moves Defendant Mehra to S2 After the U.S. Government
                Demands His Removal from Rapiscan ...................................... 16

           3.   Rapiscan's Traditional Business Struggles After Its Regulatory
                Problems with the U.S. Government ........................................ 17

      B.   As OSI's Traditional Business Stagnates, OSI Touts S2's Turnkey
           Business As the Key to the Company's Future ................................. 19

      C.   OSI Touts the Purported Benefits of the Turnkey Model ..................... 20

      D.   After Repeatedly Hyping the Turnkey Business, the Market Pressures
           Defendants For A Third Turnkey Contract ..................................... 21

      E.   Defendants Mislead Investors about OSI's New Turnkey Contract in
           Albania and Overall Success of the Turnkey Business While Concealing
           Material Facts ............................................................................ 23

1.     Defendants Misleadingly Promote the Albanian Contract as Proof of the Turnkey Model's Success ....................................................23

2.     Defendants Continue to Misleadingly Tout the Progress of the Albanian Contract and the Turnkey Business Overall ................24

3.     Defendants' Statements Knowingly Conceal Corrupt Arrangements Underlying the Albanian contract.........................25

    a.     Unbeknownst to Investors, Defendants Sell Nearly Half of OSI's Rights to the Albanian Contract Entity...................26

    b.     Defendants Conceal the Corrupt Arrangement of the Albanian Contract that Secured Highly Favorable Terms for the Company ...................................................................31

4.     Defendants Mislead Investors Regarding the Suspension of the Contract.........................................................................................33

5.     OSI Obtains a Less Favorable Contract Through Arbitration .....34

6.     OSI Announces the Reinstatement of the Albanian Contract, and Defendants Continue to Mislead Investors .................................35

7.     Defendants Falsely Represent That OSI Owns S2 Albania in Its Entirety ...................................................................................36

F.     Defendants' Misconduct in Albania Subjected OSI to Significant FCPA Risk that Jeopardized the Entire Company...........................................37

G.     Defendants' Opaque Turnkey Business Model Enabled Their Fraud....39

1.     OSI's Turnkey Business Existed Only in Jurisdictions Where Oversight Was Minimal and Corruption Was Prevalent..............39

2.     The Company's Financial Treatment of Turnkey Contracts Obscured Details About the Business ........................................40

H.     The Relevant Truth Is Slowly Revealed................................................41

V.     DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS...........................................................45

A.     August 21, 2013 Press Release .............................................................45

B. Second Quarter 2014.................................................................47

C. March 2014 Analyst Conferences.........................................49

D. Third Quarter 2014 ................................................................52

E. Summer 2014 Conferences ....................................................53

F. Fourth Quarter 2014..............................................................57

G. First and Second Quarter 2015 ...........................................59

H. Summer 2015 Conferences ....................................................61

I. Fourth Quarter 2015..............................................................63

J. First and Second Quarter 2016 ...........................................65

K. Third Quarter 2016 ................................................................68

L. Fourth Quarter 2016..............................................................71

M. First Quarter 2017.................................................................74

N. Second Quarter 2017..............................................................77

O. Third and Fourth Quarter 2017 ..........................................81

P. First Quarter 2018.................................................................85

Q. SOX Certifications.................................................................87

R. Internal Controls ..................................................................89

VI. ADDITIONAL ALLEGATIONS OF SCIENTER........................................92

A. Top OSI Executives, Including Individual Defendants Chopra and Mehra, Directly Oversaw and Had Actual Knowledge of the Undisclosed Arrangement With ICMS.................................93

B. The Individual Defendants' Senior-Level Positions, Micromanagement Styles, and Close-Knit Personal Relationships Reinforce a Strong Inference of Scienter .................................................................95

C. The Fraud Involved a Key Contract and Core Operation of the Company—Its Turnkey Business ........................................98

D.   The Small Size and Closely-Held Structure of S2, Combined With the Limited Number of Turnkey Contracts and Defendants' Scrutiny of Foreign Transactions, Reinforces a Strong Inference of Scienter ........100

E.   Defendants' Duty Under the Administrative Agreement With the U.S. Government to Implement Compliance Programs and Monitor Their Contractual Arrangements Supports Scienter.......................................101

F.   Defendants' Contradictory Explanations Regarding the Albanian Arrangement Reinforce a Strong Inference of Scienter .......................104

G.   Defendants SOX Certifications Support an Inference of Scienter .......106

H.   Defendants' Insider Trading and Executive Compensation Structure Reinforce the Strong Inference of Scienter ..........................................107

    1.   Defendants' Stock Dispositions Support Scienter ....................107

    2.   OSI's Executive Compensation Structure Supports Scienter ....110

    3.   Defendant Mehra's Compensation Was Closely Tied to the Performance of the Turnkey Business.........................................111

VII.   LOSS CAUSATION ........................................................................112

A.   December 6, 2017 Partial Disclosure .....................................113

B.   February 1, 2018 Partial Disclosure .....................................117

VIII.   CLASS ACTION ALLEGATIONS ................................................119

IX.   PRESUMPTION OF RELIANCE ..................................................121

X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................123

XI.   CAUSES OF ACTION UNDER THE EXCHANGE ACT .........................124

XII.   PRAYER FOR RELIEF...............................................................128

XIII.   JURY DEMAND ........................................................................128

This is a class action for violations of the federal securities laws brought by Plaintiffs Arkansas Teacher Retirement System ("Lead Plaintiff") and named plaintiff John A. Prokop (collectively, "Plaintiffs") individually and on behalf of all persons who purchased or otherwise acquired OSI Systems, Inc.'s ("OSI" or the "Company") common stock and 1.25% convertible senior notes due 2022 ("OSI Bonds") (collectively, "OSI Securities") between August 21, 2013 and February 1, 2018, inclusive (the "Class Period").[1] Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC") thereunder (17 C.F.R. § 240.10b-5), against: (i) OSI; (ii) OSI's Chief Executive Officer ("CEO") Deepak Chopra ("Chopra"); (iii) OSI's Chief Financial Officer ("CFO") Alan Edrick ("Edrick"); and (iv) OSI's Executive Vice President and Director, Ajay Mehra ("Mehra") (collectively, "Defendants").

Plaintiffs allege the following based upon personal knowledge with respect to Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation undertaken by Court-appointed Lead Counsel, Kessler Topaz Meltzer & Check, LLP ("Lead Counsel") and its agents, including Albanian consultants and an Albanian-speaking attorney. Lead Counsel's investigation included, *inter alia*, the review and analysis of: (i) public filings by OSI with the SEC; (ii) public reports and news articles regarding OSI, including online news sources; (iii) research reports regarding OSI by securities and financial analysts; (iv) economic analyses of securities price movements and data; (v) transcripts of investor calls and conferences with OSI senior management; (vi) interviews with former OSI employees (identified herein as Confidential Witnesses ("CWs")); (vii) public documents from Albania, reviewed and/or translated into English by an Albanian-speaking attorney; and (viii) other publicly available material and data identified

---

[1]   Excluded from the Class are Defendants, directors and officers of OSI and their families and affiliates.

herein.    Lead Counsel and its agents' investigation into the factual allegations contained herein is continuing and many of the facts supporting Plaintiffs' allegations are known only to Defendants or are exclusively within Defendants' custody or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    OSI manufactures and sells electronic scanning systems and components for homeland security, healthcare, defense, and aerospace.  During the Class Period, the Company generated more than 50% of its revenues from its core Security division, operated primarily through its Rapiscan Systems, Inc. ("Rapiscan") subsidiary, which sells and provides services for X-ray security and inspection systems to detect explosives, weapons, drugs, and other illegal goods.

2.    Before the Class Period, Rapiscan's largest and most important customer was the U.S. Government, including the Department of Homeland Security ("DHS") and the Transportation Security Administration ("TSA").  These government entities purchased OSI's security and inspection systems for use at airports, border crossings, shipping ports, military installations, and other locations.

3.    From approximately 2011 to 2013, OSI was plagued by multiple scandals involving its contracts with the U.S. Government.  *First*, in November 2012, a U.S. Congressman sent a letter to the TSA stating that Rapiscan "may have attempted to defraud the Government" by "knowingly manipulating" body scanner tests and concealing information relating to its contracts with the TSA.[2]  These allegations led to the U.S. Government's issuance of a "show cause" letter and "Notice of Proposed Debarment" of Rapiscan from future DHS contracts.

4.    *Second*, OSI was accused of misleading the U.S. Government from 2010 through 2013 regarding its checkpoint baggage and parcel scanners, including

---

[2]    Throughout this Complaint, all emphasis is added unless otherwise noted.

CONSOLIDATED CLASS ACTION COMPLAINT                                    2
CASE NO. 2:17-cv-08841-SVW-AGR

concealing the use of unapproved Chinese components to repair and manufacture scanners in violation of its contract with the TSA.  OSI's actions resulted in the termination of a $67.1 million contract with the DHS and an "Administrative Agreement" with the DHS which concluded, *inter alia*, that Rapiscan "provided false or misleading information to the Government." This conduct led to a federal civil securities fraud lawsuit that ultimately settled for $15 million in 2015. It also resulted in the effective ouster of Defendant Mehra—Chopra's first cousin who led Rapiscan during its government contract schemes—from his role as President of Rapiscan. As detailed herein, however, Mehra was simply transferred to another OSI division that soon became the hub of Defendants' newest financial scheme.

5.     In the wake of these scandals, Defendants realized that OSI needed to reduce its dependence on U.S. Government contracts and convince investors that the Company: (i) had put past improprieties behind it; (ii) had implemented adequate monitoring policies and internal controls to prevent future non-compliance and misconduct; and (iii) could pivot OSI's business to larger, long-term service contracts with foreign governments.  Defendants thus embarked on an intensive campaign to shift investor focus to a new business model called "turnkey security screening solutions," that purportedly would "transform the Company" and provide future growth and more consistent revenues.

6.     Defendants represented that under the "turnkey" model, sold through the Company's "S2 Global" subsidiary, OSI provided full turnkey services to support foreign governments and customs officials with the installation, maintenance, and operation of the Company's security inspection products—as well as the construction, staffing, and long-term operation of security screening checkpoints. The turnkey model differed from OSI's traditional equipment sales business in that the customer did not own the equipment but instead paid a subscription or per-scan fee. During the Class Period, Defendants repeatedly told investors that its turnkey model

was OSI's most promising new business segment that would provide higher profit margins, greater revenue visibility and consistency, and substantial growth opportunities in international markets.

7.     To support this turnkey narrative, Defendants needed to show the market and analysts that foreign governments were willing to pay exorbitant fees for long-term service contracts, as opposed to simply buying the equipment and running it themselves (which was far cheaper).  Leading up to the Class Period, however, the Company had only booked a total of *two* turnkey contracts in Mexico and Puerto Rico and had not announced a new major turnkey deal since 2012.  This caused intense pressure from analysts who repeatedly questioned Defendants about the timing of the next big turnkey contract.

8.     On August 21, 2013, the first day of the Class Period, Defendants finally announced a new long-term turnkey contract with the government of Albania, then controlled by the Prime Minister Sali Berisha ("Berisha") and his Democratic Party. According to the Company, the Albanian turnkey contract provided a 15-year term and $150 million to $250 million in revenues.   The Company's press release announcing the deal quoted Defendant Mehra as stating: "our selection [for the Albanian contract] *reinforces the attractiveness and compelling value of our turnkey service model*."

9.     Throughout the Class Period, Defendants continued to tout the Company's turnkey business model, and in particular, the Albanian contract, as evidence of the acceptance and success of the turnkey solution.  For example, on January 28, 2014, Defendant Chopra proclaimed, "*[a]fter winning the new turnkey services contract earlier this year in Albania, we have clearly established our leadership in growing this particular service segment* and expect to continue to leverage our position for further growth."  Similarly, on March 4, 2014, the

Company's CFO, Defendant Edrick, stated that the turnkey model provided the Company with a "first-mover advantage" over competitors:

> **[W]hat's been driving the growth over the past year has been largely dominated by our turnkey security solutions. We pioneered this area.** …There's only been three contracts of this type awarded to the world. And to date, well, we've won all three. So today, **we have 100% market share in that area**.

10. Defendants continued to represent that the turnkey model "has been **extraordinarily successful for us**" and "in just a few short years, **this has gone from 0% of our Security business to about 30% today**. So it's been very, very exciting. It's a nice revenue, higher margin business for us of a recurring nature." Defendants also issued numerous public filings with the SEC assuring investors that, *inter alia*: (i) the Company's financial disclosures were accurate; (ii) its SEC filings did not contain misstatements and "fairly present[ed]" the Company's business condition "in all material respects"; and (iii) OSI's internal compliance controls were adequate to prevent misstatements, corruption, and impropriety, including under the U.S. Foreign Corrupt Practices Act ("FCPA") and the federal securities laws.

11. Unbeknownst to investors, Defendants' representations regarding the success and sustainability of the turnkey model, including the Albanian contract, were materially false and misleading and deliberately concealed material facts. Most prominently, Defendants concealed that the Company's $150 to $250 million turnkey contact with the Albanian government was subject to a secret and corrupt arrangement whereby OSI surreptitiously transferred 49% of its Albanian contract entity and lucrative "profit shar[ing]" rights to an undisclosed Albanian shell entity owned by an Albanian dentist, Olti Peçini ("Peçini"), with reported ties to the outgoing Albanian government that issued the contract to OSI.

12. Under the hidden arrangement, OSI agreed to set up an Albanian business subsidiary, S2 Albania SHPK ("S2 Albania"), to service and own rights and obligations of the $150 to $250 million Albanian turnkey contract. OSI then

transferred 49% of that company to an Albanian holding company—Inspection Control & Measuring Systems SHPK ("ICMS")—for a price of only 490 Albanian Lekë—*the equivalent of $4.50*. This arrangement, personally overseen and executed by Defendant Mehra, also included an undisclosed "profit shar[ing]" agreement with ICMS relating to the Albanian turnkey contract. Notably, the Albanian Minister of Finance's approval of the 49% transfer to ICMS occurred only a *few days* before his party left office and the new regime came to power.

13. None of these facts were disclosed to investors. Indeed, throughout the Class Period, Defendants continued to conceal the corrupt Albanian arrangement while repeatedly touting the significance of the Albanian turnkey deal as demonstrating widespread acceptance of the "transformative" new business model. In bond offering documents issued in February 2017, OSI falsely represented that it owned "*all* of the issued and outstanding capital stock" of its subsidiaries, including "*S2 Albania*," despite knowing that 49% of that subsidiary and lucrative profit-sharing rights had been transferred to ICMS years earlier for the paltry sum of $4.50.

14. At the same time Defendants were concealing the corrupt Albanian arrangement, they also were dumping hundreds of thousands of shares of OSI stock at artificially inflated prices, collectively pocketing more than *$51 million* in proceeds. Defendants' stock dispositions represented large percentages of their total stock holdings and were suspiciously timed to take advantage of OSI's inflated stock price. Indeed, during the middle of the Class Period, only two weeks after OSI disclosed that the new Albanian government "halted further progress" on OSI's turnkey contract, Defendant Chopra entered into a Rule 10b5-1 stock "trading plan" to facilitate the immediate sale of 48,000 shares of OSI stock to unsuspecting investors for millions of dollars in illicit proceeds. As detailed below, both the SEC and U.S. Attorney's Office for the Central District of California ("DOJ") are now investigating OSI's executives' stock trading.

15.    On December 6, 2017, Muddy Waters Research ("MWR") issued a detailed report exposing certain facts surrounding the corrupt Albanian contract, including the previously undisclosed transfer of 49% of OSI's Albanian turnkey entity to ICMS (the "MWR Report").  The MWR Report concluded that OSI was "rotten to the core" and "obtained a major turnkey contract in Albania through corruption."  The report included translations from previously undisclosed Albanian reports calling OSI's turnkey contract the "theft of the century" and a "Mafia of scanning concession."  One such report asked "*how did the doctor Olti Peçini [buy] 49% of the shares of a concession worth 316 million USD for 490 lekë.  Who is hiding behind the ICMS…?!*"

16.    Within hours of the MWR Report, Defendants issued a cryptic press release admitting certain core facts underlying the report—namely, the previously undisclosed partnership and "profit shar[ing]" arrangement with ICMS surrounding the Albanian contract.  Defendants continued, however, to falsely deny and conceal certain details and known risks surrounding the contract, and misleadingly suggested that the deal was legitimate. Following these revelations (and despite Defendants' misleading statements of comfort), the price of OSI's common stock and OSI Bonds plummeted by more than 29% and 15%, respectively, causing significant damage to OSI investors.

17.    Less than eight weeks later, on February 1, 2018, OSI abruptly announced that it was the target of investigations by both the SEC and DOJ regarding its compliance with the FCPA.  The same disclosure revealed that "[t]he SEC and DOJ are also conducting an investigation of *trading in the Company's securities*, and have subpoenaed information regarding *trading by executives*, directors and employees, as well as Company operations and *disclosures in and around the time of certain trades*."  Upon this further revelation of previously concealed risks associated with Defendants' misleading statements, omissions and stock trading, the

price of the Company's common stock and OSI Bonds dropped another 18% and about 6%, respectively, causing further damage to Class members.

18.    Defendants' fraudulent conduct during the Class Period has caused significant damage to investors and long-term injury to the Company and its stock price.  OSI's stock price has never fully recovered and currently hovers at around $65 per share, roughly 30% lower than its Class Period high of over $95 per share.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and § 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

20.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

21.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, OSI's principal executive offices are located within this District.

22.    In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

23.    Lead Plaintiff Arkansas Teacher Retirement System is a large pension fund for Arkansas's public school and education employees, with approximately $15 billion in assets under management and provides retirement, disability, and survivor

benefits for more than 120,000 members. Lead Plaintiff purchased the OSI Securities, as set forth in its certification filed herewith, at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

24.    Named plaintiff John A. Prokop purchased OSI common stock, as set forth in his certification filed herewith, at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

**B.    Defendants**

**1.    Corporate Defendant OSI**

25.    OSI is incorporated in Delaware with its "World Headquarters" located in Hawthorne, California. OSI designs, develops, manufactures, and provides services related to electronic systems and components for applications in homeland security, healthcare, defense, and aerospace, through several wholly-owned subsidiaries, including Rapiscan Systems and S2 Global. OSI does business both domestically and internationally, including in Albania and Mexico. OSI common stock trades on the NASDAQ under the ticker symbol "OSIS."

**2.    Individual Defendants**

26.    Defendant Chopra is the founder of OSI and, at all relevant times, was the Company's President, CEO, and Chairman of the Company's Board of Directors. In these roles, Chopra certified and signed the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017; and the Company's Form 10-Qs, including those filed on October 25, 2013, January 30, 2014, May 2, 2014, October 24, 2014, January 27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016, October 31, 2016, February 1, 2017, April 27, 2017, and October 31, 2017.

27.    Defendant Edrick is and, at all relevant times was, OSI's Executive Vice President and CFO. Edrick has over 25 years of financial management and public

accounting experience, including mergers and acquisitions and regulatory compliance. As CFO of OSI, Edrick certified and signed the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017; and the Company's Form 10-Qs, including those filed on October 25, 2013, January 30, 2014, May 2, 2014, October 24, 2014, January 27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016, October 31, 2016, February 1, 2017, April 27, 2017, and October 31, 2017.

28.     Defendant Mehra is and, at all relevant times was, OSI's Executive Vice President, the President of OSI Solutions Business, and a member of OSI's Board of Directors. Mehra currently serves as the President of S2 Global—a position held since 2014. From 1998 to 2015, Mehra was the President of OSI's Security division. Mehra also served as President of OSI's subsidiary, Rapiscan Systems, from September of 2007 until his removal in August of 2014. Prior to serving as Executive Vice President of OSI, Mehra was the Company's CFO from November 1992 through November 2002. Mehra signed the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017. Mehra reported to Defendant Chopra and is Chopra's first cousin.

29.     Defendants Chopra, Edrick, and Mehra are referred to collectively herein as the "Individual Defendants."

30.     Defendants are liable under Section 10(b) for making false and misleading statements and omitting material adverse facts and/or participating in the fraudulent course of conduct alleged herein. In addition, each of the Individual Defendants was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, as they possessed direct or indirect power to direct or cause the direction of the management and the policies of the Company and persons who engaged in the unlawful conduct complained of herein in violation of Section 10(b). Due to their control, the Individual Defendants are jointly and severally liable for any

false and misleading statements, omissions, or conduct alleged herein that are attributable to OSI or other person they controlled.

31.     Because of their positions and responsibilities, each of the Individual Defendants had access to the adverse undisclosed information about OSI's turnkey business and operations, including details about its turnkey contract with Albania, and its internal controls via access to internal corporate documents, conversations and contact with other corporate officers and directors, attendance at meetings, and receipt of and/or access to reports and other information provided to them. Each of the Individual Defendants, by virtue of his high-level position, was directly involved in the operations of OSI at the highest levels and was privy to confidential information concerning the Company.

32.     Their positions of control and authority as officers or directors also enabled these Individual Defendants to control the content of the SEC filings, press releases, and other public statements of OSI during the Class Period. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.

33.     During the Class Period, each of the Individual Defendants substantially approved, participated in the preparation of, furnished information in connection with, and had ultimate authority for OSI's SEC filings, press releases, and public statements, and engaged in conduct that made it necessary or inevitable that material misrepresentations or omissions would be made to investors based on that conduct.

34.     The Defendants were obligated to refrain from issuing false and misleading public filings and were prohibited from using the instrumentalities of interstate commerce or the U.S. mails to: (i) employ any device, scheme or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; or (iii) engage in any act, practice or course of business which operates or would operate as a fraud upon any person. Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of OSI Securities.

35.   Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of OSI Securities by disseminating materially false and misleading statements and/or concealing material adverse facts about OSI's turkey operations, including its contract with Albania. Defendants' course of conduct deceived the investing public and caused Plaintiffs and other members of the Class to be damaged as a result of their acquisition of OSI Securities.

## C.   Relevant Non-Parties

36.   CW 1 was a Vice President of OSI's Rapiscan division in 2014 and 2015. CW 1 was part of the team that was brought in after the TSA threatened Rapiscan with debarment.[3] In CW 1's role, CW 1 was involved with Rapiscan's contracts in foreign countries, dealt directly with the TSA, and spoke numerous times with Chopra and Mehra.

37.    CW 2 was employed as a Director at Rapiscan from at least 2007 through mid to late 2013. In CW 2's position at Rapiscan, CW 2 had direct access to the U.S. Government, including Customs and Border Protection, the State Department, and the Commerce Department. CW 2 was also involved in Rapiscan's international operations, particularly when problems arose with foreign sales. During her tenure at the Company, CW 2 attended a couple of the Company's once-per-quarter meetings with executives from all divisions, including Defendant Chopra.

---

[3]    To preserve anonymity, all CWs are referred to herein using feminine pronouns.

38.    CW 3 was a Rapiscan Executive from 2013 through 2015. CW 3 had direct communications with Defendant Mehra until February 2014, when Mehra was removed from her position. Thereafter, CW 3 had direct communications with Defendant Chopra. CW 3 was familiar with the Albanian turnkey contract from conversations with Mehra.

39.    Jonathan Fleming ("Fleming") founded S2 Global in 2009 and assisted in the merger of S2 Global into OSI in 2010. Fleming was the President of S2 Global until 2014, when Mehra was named President of S2 Global. Since 2014, Fleming has been the Executive Vice President of S2 Global. Since March 19, 2013, Fleming has been the administrator of Rapiscan's Albanian subsidiary S2 Albania.

## IV.    BACKGROUND AND OVERVIEW OF DEFENDANTS' SECURITIES LAW VIOLATIONS

40.    OSI operates through three primary divisions: (i) Security; (ii) Healthcare; and (iii) Optoelectronics and Manufacturing. The Security division is the largest and most important, representing approximately 50% of the Company's net revenues between 2013 and 2017. Defendant Edrick described OSI's Security business as "our biggest business." As a result, investors and analysts were highly focused on OSI's Security division during the Class Period.

41.    OSI's Security division consists of two segments: (i) Rapiscan, which designs, manufactures, and markets, and sells security inspection systems; and (ii) S2, which provides what the Company calls "turnkey security screening solutions," as described in detail in Section IV.B. below. Historically, OSI focused on its Rapiscan equipment business. However, with the Company's traditional business model faltering due to Defendants' misconduct surrounding its U.S. Government contracts, Defendants shifted focus to the turnkey business as the driving force of the Company's future success.

**A.      Prior to the Class Period, OSI's Core Business Was Under Pressure**

42.     Traditionally, OSI's "base business model" was the manufacture and sale of security equipment through Rapiscan. These products include systems for baggage and parcel inspection, cargo and vehicle inspection, checked baggage screening, people screening, and radiation detection. The products are used for security purposes at locations such as airports, border crossings, shipping ports, military and other government installations, and freight forwarding facilities. In addition to equipment sales, Rapiscan also generated revenues by providing "after-market support," including the sale of spare parts and maintenance services. Rapiscan's main customers were domestic and foreign government agencies, including the TSA, the DHS, U.S. Customs and Border Protection, Puerto Rico, Mexico, and Albania.

43.     Prior to the Class Period, Rapiscan's single largest customer was the U.S. Government, which provided a substantial portion of the Company's revenue. As OSI disclosed in Forms 10-K between 2009 and 2013, "[t]he U.S. government currently plays an important role in funding the development of certain of our security and inspection systems and sponsoring their deployment at airports, ports, military installations and border crossings." Moreover, according to a December 9, 2013 Bloomberg article titled "OSI Tumbles on Possible Contract Ban for Chinese Parts," between 2009 and December 2013, OSI received a total of $463 million in U.S. Government contracts—nearly a third of the Security division's total reported net revenue for the same period.

**1.      Under Defendant Mehra's Leadership, Rapiscan Is Repeatedly Accused of Defrauding the U.S. Government**

44.     Defendant Mehra—who is Defendant Chopra's first cousin—served as the President of Rapiscan since at least 2005. Under his leadership, Rapiscan's relationship with the U.S. Government deteriorated between 2009 and 2013 when Rapiscan was accused of two separate schemes to mislead the government.  These

CONSOLIDATED CLASS ACTION COMPLAINT                                    14
CASE NO. 2:17-CV-08841-SVW-AGR

scandals led to the cancellation of multi-million dollar contracts with the U.S. Government, subjected the Company to increased scrutiny, and caused Rapiscan to lose market share.

45.     *First*, Rapiscan was accused of fraud in connection with a $173 million contract awarded by the TSA in 2009 for "whole-body imaging" scanners to be used for security screening in U.S. airports (the "2009 Contract"). In November 2012, TSA issued a show cause letter alleging that Rapiscan failed to fully disclose issues it discovered during the development of body scanners under the 2009 Contract. Shortly thereafter, Congressman Mike Rogers (then Chairman of the Homeland Security Subcommittee on Transportation Security) asserted that OSI "***may have attempted to defraud the Government*** by knowingly manipulating an operational test of [the] . . . software in the field in order to have a successful outcome."

46.     On January 17, 2013, OSI announced that the TSA had cancelled the $173 million 2009 Contract with Rapiscan. Four months later, OSI announced that the DHS had issued a "Notice of Proposed Debarment" in connection with TSA's show cause letter, which "allege[d] that Rapiscan ***failed to disclose*** a defect with the Products and replaced hardware in the Products without being granted proper governmental approval." The Notice of Debarment proposed prohibiting Rapiscan from doing any future business with the U.S. Government.

47.     *Second*, Rapiscan was accused of fraud in connection with a $325 million contract awarded in 2010 (before the first scandal was exposed) by the TSA for checkpoint baggage and parcel scanners (the "2010 Contract"). On November 20, 2013, the TSA issued Rapiscan another show cause letter regarding Rapiscan's use of unapproved components for the scanners, concluding that Rapiscan "***provided false or misleading information to the Government***," which "was a sufficient independent basis for TSA to terminate" the contract. As a result, the TSA canceled the $67 million 2010 Contract on December 4, 2013. Thereafter, OSI issued a press release

admitting that the component change "did not meet the contractual requirement of obtaining TSA's approval in advance."

### 2. OSI Moves Defendant Mehra to S2 After the U.S. Government Demands His Removal from Rapiscan

48.     Defendants' repeated scandals with the U.S. Government had serious implications for the Company. A debarment from the DHS would prevent OSI from contracting with the U.S. Government in the future, jeopardizing hundreds of millions of dollars in Company revenue. To avoid this outcome, OSI made several concessions to the U.S. Government, including the removal of Defendant Mehra as President of Rapiscan and the imposition of extensive compliance requirements.

49.     As discussed above, Mehra was Rapiscan's President during the time it repeatedly misled the U.S. Government. According to CW 1, the TSA saw Defendant Mehra as "slick," "not trustworthy," a "PNG" or *persona non grata*, and not willing to meet government compliance requirements.[4] CW 1 also noted that, in conversations between CW 1 and the TSA after the misconduct occurred, the TSA often asked CW 1 whether Defendant Mehra, specifically, had been involved in any way with the contract because the TSA did not trust Mehra and believed that he was not willing to satisfy contract compliance requirements, and that he would push non-compliance forward. Thus, the TSA did not want Mehra involved in any TSA contracts after the threat of debarment and pushed to have Mehra terminated.

50.     CW 1 explained that the Company agreed to terminate Mehra as President of Rapiscan as part of a consent decree with the TSA. Instead of removing Mehra from OSI altogether, however, and despite the allegations of fraud at Rapiscan under his watch—in 2014 OSI **promoted** Mehra to **President of S2 Global**. In this position, Mehra would oversee the Company's all-important turnkey solutions business—which Defendant Edrick called "one of the most exciting areas within our

---

[4]     "*Persona non grata*" means an unacceptable or unwelcome person, and is typically used to indicate a person who is prohibited from entering a location.

Security business[,]" an area that "really significantly transformed our overall financial [situation]," the "number one" "biggest growth opportunit[y] for us in Security[,]" and "a tremendous opportunity for us." In short, rather than terminating Mehra for spearheading multiple schemes, OSI put him in charge of one of the most important businesses in the Company—one which the Company told investors was going to fill the revenue hole and credibility gap created by those schemes.

51. In addition to "removing" Defendant Mehra, OSI was subjected to additional compliance requirements that further burdened OSI's business in the U.S. In particular, OSI entered into a 30-month administrative agreement ("Administrative Agreement") with the DHS whereby the Company agreed to certain compliance upgrades and organizational improvements, made certain personnel changes, and created additional positions dedicated to compliance and quality assurance.

52. More specifically, the Administrative Agreement required Rapiscan to "maintain a self-governance program that includes compliance programs for internal controls, designed for the effective monitoring and auditing of contracts and grants, and a business ethics program that covers all employees." It also required Rapiscan to "maintain a robust and functional program that includes business ethics compliance programs, and internal controls to ensure that Rapiscan effectively monitors, audits, and communicates about its compliance and ethics obligations and its commitment to the highest standards of integrity and transparency." Additionally, the reporting requirements required that Rapiscan "submit a written report to DHS describing the measures taken by Rapiscan during the semi-annual period to implement the business ethics program and to ensure compliance with [the] Agreement."

### 3. Rapiscan's Traditional Business Struggles After Its Regulatory Problems with the U.S. Government

53. Despite narrowly avoiding total disbarment, leading into the Class Period, OSI's misfeasance was taking a serious toll on the Company's core Security business. According to CW 2, the Company's actions in connection with the U.S.

Government contracts were "grossly unethical," ultimately cost the Company millions of dollars, and had a major effect on sales, operations, and morale. Indeed, the combined value of the two contracts TSA suspended was $498 million.

54.     Moreover, as the misconduct relating to the U.S. Government was playing out, the Company's body scanners were losing competitive edge and market share and becoming backlogged. As Defendant Edrick summarized, "So if you go back for our last four, five conference calls, we've been telling everybody about body scanners we haven't sold any units over the last two years. ***So the great growth that we had in Security in 2011 and 2012 lot of people thought it came from body scanners. It didn't, we didn't sell any units in those periods. And we said further that we don't expect to be selling any body scanners to the TSA going forward.***"

55.     The U.S. Government problems also threatened OSI's reputation and sales, including future U.S. Government contracts. For example, Oppenheimer commented that "[t]he risk is that the probe metastasizes into something bigger, threatening Rapiscan's reputation, broader TSA business (estimated at 5-10% of revenue), and US certification of the new RTT product." Likewise, Stephens reported that "[t]he greater concern . . . is the reputational harm caused by the missteps with the TSA, which is strong reference customer for international sales efforts. That reputational impact will be difficult and take time to assess."

56.     Further compounding the fallout from the Company's efforts to mislead the U.S. Government, Rapiscan's TSA contracts had been procured under a temporary stimulus package set to expire. Specifically, in the aftermath of the 2008-2009 financial crisis, Congress enacted the American Recovery and Reinvestment Act of 2009 to provide temporary stimulus funding for government agencies, including the DHS, who purchased security equipment from Rapiscan. According to CW 2, prior to the Company's issues with the U.S. Government, Rapiscan had received a "bump" in its sales due to the ARRA, which was set to expire.

57.    Due to all of these negative factors, between 2013 and 2015, the Company laid off employees in multiple rounds. In 2013, according to CW 2, there were at least three rounds of layoffs. In 2015, according to CW 1, the Company laid off several members of senior leadership who had been hired to try to regain the TSA's confidence in Rapiscan.

**B.    As OSI's Traditional Business Stagnates, OSI Touts S2's Turnkey Business As the Key to the Company's Future**

58.    In early 2013, as OSI's core Rapiscan Security business in the U.S. floundered, OSI shifted its focus to its second business model in the Security division—turnkey solutions. Defendant Edrick described this shift at a February 26, 2013 Morgan Stanley Technology, Media & Telecom Conference, stating: "*[o]ne of the areas that we've really been trying to grow is our turnkey business.*" Likewise, at the June 4, 2013 Stephens Spring Investment Conference (the "June 4, 2013 Conference"), Defendant Edrick touted that the Company's Security business "has been growing significantly and *we've been transforming our business model . . . with some new turnkey services*, which has led to some significant operating margin expansion, not only within the Security division but all of OSI."

59.    According to Defendants, the turnkey model differed from OSI's traditional equipment sales business. Under its turnkey model, OSI's customer did not buy or own the security equipment but instead paid a subscription or pay-as-you-go plan such as a per scan fee. By contrast, under OSI's traditional model, OSI simply sold security equipment to a customer, who then owned the equipment.

60.    According to Defendants, a standard turnkey contract works as follows: Rapiscan manufactures the requested product (i.e., scanners, equipment, installations) and sells it to S2, who installs it at the customer's location. While OSI continues to own the equipment—i.e., it still appears on OSI's balance sheet—the customer has the right to use it. OSI then presents the customer with a number of add-on services, including design and construction of the security checkpoint site(s), installation of the

equipment at the site(s), selecting, training, and managing the personnel operating the site(s), operation of the equipment, and maintenance and security of the site(s).

61.     Defendants hailed the turnkey model as the Company's most critical business opportunity. As Defendant Edrick stated at the March 11, 2014 ROTH Capital Partners Conference (the "March 11, 2014 Conference"), "***Turnkey . . . we view it as perhaps our largest growth opportunity***." Likewise, at a May 14, 2014 Oppenheimer Industrials Conference, Defendant Edrick stated, "[I]f you look at the Security business, I'd say the three biggest growth opportunities for us in Security would be***, number one would be Turnkey. That's a tremendous opportunity for us***."

62.     Additionally, Defendants repeatedly touted OSI as a "pioneer" in the turnkey industry—being the first of its competitors to offer the service and the only Company in the world to obtain three such contracts. Indeed, throughout the Class Period, Defendants consistently boasted that the Company had "***100% market share***" of the turnkey security business. As Defendant Edrick explained at a March 4, 2014 Morgan Stanley Technology, Media and Telecom Conference:

> [R]eally, ***what's been driving the growth over the past year has been largely dominated by our turnkey security solutions. We pioneered this area***….There's only been three contracts of this type awarded to the world. And to date, well, we've won all three. So today, ***we have 100% market share in that area***.

63.     Similarly, at a Jefferies Global Industrials Conference on August 14, 2014, Defendant Edrick stated: "[T]here have been three contracts awarded in the world. ***So, right now, we're batting a thousand, and we think that first mover advantage is going to lead to substantial capturing of future business going forward . . . .***"

## C.     OSI Touts the Purported Benefits of the Turnkey Model

64.     In addition to assuring the market that the Company's turnkey business would drive growth, Defendants also boasted that the turnkey model had numerous purported advantages that would result in a strategic edge over OSI's competitors.

For instance, Defendants repeatedly emphasized that turnkey contracts generate higher profit margins than standard equipment contracts for the Company. According to CW 1, OSI considered its turnkey contracts to be "cash cows."  Although the Company deliberately refused to disclose the exact margins it was seeing on these contracts during the Class Period, Defendants repeatedly represented to the market that OSI's turnkey margins were "*significantly above our corporate average or our Security division average. [And] they are very, very favorable*."

65.    Additionally, Defendants praised the turnkey contracts as providing a consistent long-term and recurring revenue stream. As Defendant Edrick stated during a February 8, 2017 conference, the turnkey model "has been extraordinarily successful for us. . . *It's a nice revenue, higher margin business for us of a recurring nature*."  Similarly, at the March 11, 2014 Conference, Defendant Edrick stated that "[t]he new turnkey revenues is really an exciting business model in order to have *recurring revenues* as substantially higher margins makes a big impact for us and *gives us a great deal of visibility as we look forward*."

**D.    After Repeatedly Hyping the Turnkey Business, the Market Pressures Defendants For A Third Turnkey Contract**

66.    Before the Class Period, OSI had secured only two turnkey contracts— one in Puerto Rico in 2010 and another in Mexico in 2012.  Given Defendants' repeated representations that turnkey would drive future growth, analysts began pressing Defendants on new turnkey deals to demonstrate that the new model was sustainable. Defendants insisted that new turnkey opportunities were on the horizon. For instance, in a February 13, 2013 report, Oppenheimer recounted discussions with OSI management, stating:

> Turnkey solutions. ***OSIS continues to work on approximately half a dozen potential deals.*** Sales cycles remain long and render the timing of deal closings unpredictable. But OSI believes the competitive differentiators that allowed it to win PR/Mexico still hold and will allow it to add an average of at least one incremental deal a year.

---

67.    Similarly, a month after OSI lost a contract with the TSA, at a February 26, 2013 conference, Defendant Edrick stated:

[T]here is a customer set out there that is very interested in the turnkey. So *we're pursuing additional turnkey opportunities. They are generally longer sales cycles, but we're working through those, some of those we've been working on for some time and I think we're going to see some nice rewards and in the future.*

68.    As a result of these promises, analysts expected to see a turnkey contract within the year. In a May 9, 2013 report, for example, CRT Capital Group stated "*New turnkey win expected this calendar year.* We would expect it to be bigger than Puerto Rico on a revenue generating basis . . . ." Likewise, at the June 4, 2013 Conference, Stephens analyst Timothy Quillin ("Quillin") asked about future turnkey opportunities: "[C]an you talk about the turnkey services business both in Puerto Rico, maybe how Puerto Rico helped you win Mexico and then maybe how Mexico *might help you win the next project?*"

69.    Defendants' promise of a new turnkey contract assuaged analyst concerns about the Company's struggling Rapiscan business. For instance, Stephens commented in a March 27, 2013 report that "Dysfunction in the U.S. Government procurement process and economic sensitivity internationally has resulted in longer sales cycles in the Security business[,]" but highlighted "opportunities for new turnkey contracts[.]" Similarly, in an August 14, 2013 report, Stephens expressed optimism about OSI's turnkey prospects, stating "[t]urnkey pipeline still looks good, we think. The Company's pipeline of turnkey contracts has grown over the past few months, and management remains optimistic about the prospects of another turnkey award by the end of the calendar year." In short, with its Rapiscan business faltering and its credibility under scrutiny, the Company desperately needed another turnkey win to convince the market that its turnkey business would reduce dependence on the U.S. Government and drive growth in its key Security division.

**E.** **Defendants Mislead Investors about OSI's New Turnkey Contract in Albania and Overall Success of the Turnkey Business While Concealing Material Facts**

70.     The Class Period begins on August 21, 2013 when the Company announced its highly anticipated third turnkey contract in Albania. In an August 21, 2013 press release entitled, "*OSI Systems Receives a Fifteen-Year Agreement to Provide Turnkey Screening Services in Albania*," the Company announced that "[the] Government of Albania has awarded its Security division, Rapiscan Systems, a fifteen-year contract to provide turnkey cargo and vehicle security screening services at various sites throughout the country." The Company touted that it expected total gross revenues from the Albanian contract to "*range from $150 million - $250 million over the term of the agreement*."

71.     As discussed below, throughout the Class Period, Defendants made a series of false and/or misleading statements and/or omissions of material fact concerning OSI's Albanian turnkey contract, its turnkey business generally,  and the Company's ownership interest in the Albanian subsidiary that held the rights to the Albanian contract.

**1.** **Defendants Misleadingly Promote the Albanian Contract as Proof of the Turnkey Model's Success**

72.     Immediately upon announcing the Albanian contract, Defendants hailed the deal as proof that the Company's turnkey model was a success. For instance, in the August 21, 2013 press release, Defendant Chopra stated:

> *This significant award from Albania to provide turnkey screening services* builds upon similar long-term agreements awarded by the Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive *turnkey screening services continues to be well received in the marketplace.*

73.     In the same press release, Defendant Mehra represented that "[t]he Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud *to have been*

*selected* to execute this critical program. ***Our selection reinforces the attractiveness and compelling value of our turnkey service model***."

74.     Throughout the Class Period, Defendants continued to tout the Albanian deal as proof of the sustainability of the turnkey model. At the Company's January 28, 2014 conference call for the second quart of fiscal year 2014 ("2Q14") (the "January 28, 2014 Conference Call"), Defendant Edrick highlighted that the Albanian contract validated the turnkey model: "Although this new 15-year contract is not expected to contribute much to the top line in fiscal '14, we expect that it could contribute more substantially in fiscal '15 and beyond and ***further validates the increasing acceptance of this model in the global market for security screening solutions***." Likewise, on the same call, Defendant Chopra boasted: "***[a]fter winning the new turnkey services contract earlier this year in Albania, we have clearly established our leadership in growing this particular service segment[.]***."

### 2.     Defendants Continue to Misleadingly Tout the Progress of the Albanian Contract and the Turnkey Business Overall

75.     In the months following the announcement of the Albanian contract, Defendants repeatedly trumpeted the progress of the Albanian contract, creating the misleading impression that the Albanian contract faced no impediments and would soon generate considerable revenues.    For instance, at the January 28, 2014 Conference Call, Defendant Edrick stated: "***[W]e have been busy preparing to go live before fiscal year end for our latest turnkey contract award*** in ***Albania***." On the same call, Defendant Chopra stated: "***I should mention here that the build-out phase for the Albanian turnkey services project is well underway, and we're happy to announce that it'll start generating revenues before the end of the fiscal year***."

76.     Defendants continued to make similar statements in 2014. Defendant Edrick confirmed the progress of the Albanian contract at a March 4, 2014 Morgan Stanley Technology, Media and Telecom Conference, stating that, "***Albania, we're ramping up as we speak.***" Edrick reiterated this status update on at the March 11,

2014 Conference, stating "*[a]nd most recently earlier in our fiscal year, we sold our third deal in Albania, which we're ramping up right now. So very, very exciting for us. It's really changed our profile significantly.*" Likewise, on an April 30, 2014 conference call ("April 30, 2014 Conference Call"), Defendant Chopra emphasized: "[r]egarding Albania, we are making progress and we are on track. But I don't think so there will be any contribution in revenue in Q4. But we are moving on target. We're working diligently with it and looking forward to 2015."

77.     Defendants also repeatedly boasted about the performance of OSI's turnkey business overall.  For example, during an April 27, 2016 Conference Call, Defendant Chopra proclaimed that "*[o]n the turnkey services front, Mexico, Puerto Rico and Albania turnkey screening service contracts continue to perform well and we continue to add new opportunities to the turnkey pipeline.*" Similarly, on an August 16, 2016 conference call, Chopra emphasized that the turnkey "*market represents a key growth driver for us going forward  . . . we believe we are in excellent position to capture additional turnkey services opportunities.*"

### 3.     Defendants' Statements Knowingly Conceal Corrupt Arrangements Underlying the Albanian contract

78.     Unbeknownst to investors, Defendants' statements were highly misleading in that the Albanian contract neither "reinforce[d] the attractiveness" of the turnkey model nor was it "ramping up" without a problem. To the contrary, Defendants concealed, *inter alia*, that: (i) the Albanian contract was subject to a secret arrangement whereby OSI sold 49% of its Albanian subsidiary that held the rights to the $150 to $250 million Albanian contract to a suspicious holding company owned by an Albanian doctor for only $4.50; (ii) OSI was not entitled to all of the contracts profits, as it had entered into a secret "profit share" arrangement with the doctor's company; and (iii) the 49% transfer occurred under suspicious circumstances the same week that the outgoing Albanian government (who had given OSI extremely favorable terms on the contract) left office.

a.   **Unbeknownst to Investors, Defendants Sell Nearly Half of OSI's Rights to the Albanian Contract Entity**

79.   According to the May 10, 2013 Official Gazette of the Government of Albania(the "May 10, 2013 Official Gazette"), on April 10, 2013, Rapiscan officially entered into a turnkey contract with Albania's Ministry of Finance for the financing, establishment, and operation of scanning services for containers and other vehicles. The contract was signed by then-President of S2 Global, Fleming, and then-Minister of Finance, Ridvan Bode, a member of the Albanian Democratic Party. According to S2 Albania's Historical Register, on May 22, 2013, OSI, through Rapiscan, registered an Albanian corporation, S2 Albania, to accept the rights and obligations of the contract. According to S2 Albania's "Articles of Association" signed by Fleming and dated March 19, 2013, the entity was formed for the "execution of the concession agreement, as well as any other activity related to such matter, or required in order to fulfill it."

80.   Unbeknownst to the market, on August 30, 2013, Minister of Finance Ridvan Bode—the member of the Democratic Party who signed the Albanian contract—approved a sale of 49% of S2 Albania to an Albanian entity called ICMS. Under the Albanian contract, OSI was required to obtain government approval for the transfer of more than 25% of S2 Albania. On September 6, 2013, Defendant Mehra— who also oversaw the prior misconduct at Rapiscan—authorized the sale of 49% of S2 Albania to ICMS. More specifically, on September 6, 2013, Mehra signed a Power of Attorney in Los Angeles explicitly authorizing an Albanian attorney named Endrit Shijaku ("Shijaku") to "carry out the [] sale" of S2 Albania to ICMS "for 490 Albanian lekë" (the equivalent of *$4.50*), sign the contract transferring 49% of S2 Albania to ICMS, and execute any necessary steps to complete the sale.  Below are the relevant portions of the Power of Attorney, a full copy of which is attached hereto as Exhibit A:

Mr. Endrit Shijaku, born on 6 June 1974 resident in Tirana, holder of the Albanian ID No. 032276700, (the "**Representative**"

to represent the Company in relation to the sale to ICMS of 490 quotas (only) that the Company holds (amongst others) in S2 Albania shpk a company established under the laws of the Republic of Albania registered with the commercial register held by the National Registration Centre under NIPT: L31722010Q (the "**Sale**").

The Representative has the power to carry out the above mentioned Sale of quotas for a purchase price that is equal to 490 Albanian leke.

The Representative shall have the power to conclude any contract and take and steps make any filings that may be required in order to complete the above described Sale and register it with the Albanian National Registration Centre.

Z. Endrit Shijaku, lindur me 6 Qershor 1974, ne Tirane banues ne Tirane mbajtes i Leternjoftimit ID me Nr. 032276700, "**Perfaqsuesi**"):

te perfaqsoje Shoqerine ne lidhje me shitjen tek ICMS te 490 kuotave qe Shoeria zoteron ne shoqerine S2 Albania nje shoqeri e themeluar sipas se drejtes se Republikes se Shqiperise e regjistruar ne regjistrin tregtar te mbajtur nga Qendra Kombtare e Regjistrimit me NIPT: L31722010Q (me poshte referuar si "**Shitja**")

Perfaqesuesi k ate drejten qe te beje shitjen e kuotave te mesiperme per nje cmim te barabarte me 490 leke shqiptare.

Perfaqesuesi ka te drejte te lidhe cdo kontrate dhe te ndermarre cdo hap apo te beje cdo kerekse qe mund te jete e nevojshme per te perfunduar. Shitjen e pershkruar me larte dhe per ta regjistruar ate prane Qendres Kombtare te Regjistrimit ne Shqiperi.

---

The representative has also the right to:

effect all such action as they deem necessary or useful for the above as well as receive declarations and documents including forms; the Representative is authorized and shall have the right to effect all payments and fees for such registrations.

All acts performed by the Representative pursuant to this power of attorney shall be considered valid and regular as if conducted by the Company itself.

For the Company:

Ajay Mehra, Director
Rapiscan Systems, Inc.

Perfaqsuesi ka gjithashtu te drejte te:

kryeje te gjitha veprimet e nevojshme apo te dobishme lidhur me sa me siper si dhe te marre ne dorezim deklarata dhe dokumenta duke perfshire dhe formulare; Perfaqesuesi eshte I autorizuar dhe ka te drejten te kryeje te gjitha pagesat e likuidoje te gjitha detyrimet e tarifat per keto regjistrime.

Te gjitha veprimet e kryera nga perfaqsuesi sipas kesaj prokure konsiderohen te vlefshme dhe te rregullta si te ishin kryer nga vete Shoqeria.

Per Shoqerine

Ajay Mehra, Director
Rapiscan Systems, Inc.

81.     Pursuant to Defendant Mehra's instructions, on September 16, 2013, Shijaku secretly signed the formal contract for the sale of 49% of S2 Albania to ICMS for approximately $4.50. As Defendants later admitted following the MWR Report, S2 Albania also entered into an undisclosed "profit shar[ing]" agreement with ICMS relating to the Albanian turnkey contract.

82.     Below is a copy of the relevant portion the sale contract reflecting the purchase price, a full copy of which is attached hereto as Exhibit B:

### QUOTA PURCHASE AND SALE CONTRACT

THIS CONTRACT (the "Contract") dated 16.09. 2013 is made among:

Rapiscan Systems Inc, with its registered seat at 2805 Columbia Street, Torrance, California 90503 (the "Seller"), represented through Power of Attorney by Endrit Shijaku; and

Inspection Control & Measuring Systems Sh.p.k., a company organized under the laws of Albania with registration number K81902014E with offices located at R. Kongresi Lushnjes, Tirane, Albania ("ICMS") represented by its administrator ≥ Oli teein       (the "Purchaser").

### ARTICLE I - DEFINITIONS

Section 1.01.     Definitions

Wherever used in this Contract, unless stated otherwise or the context otherwise requires, the following terms shall have the following meanings:

| "Quota" | means each of the quotas of the Company with a nominal value of ALL 1 each. |
| "Company" | means S2 Albania shpk a company established under the laws of the Republic of Albania registered with the commercial register held by the National Registration Centre under NIPT: L31722010Q. |
| "Leks" or "ALL" | means the lawful currency of the Republic of Albania. |
| "Purchase Price" | means ALL 490 (four hundred ninety leke). |

### ARTICLE II - PURCHASE AND SALE OF THE QUOTAS

Section 2.01.     Purchase Price

The Seller hereby sells to the Purchaser and the Purchaser hereby purchases from the Seller 490 Quota in the Company with a total nominal value of ALL 490 representing 49% of the entire registered capital of the Company in consideration for the Purchase Price ("Target Quotas").

For the avoidance of doubt, the Seller shall – upon registration of the above sale - continue to hold the 510 quotas in the Company with a nominal value of ALL 510 representing 51% of the Quotas of the Company.

83.     According to S2 Albania's Historical Register, on September 19, 2013, OSI completed the transfer of the 49% ownership in S2 Albania. Below is the relevant excerpt of S2 Albania's Historical Register, reflecting the 49% transfer.

### HISTORIKU I REGJISTRIMIT

| Data e regjistrimit | Ndryshimi i te dhenave te regjistruara |
|---|---|
| 19/09/2013 | Numri i ceshtjes: CN-194966-09-13<br>Arsyet e hapjes se ceshtjes: Depozitimi i Kontrates se Shitjes se 49 % te kuotave nga shoqeria "Rapiscan Systems, Inc" ne favor te shoqerise "ICMS" sh.p.k , date 16.09.2013.<br><br>*Kane ndodhur ndryshimet e meposhtme tek ortaket juridik:*<br>*eshte shtuar ortaku:*        *("ICMS")*              *Numri i aksioneve "490,00*<br>*Perqindja ne kapital "49,00          Kontributi ne para "490,00*<br>*Kane ndryshuar te dhenat per          ("Rapiscan Systems, Inc")          , Vlera e*<br>*Kontributit ishte          ("1.000,00")        u be        ("510,00")*<br>*Kane ndryshuar te dhenat per          ("Rapiscan Systems, Inc")          , Përqindja*<br>*e Kapitalit ishte          ("100,00")        u be        ("51,00")*<br>*Kane ndryshuar te dhenat per          ("Rapiscan Systems, Inc")          , Numri i*<br>*aksioneve ishte          ("1.000,00")        u be        ("510,00")* |

84.     According to ICMS's Historical Register, at the time of the transfer, ICMS's sole shareholder was Peçini. Below is the relevant excerpt of ICMS's Historical Register:

| | | aktiviteti. | |
|---|---|---|---|
| 10. Administratori/ët | | Olti Peçini | |
| 10.1 Afati i emërimit | | Nga: 07/09/2010 | Deri: 31/12/2020 |
| 11. Procedura e emërimit nëse ndryshon nga parashikimet ligjore | | | |
| 11.1 Kufizimet e kompetencave (nëse ka) | | | |
| 12. Ortakët | | OltiPeçini | |
| 12.1 Vlera e kapitalit | | Para: 70.000.000,00 | Natyre: |
| 12.2 Numri i pjesëve | | 100,00 | |
| 12.3 Pjesëmarrja në përqindje (%) | | 100,00 | |
| - Të përfaqësuarit, (Plotësohet vetëm nëse zotëron kuotën si përfaqësues) | | | |

85.     Peçini is an Albanian dentist, according to a list published by "Rreth Shendetit Publik" (an Albanian public health organization).[5] He has owned several companies in Albania, including a cleaning service and an insurance brokerage, according to searches on Albania's National Business Center. He also founded the Salus Hospital in Tirana, Albania, according to the Salus Hospital website.[6] But he had no reported experience in providing security services on par with the Albanian contract. Indeed, Peçini's only ostensible connection to the Albania turnkey contract was his relationship with then-Prime Minister Berisha (a doctor himself), who— according to a January 14, 2012 press release by the Albanian Council of Ministers titled "PM Berisha attends inauguration of Italian-Albanian SALUS hospital"— attended and spoke at the inauguration of the Salus Hospital founded.  At the time of the 49% transfer, records show that ICMS appears to have lacked any material assets aside from its ownership of S2 Albania. According to ICMS's fiscal year 2013 financial statements, ICMS had liabilities that exceeded its less than one million dollars in assets and was operating at a loss of over $100,000.

86.     Although Peçini only paid $4.50 for a 49% stake in the lucrative S2 Albanian contract entity, he used his stake in S2 Albania to immediately secure a €1.9 million loan. More specifically, according to a Pledge Agreement dated December 7, 2013, Peçini pledged 49% of ICMS's shares for a €1.9 million loan from the National Bank of Commerce sh.a. According to a the Decision of the General Assembly of ICMS issued on December 11, 2013, ICMS's credit agreement with the National Bank of Commerce sh.a. prohibited ICMS from selling its shares in S2 Albania without approval from the National Bank of Commerce sh.a.

---

[5]     Available     at     (http://shendetipublik.com/al/wp-content/uploads/bsk-pdf-manager/34_lista_e_stomatologeve_me_te_dhena.pdf).

[6]     Available at (http://www.salus.al/rreth-nesh/#vizioni).

**b.** **Defendants Conceal the Corrupt Arrangement of the Albanian Contract that Secured Highly Favorable Terms for the Company**

87.     In addition to concealing their sale of half of the entity with the rights to the Albanian contract, Defendants also concealed various indicia of corruption that permeated the history of the Albanian contract, including special favors, a non-competitive bid, and approval of the transfer of 49% of S2 Albania by the outgoing Albanian government, *only days before the new government took office*.

88.     In particular, OSI was pursuing the Albanian contract since at least late 2011 when Albania was governed by the Democratic Party, led by then-Prime Minister Berisha—a cardiologist and professor in the Faculty of Medicine at the University of Tirana (in the same city as the hospital founded by Peçini ). Almost immediately, OSI began receiving favorable treatment from Albania's government. As first reported by MWR in its December 6, 2017 report exposing certain details surrounding the Albanian turnkey contract, on November 11, 2011, Berisha's government granted OSI an *8% bonus on its bid*—thereby giving OSI a significant advantage against any potential competitors. More specifically, a decision of the Council of Ministers of the Government of Albania signed by Berisha awarded a "bonus of 8% for the technical and financial result in the procedure selective bidding (unsolicited proposal)."

89.     In 2012, the Albanian government issued a request for proposal for the Albanian contract, according to the May 10, 2013 Official Gazette. However, several previously untranslated Albanian reports—which were only reported in Albania, in Albanian, and remained unknown to market analysts and investors until the December 6, 2017 MWR Report—evidence signs of collusion. For example, according to a September 19, 2014 *Monitor* (an Albanian language publication) article entitled "'Rapiscan' requires the revocation of recommendations for scanning

of containers, Competition revokes it,"[7] the Albanian Competition Authority concluded that the bid was not a public tender where bidders were on the same footing. Additionally, in a November 26, 2014, *Gazeta Telegraf* article titled "Brace: Berisha laments, the energy price will not be over 10 ALL," Erion Brace—a member of the Socialist Party in the Albanian Parliament—argued that the money of the Albanian contract went into the pockets of Berisha and the ministers who signed the contract. Moreover, at a July 7, 2015 meeting of the Albanian Committee for Economy and Finances, Brace criticized the contract because OSI's bid was the only offer.  As MWR later reported on December 6, 2017, OSI originally proposed a €32 scanning fee, yet the Democratic government inexplicably awarded Rapiscan a contract with a €39 scanning fee, and agreed to pay the scanning fee to OSI for *all* customs declarations, even if OSI did not scan them.

90.    In June 2013, Berisha's party lost power and began transitioning to a new administration. On September 6, 2013, Defendant Mehra approved the sale of 49% of S2 Albania to ICMS and the contract was signed on September 16, 2013— ***within days*** of the departure of the Berisha government.

91.    Unbeknownst to investors, immediately after Berisha's departure from Office, the newly-elected government denounced the contract. By June 2014, the Albanian Competition Authority recommended the revision of the contract. Business opposition by this time was also considerable due to the extremely high service fee, according to a July 13, 2015 *Monitor* article titled "New 'Tax' on Customs" (the "July 13, 2015 Article").

92.    As a result of this opposition, the new government refused to implement the contract and attempted to unilaterally terminate it, according to the July 13, 2015 Article. Meanwhile, Defendants continued falsely touting the progress of the

---

[7]    Originally titled: "'Rapiscan' kërkon revokimin e rekomandimeve për skanimin e kontejnerëve; Konkurrenca e rrëzon."

Albanian contract, in June 2014, stating "*in Albania, similarly, the construction is ongoing, which is our latest deal, as well as the equipment*."

93.     None of these facts were disclosed to investors.  To the contrary, when Defendants disclosed in late-August 2014 that the Albanian government was "halting further progress" of the turnkey contract, they continued to knowingly conceal the true facts and corrupt history of the deal, including the 49% transfer and profit-sharing agreement with ICMS.

### 4.     Defendants Mislead Investors Regarding the Suspension of the Contract

94.     By August 2014, OSI's troubles in Albania were still entirely unknown in the United States, including by investors, analysts and U.S. media. On August 25, 2014, Defendants cryptically informed investors of the Albanian government's decision to suspend the contract, stating that:

> Last year, we announced a 15-year contract that we received from the government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country of Albania. *Unfortunately, we recently learned that the customer, the Albanian newly elected government, has halted further progress on the contract and put into doubt the continuation of the program. The program had been proceeding smoothly and ahead of schedule. We intend to strongly enforce our contractual rights and hope to reach an amicable outcome. I would also note here that no revenues from Albania are included from this contract in the revenue guidance we are providing for fiscal 2015. You can understand that, under the circumstances, we cannot comment further at this time.*

95.     Additionally, OSI's Form 10-K for fiscal year 2017 further stated that "in August 2013, we announced a 15-year contract award from the Government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country. *We were recently notified that the Government of Albania has halted further progress on the contract. We have begun proceedings to protect our legal rights.*"

96.     Defendants' statements were highly misleading, in that they led investors to believe that the contract had simply been halted by a change in power in

---

CONSOLIDATED CLASS ACTION COMPLAINT                                                           33
CASE NO. 2:17-CV-08841-SVW-AGR

Albania, rather than as a result of corruption in the procurement of the Albanian contract and the secret arrangement with ICMS and Peçini. Indeed, Defendants continued to conceal, *inter alia*: (i) their 49% transfer of S2 Albania to Peçini  who was associated with the outgoing Albanian administration for $4.50; (ii) the Company's joint venture and profit-sharing agreement with ICMS; (iii) the 8% bonus and more favorable contract terms that Berisha inexplicably awarded the Company during its bid; (iv) accusations reported in Albania that the Company's bid had been collusive; and (v) the undisclosed opposition to the deal due to allegations of corruption. Moreover, because all of these facts and accusations were partially reported only in Albania (and in Albanian), OSI's investors remained completely in the dark.

**5.** **OSI Obtains a Less Favorable Contract Through Arbitration**

97.     Unable to proceed under the contract, OSI brought an action against the Government of Albania before the International Court of Arbitration. On April 28, 2015, OSI settled the case under less favorable contract terms, to be effective by October 31, 2015, according to Law No. 75/2015 of the Assembly of the Republic of Albania.

98.     Under the renegotiated contract, OSI's payment terms were contingent on the amount of each customs declaration. For example, for all customs declarations over 1,000 euros, OSI would be paid a scanning fee of 22 euros—i.e., 17 euros or approximately 44% less than the fee in the original contract. Moreover, for customs declarations under 1,000 euros, Albania would charge a fee of 5 euros.  On June 5, 2015, the Council of Ministers of Albania submitted the renegotiated concession to the Albanian Assembly, and stated that the value of the contract had been reduced from approximately 316 million euros to 210 million euros, according to a December 12, 2017 Lapsi article titled "The scan concession crashes Ball with Berisha" (the December 12, 2017 Article")—a difference of 106 million euros.

99.   As MWR later revealed in its December 6, 2017 report, previously untranslated Albanian reports pointed to the contract as evidence of collusion and corruption with the former government, and highlighted the exorbitant fees to be imposed under the contract. A July 7, 2015, Pamfleti Online article called the Albanian contract a "Mafia of scanning concession," while Ora News published in Albanian a television news program called "Rapiscan, Theft of the Century" referring to the Albanian contract.[8]

100.   Until the MWR Report was published, however, neither analysts nor investors were aware of the material facts concealed by Defendants. Indeed, it was not until MWR undertook a comprehensive investigation, including hiring investigators, obtaining documents directly from Albania, translating previously undisclosed Albanian reports, and piecing together the ties between these many scattered and obscure pieces of information, that these previously undisclosed facts were revealed to OSI investors.

### 6.   OSI Announces the Reinstatement of the Albanian Contract, and Defendants Continue to Mislead Investors

101.   When Defendants announced the reinstatement of the Albania deal, Defendants continued to mislead investors and deliberately conceal the secret arrangement with ICMS and the corruption underlying the contract. More specifically, on October 13, 2015, OSI issued a press release (the "October 13, 2015 Press Release") announcing that "*the Company has commenced the operations phase with the Government of Albania to provide turnkey cargo and vehicle security screening services at multiple sites throughout the country. The Company currently anticipates total revenues to be approximately €200 million over the multi-year term of the agreement*."

---

[8]      Originally titled: "Rapiskan, vjedhja e shekullit."

102.   Similarly, during an October 29, 2015 conference call, Defendant Edrick touted "*Albania we expect to be fully ramped during the course of this fiscal year. It's moving up at a nice pace and we think will enter fiscal 2017 at a full ramp rate. So we are very pleased with the progress that we are making in Albania.*" Defendant Edrick highlighted that the Albanian contract was worth $10-$15 million a year, stating, "*We also note that Albania is expected to ramp in FQ3'16 (March). This contract is expected to generate $10M-$15M in recurring annual revenue.*"

103.   As fiscal year 2016 drew to a close, the Company continued to tout the Albanian contract as driving the Security division's performance and making up for poor performance in its other business segments. For instance, the Company's Form 10-K for fiscal year 2016 reported:

> Fiscal 2016 Compared with Fiscal 2015. Revenues for the Security division decreased 15% primarily as a result of a $66.4 million reduction in revenues associated with a Foreign Military Sale contract with the U.S. Department of Defense . . . This decrease was partially *offset by revenues from the commencement of our turnkey scanning operation in Albania during the year*.

104.   Likewise, the Company's Form 10-K for fiscal year 2017 represented:

> Fiscal 2017 Compared with Fiscal 2016. *Revenues for the Security division increased primarily as a result of increased sales of cargo and vehicle inspection systems . . . and increased revenue from turnkey scanning operations as a result of a full year of operations in our Albanian program, which commenced in the second quarter of fiscal 2016*, and our expanded operations within our Mexican program, which added several sites in the fourth quarter of the current year.

105.   At the same time, Defendants continued to conceal the hidden arrangement with ICMS, including the 49% transfer and profit sharing agreement.

### 7.   Defendants Falsely Represent That OSI Owns S2 Albania in Its Entirety

106.   Defendants went to great lengths to conceal their joint venture with ICMS from investors. This was crystallized in the offering documents for the Company's issuance of $250 million in OSI Bonds. In Exhibit 1.1 to the Purchase

Agreement for the notes, OSI explicitly represented that it fully owned all of the shares of each Subsidiary, stating:

> *Except as otherwise disclosed in the General Disclosure Package and the Final Offering Memorandum, all of the issued and outstanding capital stock of each Subsidiary has been duly authorized and validly issued, is fully paid and non-assessable and is owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity*. None of the outstanding shares of capital stock of any Subsidiary was issued in violation of the preemptive or similar rights of any securityholder of such Subsidiary . . . *The only Subsidiaries of the Company are the subsidiaries listed on Schedule D hereto*.

107.   Schedule D of the Purchase agreement listed S2 Albania (Albania) as a wholly owned "Subsidiary." Nowhere in the Purchase Agreement did OSI disclose anything about the secret arrangement with ICMS or its 49% interest and profit-sharing rights in S2 Albania.

**F.      Defendants' Misconduct in Albania Subjected OSI to Significant FCPA Risk that Jeopardized the Entire Company**

108.   Defendants' wrongdoing in connection with the Albanian contract and their related misstatements and omissions created the significant and foreseeable risk that OSI would be investigated for violations of and found to have violated the FCPA.

109.   Congress enacted the FCPA in 1977 after revelations of widespread global corruption, including the SEC's discovery that more than 400 companies had paid hundreds of millions of dollars in bribes to foreign officials to secure business overseas. The FCPA addresses the problem of international corruption in two ways: (i) anti-bribery provisions; and (ii) accounting provisions.

110.   The FCPA's anti-bribery provisions prohibit U.S. persons and businesses from offering to pay, paying, promising to pay, or making or authorizing a payment of money or anything else of value to a foreign official in order to influence any act or decision in his or her official capacity or to secure any other improper

advantage for the purpose of obtaining or retaining business. Many FCPA enforcement actions involve bribes to obtain or retain government contracts.

111.   The FCPA's accounting provisions require companies to: (i) make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect an issuer's transactions and dispositions of an issuer's assets ("books and records"); and (ii) devise and maintain a system of internal accounting controls sufficient to assure management's control, authority, and responsibility over the firm's assets. The FCPA's internal control provisions address the fact that the payment of bribes often occurs in companies that have weak internal control environments. The FCPA's books and records provisions address the concern that bribes are often mischaracterized in companies' books and records, with companies utilizing things like commissions, consulting fees, sales and marketing fees, and rebates or discounts to conceal corrupt payments. Additionally, given that bribes may be paid in small amounts or installments over a number of years or across a number of recipients, there are no materiality thresholds for enforcing the FCPA's accounting provisions.

112.   The DOJ and SEC both have authority to enforce compliance with the FCPA. Failure to comply with any of the FCPA's provisions can result in civil or criminal penalties, including substantial fines, prohibitions on operations in an industry or particular country, or disbarment from doing business with the federal government. These penalties also cause material damage to a company's brand, business, and operating results, and often involve costly investigations and remediation efforts.

113.   As discussed above, Defendants' conduct during the Class Period created a material and entirely foreseeable risk that OSI was vulnerable and would be subjected to an investigation and potential criminal and civil penalties—which could prohibit OSI from doing business with the U.S. and foreign governments. Defendants

knew that such a result would be devastating for OSI.  Indeed, they repeatedly touted the Company's "international operations as providing an important strategic advantage over competitors" and "significant growth opportunities" during the Class Period.

### G.  Defendants' Opaque Turnkey Business Model Enabled Their Fraud

114.  As part of their attempt to mislead investors, Defendants created a business model that allowed them to conceal crucial details of their turnkey operations and their contracts in general.  Indeed, the Company worked in foreign jurisdictions that had little oversight but had notoriously high corruption and purposefully refused to provide crucial details regarding the turnkey business and contracts.

#### 1.  OSI's Turnkey Business Existed Only in Jurisdictions Where Oversight Was Minimal and Corruption Was Prevalent

115.  OSI sought to do business in foreign jurisdictions that allowed the Company to operate without the stringent reporting and ethics standards required in the U.S. According to the Company, it sought to do business with countries where a "fear of corruption" existed and the government might be looking to lend credibility to their programs. As Defendant Edrick explained:

> We are dealing with governments, and we are not generally dealing with the Western world. *Most of the turnkeys we are looking at are not in the US or Western Europe. They are in places that have other unique challenges. . . . [O]thers might have other concerns in their particular country such as fear of corruption and things like that. And being able to outsource it to another Company could lend greater credibility to the overall program*.

116.  For instance, Albania's dismal record on transparency and corruption was notorious. In 2013, when OSI secured its Albania turnkey contract, "[c]orruption in all branches of government was pervasive," and "officials frequently engaged in corrupt practices with impunity," according to the State Department. Indeed, in 2013, Albania ranked 116th on Transparency International's Corruption Transparency

Index. Because OSI's turnkey business was exclusively located in foreign jurisdictions where corruption was pervasive and the government lacked transparency, Defendants were able to conceal its corrupt arrangements, as they did in Albania.

### 2. The Company's Financial Treatment of Turnkey Contracts Obscured Details About the Business

117. Although Defendants enthusiastically promoted the importance of the Company's turnkey contracts, they repeatedly refused to provide financial details for the contracts or turnkey services more generally, which facilitated Defendants' fraud.

118. For example, Defendants refused to disclose OSI's actual profit margins from its turnkey contracts or distinguish between non-turnkey and turnkey financial results. At a May 14, 2014 Oppenheimer Industrials Conference, Defendant Edrick unequivocally stated "*[W]e don't break out the margin specifically between Turnkey and non-Turnkey*." Nevertheless, Edrick did not hesitate to emphasize that "[t]he overall margin improvement has been largely driven by the uptick in revenues associated with the Turnkey business."

119. Nor did Defendants provide insight into turnkey revenues. For instance, on the April 30, 2014 Conference Call in response to questions from an analyst regarding "Security bookings" and the "number for Security funded backlog," Defendant Edrick stated, "*We don't break down our revenues precisely between turnkey and non-turnkey as a matter of course.*" When pressed for more information regarding the turnkey business, Defendant Edrick declined to do so, stating: "*We don't break out our turnkey revenues.* But I think you have a pretty good idea of the range of what our turnkey revenues are. *But we don't break that out separately.*"

120. Because Defendants did not disclose margins or revenues specifically due to turnkey, they were able to conceal the financials associated with the Albanian contract, including the profits that S2 Albania shared with ICMS.

## H.     The Relevant Truth Is Slowly Revealed

121.   Defendants' scheme began to unravel on December 6, 2017 when MWR issued a detailed report entitled, "OSIS: Rotten to the Core." The MWR Report revealed, among other things:

> There was an unannounced transfer of 49% of OSIS's project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for consideration of less than $5.00. To be clear, this company (S2 Albania SPHK) is the company to which all rights and obligations under the turnkey contract award belong, so 49% of the company is presumably worth many millions of dollars. It appears to us that OSIS's accounts do not reflect the transfer – there are no deductions for non-controlling interests in the income statement, and February 2017 bond offering documents appear to show the subsidiary as 100% owned by OSIS.

122.   According to MWR, this demonstrated that the Albanian contract was obtained "through corruption," which put "at significant risk OSIS's Security Division contracts with the U.S. and European government agencies." MWR also noted that "OSIS could face liability under the Foreign Corrupt Practices Act ('FCPA'), which could be in the many hundreds of millions of dollars."

123.   In response to these revelations, the price of OSI Securities plummeted. By mid-day, *MT Newswires Live* had issued a report entitled, "Market Chatter: OSI Systems Falls to 13-Month Low; [MWR] Said to Unveil Short Position Tied to Corruption Accusations," stating, "OSI Systems (OSIS) shares fell by more than 21% Wednesday to their lowest level in more than a year after a major Wall Street hedge fund established a short position in the company amid allegations of corruption and unsustainable earning expectations."

124.   Before the close of business that same day, Defendants issued a terse half-page response confirming certain facts, including ICMS's ownership and profit-sharing in S2 Albania, but denying any wrongdoing:

> Our Albania turnkey security inspection program is operated in partnership with ICMS, a local company with civil works construction capabilities in Albania, with a profit share in accordance with the terms of our agreement with ICMS. ICMS implemented all civil works construction for the program. As such, both we and ICMS made

significant capital investments toward the implementation of the program in a value well beyond the par value of shares.

125. Despite these admissions, however, the Company characterized MWR's conclusions regarding corruption in Albania as "misleading allegations" and represented that the Albanian contract was secured as "the result of [a] public tender[]."

126. Following these disclosures, the price of OSI's Securities fell precipitously. OSI's common stock price plummeted nearly 30% in a single day—from a close of $84.07 per share on December 5, 2017 to a close of $59.52 per share on December 6, 2017, wiping out $465.7 million in market capitalization. Additionally, on December 6, 2017, OSI's common stock traded on extremely heavy volume of 10,596,800 shares—significantly higher than the 209,128 average daily trading volume during the Class Period. OSI Bonds, likewise, dropped precipitously by $162.62 or 15.67%—from a close of $1,037.50 on December 5, 2017, to a close of $874.88 on December 6, 2017.

127. The market attributed the decline to the facts revealed by MWR. For example, in a December 7, 2017 article entitled, "$canner 'Muddy'ed," the New York Post reported:

> OSI Systems, the maker of airport scanning systems, ***lost nearly a third of its value on Wednesday after short seller Carson Block accused it of underhanded practices*** . . . . 'We think this company is rotten to the core,' Block's firm, [MWR], said in a 19-page report. . . . A potential $250 million contract OSI signed with Albania is tainted by corruption, [MWR] claimed. . . . Late Wednesday, the company, based in Hawthorne, Calif., denied any wrongdoing and said its 'turnkey' contract was the result of public tenders.

128. Later that month, according to the December 9, 2012 Article, the head of Albania's Parliamentary Group of the Socialist Party, Taulant Balla, issued a series of accusations against Berisha regarding the Albanian contract and asked for Berisha's prosecution. The article further noted that, according to Balla, Berisha engaged in a $122.5 million corruption—49% of the value of the Albanian contract.

129.   On January 31, 2018, MWR addressed OSI's December 6, 2017 response ("MWR Rebuttal"), providing further facts and main reasons why OSI's response "in no way changes our opinion that OSIS is rotten to the core":

- First, OSIS's statement that "…ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares" is greatly misleading because it appears from the various entities' financials that OSIS has provided virtually all funding to, and investment in, S2 Albania.

- Second, OSIS appears to have sought to conceal its joint venture with ICMS from its investors, which we see no reason to do if this arrangement were legitimate.

- Third, even if ICMS were the greatest construction company in the world, how would it be entitled to half of the economics of the concession for pouring concrete when OSIS is providing the key equipment, technology, knowhow, and financing?

- Fourth, we are fairly certain that ICMS is not the greatest construction company in the world – or even in Albania. ICMS's construction affiliate was formed only eight months before OSIS was awarded the concession – its capitalization was only ~US$850, and it was then sold to ICMS's physician shareholder also for ~US$850. Moreover, it has virtually no tangible assets. If it's really this easy and cheap to get a nine-figure construction contract, then we at MWR are wondering why we're in the relatively impoverished world of hedge funds.

- Fifth, the timeline of this "partnership" is beyond suspicious – with the requisite approval of the transfer of shares taking place on the day the outgoing Minister of Finance left and the new one was seated.

130.   Additionally, the MWR Rebuttal stated that "OSIS's response seems greatly misleading when it implies that ICMS has made capital contributions that are on par with those of OSIS (and thus somehow justifying half of the concession)." MWR also provided further facts contradicting OSI's explanation:

- **We see no S2 Albania assets to which ICMS could conceivably have** contributed. As of December 31, 2015, S2 Albania had total assets of US$10.8 million. Virtually all of the assets – US$9.6 million – were PP&E. According to the footnotes, 98.5% of PP&E (US$9.6 million) were machines (i.e., likely equipment from OSIS) – with no construction or buildings disclosed at all.

- **We see no financial contribution from ICMS to S2 Albania.** S2 Albania's December 31, 2015 liabilities confirm that substantially all of S2 Albania's capitalization came from OSIS. The financials show

US$11.7 million in payables to OSIS. (Note that S2 Albania had negative shareholders' equity of US$-1.1 million.)

- **We see no account evidencing investment in S2 Albania by ICMS or ICMS Construction.** We see nothing on ICMS's CY2016 balance sheet that could resemble a meaningful investment in S2 Albania. Of its US$3.06 million in assets as of December 31, 2016, US$2.97 million are current assets. (US$1.8 million – 59.6% – is prepaid expenses; the balance is substantially all cash and receivables.) Of the US$80,000 of non-current assets, 99.99% is PP&E.

We also see nothing on the CY2016 balance sheet of ICMS Construction, which is an affiliate of ICMS, that evidences investment in S2 Albania. (Note that ICMS Construction does not own the equity in S2 Albania.) ICMS Construction has a total of US$704,000 of assets, of which US$647,000 are receivables. There is no meaningful PP&E or investments. ICMS Construction had $627 million of revenue in 2015, which means it undertook no significant construction prior to 2016.

\*      \*      \*

ICMS was not an established construction company in Albania, and its construction affiliate, ICMS Construction (100% owned by the doctor who owns ICMS) was formed by a single shareholder on January 29, 2013, only eight months before the award of the concession. When formed, it was called Bledi Construction and had capital of $850. Approximately one and one half months after formation (March 11, 2013), it changed its registration status from "active" to "suspended", during which time it would not have been permitted to conduct business. On June 21, 2013, Bledi changed its status back to "active". The next day – only two months before the award of the concession – it was sold to ICMS…for $850. A few days after that, the name was changed to ICMS Construction. (In 2016, the shares were transferred from ICMS to Dr. Olti Peçini again for $850.)

131.   The MWR Rebuttal concluded by citing further evidence that ICMS Construction was a farce, noting that, at the end of 2015, ICMS Construction had "$1,300 cash," "zero inventory," "$20,000 in plant and machinery," and "office equipment of just $514[.]"

132.   The very next day, on February 1, 2018, the Company issued a press release, filed with the SEC on Form 8-K, disclosing that the SEC had commenced an investigation into the Company's actions. More specifically, the Company announced:

Following a report by a short seller, the Securities and Exchange Commission (SEC) commenced an investigation into the Company's compliance with the Foreign Corrupt Practices Act (FCPA). The U.S.

Attorney's Office for the Central District of California (DOJ) has also said it intends to request information regarding FCPA compliance matters. The SEC and DOJ are also conducting an investigation of trading in the Company's securities, and have subpoenaed information regarding trading by executives, directors and employees, as well as Company operations and disclosures in and around the time of certain trades. In relation to the matters that are the subject of the trading-related investigation, the Company has taken action with respect to a senior-level employee. At this time, the Company is unable to predict what, if any, action may be taken by the DOJ or SEC as a result of these investigations, or any penalties or remedial measures these agencies may seek. The Company places a high priority on compliance with its anti-corruption and securities trading policies, and is cooperating with each of the government investigations.

133.   On this news, the price of OSI Securities fell precipitously. OSI common shares declined from a close of $66.60 on February 1, 2018 to $54.60 on February 2, 2018, a drop of 18%, losing $227.6 million in market capitalization. On February 2, 2018, OSI's common stock traded on heavy volume of 3,294,200 shares—significantly higher than the 209,128 average daily trading volume during the Class Period. Additionally, OSI Bonds dropped by 5.94% or $54.57—from a close of $919.01 on February 1, 2018 to a close of $864.44 on February 2, 2018.

134.   Although Defendants touted the Albanian contract in 2013 as a validation of the Company's turnkey business, nearly five years later, OSI has not signed a single additional turnkey contract.

## V.   DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

### A.   August 21, 2013 Press Release

135.   On August 21, 2013, the Company issued a Press Release entitled, "*OSI Systems Receives a Fifteen-Year Agreement to Provide Turnkey Screening Services to Albania*." In that press release, the Company announced that "*the Government of Albania has awarded its Security Division, Rapiscan Systems, a fifteen-year contract to provide turnkey cargo and vehicle security screening services at various sites throughout the country*."   The Company explained that it expected total gross

revenues from the Albanian contract to "*range from $150 million - $250 million over the term of the agreement*."[9]

136.    In the same press release, Defendant Chopra stated:

> *This significant award from Albania to provide turnkey screening services builds upon similar long-term agreements* awarded by the Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive turnkey screening services *continues to be well received in the marketplace*. Our experience and capability to develop and integrate leading edge inspection technologies coupled with our depth of operational expertise is unmatched in the industry and we believe *makes us uniquely qualified to secure and manage such complex programs*.

137.    Defendant Mehra bolstered Defendant Chopra's statement by representing that "[t]he Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud to have been selected to execute this critical program. *Our selection reinforces the attractiveness and compelling value of our turnkey service model*."

138.    Each of Defendants' statements set forth in ¶¶ 135-137 were materially false or misleading when made, and/or omitted material facts, including the following:

   a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

   b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement

---

[9]    Each of Defendants' statements in Section V that is alleged to be false and misleading is highlighted in *bold and italics*.

CONSOLIDATED CLASS ACTION COMPLAINT                                          46
CASE NO. 2:17-CV-08841-SVW-AGR

was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The omission of material facts relating to (a)-(c) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## B. Second Quarter 2014

139. On January 28, 2014, Defendants held a conference call to discuss the Company's 2Q14 financial results.  During the call, Defendant Edrick touted the Company's turnkey contract with Albania, stating: "***[W]e have been busy preparing to go live before fiscal year end for our latest turnkey contract award in Albania***. Although this new 15-year contract is not expected to contribute much to the top line in fiscal '14, ***we expect that it could contribute more substantially in fiscal '15 and beyond and further validates the increasing acceptance of this model in the global market for security screening solutions***."

140. Defendant Edrick concluded by emphasizing the turnkey business: "[d]uring the past few years, we have consistently delivered a strong bottom line. ***The investments we have made enabled us to be a leader in turnkey screening solutions and to continue to innovate to bring new products and services to market***."

141. Defendant Chopra echoed Defendant Edrick's positive comments about the Company's turnkey operations and emphasized the Albanian contract:

Moving on to the other activities in our Security division. . . . ***After winning the new turnkey services contract earlier this year in Albania, we have clearly established our leadership in growing this particular service segment*** and expect to continue to leverage our position for further growth.

\* \* \*

***I should mention here that the build-out phase for the Albanian turnkey services project is well underway, and we're happy to announce that it'll start generating revenues before the end of the fiscal year.***

142.   Each of Defendants' statements set forth in ¶¶ 139-141 were materially false or misleading when made and/or omitted material facts, including the following:

a.   As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b.   The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c.   The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d.   The omission of material facts relating to (a)-(c) above created a false and/or misleading impression that the turnkey model would be the

---

primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## C.   March 2014 Analyst Conferences

143.   On March 4, 2014, Defendant Edrick appeared at the Morgan Stanley Technology Media Conference on behalf of the Company and continued to tout the Company's turnkey success: "***what's been driving the growth over the past year has been largely dominated by our turnkey security solutions. We pioneered this area. We won our first contract in Puerto Rico, and we followed it up in Mexico which has been a big driver of our growth. There's only been three contracts of this type awarded to the world. And to date, well, we've won all three. So today, we have 100% market share in that area***."

144.   Also at this conference, Edrick emphasized the importance of the turnkey operations and the "third" turnkey contract (Albania) to the growth of the Company, stating: "***So, we're extremely excited about the turnkey. These are long sales cycles. We've won the three contracts that you just mentioned. And now that we have three—or we have two up and running, the third one that'll be coming here in the not too distant future***", it makes it easier and easier to sell these and we hope we can shorten that sales cycle a little bit."

145.   During a question and answer session with an analyst, Defendant Edrick further elaborated:

<A>: Edrick>: We think our first-mover advantage is going to give us more than our fair share in this. We're working on a number of opportunities. It's hard to say what that cadence will exactly be. ***But we feel confident that this is going to be a major growth driver for us going forward***.

<Q>: How did that change the financial picture for the company over time?

<A - Alan I. Edrick>: ***Changes it pretty dramatically***.

<Q>: Yeah.

<A - Alan I. Edrick>: You know, when you started to see Mexico ramp up in the early part of calendar 2013; I think people started to get a sense. But it's a recurring revenue stream, so it gives us much greater visibility.

<Q>: But taken over a fairly long period of time, right? It's not like a software product where it's one or two years versus...

<A - Alan I. Edrick>: You're exactly right. Mexico is a six-year contract, Puerto Rico a 10-year contract, Albania a 15-year contract.

<Q>: Yeah.

<A - Alan I. Edrick>: *So it is over a much longer period of time, great revenue visibility and much higher margins. While we haven't disclosed what those margins are, you can kind of begin to feel the impact when you see our financials as we've been ramping up*.

146.    Defendant Edrick also confirmed that, "as we head into the balance of fiscal 2014 and into fiscal 2015, our priority is—on the Security side, continue to be to—continue to roll out the successful turnkey programs. We've ramped up Mexico a little bit more to go. *Albania, we're ramping up as we speak*. We look forward to winning new turnkey contracts."

147.    Defendant Edrick reiterated his statements about the importance of the Company's turnkey operations, including Albania, at the March 11, 2014 Conference: "*[M]ost recently earlier in our fiscal year, we sold our third [turnkey] deal in Albania, which we're ramping up right now. So very, very exciting for us. It's really changed our profile significantly*." Similarly, Edrick represented:

*Turnkey, which we talked about before, we view it as perhaps our largest growth opportunity*. This is really a market outside the United States, outside of Western Europe, so look in places such as Latin America, Middle East, Eastern Europe. We think there's substantial growth opportunities here. *We have a nice pipeline of opportunities. We've landed three deals. We want 100% of all deals landed to this point. We believe we have a great first mover advantage*. While we may not always [ph] bag 1,000, we think we're going to win more than our fair share.

148.    Edrick also highlighted that the Company is "well-positioned for our fiscal 2014 and beyond. We have a lot of catalysts in place for growth. *The new turnkey revenues is really an exciting business model in order to have recurring*

*revenues as substantially higher margins makes a big impact for us and gives us a great deal of visibility as we look forward*."

149. Each of Defendants' statements set forth in ¶¶ 143-148 were materially false or misleading when made, and omitted material facts, including the following:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The omission of material facts relating to (a)-(c) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

---

**D.     Third Quarter 2014**

150.    During the April 30, 2014 Conference Call, Defendant Edrick continued to emphasize that "[d]uring the past few years, we have built a strong foundation for growth. ***The investments we have made enabled us to become the leader in turnkey screening solutions, and to continue to innovate to bring new products and services to market***."

151.    On the same call, Defendant Chopra specifically trumpeted the Company's progress on the contract with Albania: "***Regarding Albania, we are making progress and we are on track***. But I don't think so there will be any contribution in revenue in Q4. ***But we are moving on target***. We're working diligently with it and looking forward to 2015."

152.    Each of Defendants' Class Period statements set forth in ¶¶ 150-151 were materially false or misleading when made, and/or omitted material facts, including the following:

  a.  As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

  b.  The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

  c.  The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory

action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The omission of material facts relating to (a)-(c) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

**E.     Summer 2014 Conferences**

153.   On May 14, 2014, Defendant Edrick appeared at the Oppenheimer Industrials Conference. During the conference, Edrick highlighted the turnkey business as the "biggest growth opportunity[,]" stating that:

> **[N]umber one would be Turnkey. That's a tremendous opportunity for us. . . .** So to the extent we win some of these contracts and win them sooner, it could propel some significant revenue growth for our Security, our Rapiscan business for the foreseeable future.

154.   Defendant Edrick touted the Company's "first-mover advantage" against competitors in turnkey:

> There has been three contracts in the world that have been awarded to date in the order of Puerto Rico, Mexico, and Albania. **So we've won all three. So while we're batting 1.000 today, and we think we have a good first-mover advantage that we won't always win 100% of them. But we think we're in great shape.** And we have a real nice pipeline of opportunities. These are long sales cycle products.

155.   During the June 3, 2014 Stephens Spring Conference, Defendant Edrick further emphasized the Company's turnkey solutions, as follows:

> <Q - Timothy J. Quillin>: . . . In the Security business, I think over the past, let's say, three years or so, one of the big changes has been that you've won some big and small turnkey services, outsource services contract where you own the equipment. Your employees run the equipment and you get paid on a per site or per scan basis. Why has that business model proved to be popular? What's the pipeline look like of additional opportunities?
>
> <A - Alan I. Edrick>: . . . You talk about the pipeline of opportunities, we are working on a number of deals. We're very excited about those opportunities. It's a long sales cycle. As we've gone through these other

contracts, they generally ranged from the time we started talking to the time we executed the contract, anywhere between a couple of years to maybe as much as four years. I would say initially, it was a missionary sale, and we had to talk about a concept or a theory. And now hopefully, we're moving a little bit beyond that as we're able to take potential future customers, we can take into Puerto Rico, we can take into Mexico, and they can see for themselves just how seamless an operation it is.

It really works extremely efficiently and it's a very, very sophisticated operation. So we're encouraged by that and we're looking forward to winning new turnkeys in the future, *while today we've been successful on winning all turnkeys awarded today, 100%, we're not saying in the future, we'll always win 100% but we think our first-mover advantage is significant and is going to allow us to win perhaps more than our fair share of deals going forward*.

156. During the same conference, in response to specific questions from analyst Quillin about the "ramp-up process of each" turnkey contract, Defendant Edrick stated, "*[I]n Albania, similarly, the construction is ongoing, which is our latest deal, as well as the equipment. And again, we're waiting on the customer*."

157. On June 4, 2014, the Company participated in the Jefferies LLC Healthcare Conference (the "June 4, 2014 Conference"). At the conference, Defendant Edrick touted the turnkey model:

*Let's start talking about maybe one of the most exciting areas within our Security business, and that's turnkey.* I started off the conversation telling you a little bit about this. But really the value proposition is for customers that either don't have the capital or the money to spend upfront or perhaps don't have the operational expertise to do it, we provide a full turnkey solution. And what we mean is we manufacture the equipment, we place it at the customer location, but we still own it, it's on our balance sheet. We staff it up with our people and then we charge a fee per scan or a fee per site per month. We determine what might be right for the customer.

*We sort of pioneered this model. And to-date we've won all contracts in the turnkey arena. While we think we have a nice first-mover advantage and hopefully we'll win more than our fair share in the future, clearly we're not going to win 100% going forward. But we really like our position*.

158. In response to questions, Defendant Edrick further trumpeted margins resulting from turnkey contracts:

Q: What are the return on capital ROI metrics for these turnkey projects? How much do you have to invest per dollar of revenues down the road when you reach breakeven? Thanks.

Edrick: Yeah, it's a great question and one that we have refrained from answering for a number of reasons. As you can well imagine, we're getting margins that are well above our corporate averages. So for a competitive reasons as well as potential prospects in the future, we've refrained from giving out our margins on those. ***But what we can tell you is that the payback is extremely attractive, the return on invested capital is extremely attractive and we'd be happy to sign these type of contracts any day of the week***.

159. On August 12, 2014, Defendant Edrick appeared at another Oppenheimer Conference—the Technology, Internet & Communications Conference (the "August 12, 2014 Conference") and again touted the Company's turnkey operations: "***And we won our first contract in Puerto Rico, followed that up with a win in Mexico and then Albania. And this recurring revenue at higher margin has really been a key to our success***."

160. During the August 12, 2014 Conference, in response to questions from Yair Reiner, an analyst with Oppenheimer, Defendant Edrick promoted the turnkey contracts as driving growth:

> ***Turnkey, so this is the area that we might consider maybe our most exciting opportunity for growth. These are the three contracts I referred to you earlier in Puerto Rico, Mexico and Albania. Very exciting area for us. It really has changed the landscape not only for our Security business but for OSI Systems overall. It's higher margin and recurring revenue.***
>
> This is as much an IP project as it is an equipment project. The stuff we're doing is highly sophisticated. ***We think we have a nice first-mover advantage.***
>
> ***Today we've won a 100% of the turnkey projects that have been awarded in the world. And while we don't profess to be able to maintain 100%, we think our first-mover advantage will allow us to win hopefully more than our fair share of future turnkey awards***.

161. On August 14, 2014, the Company participated in the Jefferies Global Industrials Conference (the "August 14, 2014 Conference"). At the conference, Defendant Edrick again touted the turnkey contracts and the Company's "first mover" advantage:

[W]e challenged ourselves to say, how can we expand our revenues, and how can we expand our margins. And we said, well, what if there is a customer segment out there that maybe doesn't have the capital to buy the equipment upfront, or if they do, perhaps they don't have the operational expertise to run the equipment. Or if they have that, maybe there's a third reason that they'd like to outsource the operation altogether. *And to that end, we set up a business specifically focused on this a few years back, and we've won three contracts now in Puerto Rico, Mexico and Albania.*

*And there have been three contracts awarded in the world. So, right now, we're batting a thousand, and we think that first mover advantage is going to lead to substantial capturing of future business going forward*, though we don't expect to win 100% going forward all the time.

162. Each of Defendants' Class Period statements set forth in ¶¶ 153-161 were materially false or misleading when made, and/or omitted material facts, including the following:

    a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

    b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

    c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:17-CV-08841-SVW-AGR

56

d. The omission of material facts relating to (a)-(c) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## F.    Fourth Quarter 2014

163.   On August 25, 2014, Defendants held a conference call to discuss the Company's 4Q14 financial results ("the August 25, 2014 Conference Call"). During that call, Defendant Chopra stated:

> Last year, we announced a 15-year contract that we received from the government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country of Albania.
>
> ***Unfortunately, we recently learned that the customer, the Albanian newly elected government, has halted further progress on the contract and put into doubt the continuation of the program. The program had been proceeding smoothly and ahead of schedule. We intend to strongly enforce our contractual rights and hope to reach an amicable outcome. I would also note here that no revenues from Albania are included from this contract in the revenue guidance we are providing for fiscal 2015. You can understand that, under the circumstances, we cannot comment further at this time.***

164.   On August 27, 2014, OSI filed a Form 10-K, signed by Defendants Chopra, Mehra and Edrick, with the SEC, to report the Company's financial results with the SEC ("FY14 10-K").

165.   The FY14 10-K further stated the following regarding the Albania turnkey contract:

> The loss or termination of a contract by such an institution, even if for reasons unrelated to the quality of our products or services, could therefore have a more wide-spread and potentially material adverse effect on our business, financial condition and results of operations. ***For example, in August 2013, we announced a 15-year contract award from the Government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country. We were recently notified that the Government of Albania has halted further progress on the contract. We have begun proceedings to protect our legal rights***.

166.  Exhibit 21.1 to the FY14 10-K also included a list of "Subsidiaries of OSI Systems, Inc.," which included "S2 Albania Sh.p.k."

167.  Each of Defendants' statements set forth in ¶¶ 163-166 were materially false or misleading when made, and/or omitted material facts, including the following:

a.  As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b.  The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c.  The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d.  The new Albanian government did not simply halt progress on the contract, but did so in part because of OSI's collusive arrangement with ICMS, the corrupt terms and timing of the outgoing Albanian government's authorization of the 49% transfer, and the undisclosed means required to secure the Albanian contract in the first instance.

e. The omission of material facts relating to (a)-(d) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## G.    First and Second Quarter 2015

168.   On October 24, 2014 and January 27, 2015, OSI filed Form 10-Qs, signed by Defendants Chopra and Edrick, with the SEC. In both of these Form 10-Qs, Defendants touted the Company's turnkey segment, stating "We believe that our wide-ranging product portfolio together with *our ability to provide turnkey screening solutions position us to competitively pursue security and inspection opportunities as they arise throughout the world*."

169.   On March 3, 2015, Defendant Edrick appeared at Morgan Stanley's Technology Media & Telecom Conference and provided a detailed explanation of the Company's turnkey business:

> The security business has been growing the fastest for us and in most the areas that we've been and we tend to be number one or number two. . . . And when we look at it sort of break it down, we might break it down into cargo products, baggage and parcel inspection products, maybe some people screening and turnkey. And what turnkey is in the technology world, it's sort of equivalent to a SaaS model rather than software-as-a-service, its security screening as a service. *And we're clearly the number one in this market and is rapidly growing for us, and it's a high margin area.*

170.   In response to questions by analyst David Chen of Morgan Stanley, Defendant Edrick further discussed the turnkey solution, stating:

> <Q - David Chen>: Okay. So you've announced two so far Mexico and Puerto Rico?
>
> <A - Alan I. Edrick>: Correct. *We had won a third one as well called Albania. Shortly after winning that, there was a change in the administration. So we've cautioned The Street to exclude that from future prospects in terms of what we're looking at, but there is always opportunity to rekindle that.*

171.   On March 10, 2015, the Company participated in the ROTH Growth Stock Conference (the "March 10, 2015 Conference") where Defendant Chopra continued to tout the turnkey business:

> *One of the other growing opportunity for us is, as I mentioned, we consider ourselves to be a pioneer in that, is the turnkey screening solutions.*
>
> \*   \*   \*
>
> *Turnkey screening solutions gaining increased visibility. And we are well positioned to further revenue, earnings and EBITDA growth; market share gains* and a very strong pipeline of new products driven by R&D...Significant growth in service revenues. *As I've mentioned, one of the fastest growing segments and with high gross margins, operating margins is a service business consists of both our turnkey operations and the service we provide after sale of the equipment both in healthcare and in the security. . . . In the security, the large addressable market for turnkey security solutions catching on. We would consider ourselves from the pioneers in developing this marketplace.*

172.   Each of Defendants' Class Period statements set forth in ¶¶ 168-171 were materially false or misleading when made, and/or omitted material facts, including the following:

a.  As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b.  The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The new Albanian government did not simply halt progress on the contract, but did so in part because of OSI's collusive arrangement with ICMS, the corrupt terms and timing of the outgoing Albanian government's authorization of the 49% transfer, and the undisclosed means required to secure the Albanian contract in the first instance;

e. The omission of material facts relating to (a)-(d) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## H. Summer 2015 Conferences

173. On June 3, 2015, the Company participated in the Jefferies Global Healthcare Conference (the "June 3, 2015 Conference") at which Defendant Edrick stated:

> ***This slide talks about our turnkey screening solutions, what we're talking a little bit about at the outset. . . . . This represents one of our biggest growth opportunities. In addition to the few contracts that we've won***, we have a nice funnel of opportunities. They're generally along our sales cycle. Some of these potential customers we've been working with for quite some time and are very optimistic about winning some deals here in the not too distant future. It's really had a major impact on improving our overall operating margins both through Rapiscan Systems and for OSI Systems overall. ***So quite excited about this, and we'll consider this one of our top growth opportunities.***

174.   On August 5, 2015, the Company participated in the CFA Society of Minnesota's InvestMNt Conference (the "August 5, 2015 Conference") where Edrick stated:

> ***Turnkey, so we talked a little bit about this earlier. . . . When we think about what are our three biggest growth opportunities in security, one I would say would be turnkey, which we just talked about.***

175.   During the August 5, 2015 Conference, Defendant Edrick again highlighted the advantages of the Company's turnkey business, stating:

> Yes, so the question, what's the advantage of the turnkey? Why would a customer buy that as opposed to buying the equipment outright? Our customers are governments. So we are not talking about commercial concerns whose primary motivation is profit.
>
> ***We are dealing with governments, and we are not generally dealing with the Western world. Most of the turnkeys we are looking at are not in the US or Western Europe. They are in places that have other unique challenges***. So, one could be capital; they might not have the cash in order to lay out. So that's a real advantage for it.
>
> ***Two, many of them really don't have the expertise to do it themselves, the operational expertise. Third, others might have other concerns in their particular country such as fear of corruption and things like that. And being able to outsource it to another Company could lend greater credibility to the overall program.***
>
> ***Four would be not having to worry about the upkeep of the equipment throughout the life of it because we are taking all that responsibility***. So, most of our customers on the turnkey are not necessarily motivated by a profit because they are a government entity who is really motivated by making sure that they have a complete screening.
>
> So, we continue to believe most customers -- to the point of your question -- will buy equipment. But there is a nice set of customers out there that are very, very interested in the turnkey, and we are pursuing that. So we sort of pursue it on a parallel path.

176.   Each of Defendants' statements set forth in ¶¶ 173-175 were materially false or misleading when made, and/or omitted material facts, including the following:

a.   As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2

Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The omission of material facts relating to (a)-(c) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

**I.      Fourth Quarter 2015**

177. OSI issued the October 13, 2015 Press Release announcing that "***the Company has commenced the operations phase with the Government of Albania to provide turnkey cargo and vehicle security screening services at multiple sites throughout the country. The Company currently anticipates total revenues to be approximately €200 million over the multi-year term of the agreement.***"

178. Defendant Chopra added that "***With Albania now operational, along with the Puerto Rico and Mexico turnkey programs, we continue to innovate and***

*differentiate ourselves in the turnkey solutions space where we expect to experience additional growth*."

179. Each of Defendants' Class Period statements set forth in ¶¶ 177-178 were materially false or misleading when made, and/or omitted material facts, including the following:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The purported €200 million in revenue from the Albanian contract was subject to an undisclosed "profit shar[ing] agreement" and 49% transfer of the S2 Albania entity that owned the rights to the contract;

e. The omission of material facts relating to (a)-(d) above created a false and/or misleading impression that the turnkey model would be the

primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

**J.      First and Second Quarter 2016**

180.   On October 29, 2015, OSI issued a press release announcing its financial results for the first quarter of fiscal year 2016 ("1Q16") (the "October 29, 2015 Press Release"), which was attached as an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date.

181.   In the October 29, 2015 Press Release, Defendant Chopra boasted about the commencement of the Albanian contract, stating "*[b]ookings in our Security division were outstanding, highlighted* by the recently announced $19 million order under . . . *and the commencement of the turnkey security screening program in Albania, our third such turnkey program.*"

182.   On the same day, the Company held a conference call to discuss the results of 1Q16 (the "October 29, 2015 Conference Call"). On the call, Defendant Edrick also trumpeted the commencement of the Albanian turnkey contract:

> *We were pleased to reach agreement with the Government of Albania on certain contract changes, which led to the commencement of activities. We expect to ramp up to our full run rate this fiscal year.*
>
> *This 15-year contract for turnkey cargo and vehicle security screening services at various checkpoints throughout the country is valued at approximately EUR200 million. Initial site operations are going smoothly* and we look forward to increasing revenues from this contract throughout this fiscal year as new sites come online.
>
> *Following Puerto Rico and Mexico, this is the third major turnkey services program now in operation. Similar to that in Mexico, Albania's service cost is based on a fixed amount per site per month.*

183.   Defendant Edrick further touted the status of the Albanian turnkey contract:

> [Millward] Alan, given your strong bookings during the quarter, how should we think about the overall growth of your security business this year? And in terms of seasonality, if you can talk about seasonality and when do you expect Albania to be fully operational?

[Edrick] Sure, Josephine. Good questions, *I'll maybe take them in inverse order. Albania we expect to be fully ramped during the course of this fiscal year. It's moving up at a nice pace and we think will enter fiscal 2017 at a full ramp rate. So we are very pleased with the progress that we are making in Albania.*

184.   On January 27, 2016, OSI issued a press release announcing its financial results for the second quarter of fiscal year 2016 ("2Q16") (the "January 27, 2016 Press Release"), which was attached as an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date.

185.   In the January 27, 2016 Press Release, Defendant Chopra boasted about the reinstatement of the Albanian contract:

Security division bookings in the first half were up 272% over the prior year. *These bookings, together with the ramp up of our turnkey program in Albania and a solid pipeline of opportunities, position the division well for a strong second half weighted to the fourth quarter based upon the anticipated timing of converting our backlog and opportunities into revenue.*

186.   On January 27, 2016, OSI held a conference call to discuss and expand upon the Company's 2Q16 financial results (the "January 27, 2016, Conference Call"). During the call, Defendant Edrick had the following exchange with analyst Josephine Millward of The Benchmark Company:

Millward: What do you have in your backlog for Albania, Alan? It's not the EUR 200 million, right? You don't have all of it in there?

Edrick: *That's correct. We only include five years worth of revenues on Albania in our backlog, so that's in the neighborhood of $60 million, plus or minus.*

187.   On the same call, Defendant Edrick elaborated on the status of the Albanian contract, stating "*The Albania turnkey contract has been ramping up nicely. It is expected to be fully operational in Q3.*

188.   Defendant Edrick further touted the growth opportunity of OSI's turnkey services and the performance of the Albanian contract, stating:

*In turnkey services, another major growth opportunity for us with a long sales cycle, we continue to see a strong pipeline. We are optimistic of landing new turnkey deals* and have added additional resources to support these opportunities. However, the timing of these deals has been

and will continue to be influenced by the macroeconomic factors discussed earlier. ***Our most recent turnkey contract in Albania is performing well, and we expect to be fully operational within this quarter. In addition, our other turnkey programs continue to perform well.***

***We are well situated for growth in products and services including turnkey programs*** and have a strong balance sheet that can easily absorb the capital requirements from longer lead time builds or turnkey opportunities that often require significant initial capital outlay. . . . ***The strength in our backlog and bookings trend and continued strength in foreseeable demand for our products globally gives us confidence in the second half and delivering a very strong Q4 in security.***

189.   On March 15, 2016, Defendants participated in the ROTH Conference (the "March 15, 2016 Conference"). During the March 15, 2016 Conference, Defendant Chopra touted the turnkey business and the Albanian contract:

***One of the big growth opportunities for us is in the large-scale turnkey screening solutions with significant global expansion opportunities. . . . [T]he latest win was Albania. So that in this space, this is a new evolving market because you're trying to get to be a service provider in the security field to your customer. And a site to have a site to show is a big win for us. . . .*** Margins tend to be very good compared to selling just the equipment.

190.   Each of Defendants' Class Period statements set forth in ¶¶ 181-183, 185-189 were materially false or misleading when made, or omitted material facts, including the following:

a.   As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b.   The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement

was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c.  The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d.  The purported €60 million in "backlog" revenues from the Albanian contract was subject to an undisclosed "profit shar[ing] agreement" and 49% transfer of the S2 Albania entity that owned the rights to the contract;

e.  The omission of material facts relating to (a)-(d) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## K.   Third Quarter 2016

191.   On April 27, 2016, OSI held a conference call to discuss and expand upon the Company's 3Q16 financial results (the "April 27, 2016, Conference Call"). During the call, in an exchange with Brian W. Ruttenbur of Drexel Hamilton LLC, Defendant Edrick provided revenue estimates for the Albanian contract:

> Ruttenbur: And then, Albania started, you said in the third quarter, how much revenue did that contribute?
>
> Edrick: We don't generate-- talk about revenues by projects, but as you know, ***Albania at full run rate is in the neighborhood of the $12 million to $13 million a year, increasing on an annual basis.***

192.   On the same call, Defendant Edrick touted the performance of the Security division, which included revenues from the Albania turnkey contract, stating:

> Excluding this FMS contract, *sales were up by 5% for the quarter due to the performance of our security division, which included revenues associated with a large Middle East contract and Albania, our latest turnkey program, where all sites became fully operational during Q3.* Strong Security Division sales were offset by significantly weaker-than-expected sales in our Healthcare division.

193.   Defendant Chopra further lauded OSI's turnkey business and boasted that all three contracts were performing well:

> *On the turnkey services front, Mexico, Puerto Rico and Albania turnkey screening service contracts continue to perform well and we continue to add new opportunities to the turnkey pipeline. We are pleased that the ramp-up in Albania went as expected and by quarter end, all sites are fully operational.*
>
> *Our overall long-term pipeline for Rapiscan products and screening services continues to be strong. . . .*

194.   On the April 28, 2016, OSI filed a Form 10-Q with the SEC for 3Q16 (the "3Q16 Form 10-Q") signed by Defendants Chopra and Edrick. In the 3Q16 Form 10-Q, the Defendants OSI, Chopra, and Edrick touted that the increase in Security division revenues were due, in part, to the implementation of Albania turnkey contract:

> *Revenues for the Security Division for the three months ended March 31, 2016 increased primarily as a result of* a $23 million equipment sale to a Middle East customer and *the implementation of our turn-key screening operations in Albania.*

195.   On May 9, 2016, BB&T Capital Markets issued an analyst report titled "OSIS: Light at the End of the Tunnel; Upgrading to Buy, $70PT" describing a meeting with OSI's management as follows:

> Following a recent non-deal roadshow alongside OSIS management, we are growing increasingly confident in the company's ability to overcome recent issues.

\*     \*     \*

*Turnkey. Following the ramp in Albania, we estimate that the company is seeing approximately $140M-$150M contributed to annual revenue by Turnkey programs. We believe there are still meaningful opportunities for these solutions and would anticipate the company adding about 1 per year on average.*

196. On June 7, 2016, Defendants participated in Jefferies Healthcare Conference (the "June 7, 2016 Conference"). During the conference, Defendant Edrick highlighted the benefits of the turnkey business and the high margins of its current turnkey contracts:

*We are a leader in cargo and in cargo turnkey is really the fastest-growing area for us.* As mentioned a bit earlier, the difference between selling equipment and turnkey, turnkey is our version really of a SaaS model rather than software as a service, it is security as a service. We own the equipment and then we charge a fee per scan or we charge a fee for site per month and then turn long-term contracts. *The first three that we have gotten are six years, 10 years and 15 years in duration. They are substantially higher margin than our corporate averages and has really enabled a lot of the EPS and EBITDA growth that we have seen over the last several years.*

*Our opportunity pipeline for turnkey remains robust.* It is a longer sales cycle as there is quite a bit of education that needs to take place. We are hopeful now that *we have three up and running and three up and running that are very successful.* We can shorten that new win process by a little bit.

197. Each of Defendants' Class Period statements set forth in ¶¶ 191-196 were materially false or misleading when made, or omitted material facts, including the following:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement

was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c.   The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d.   The purported revenues from the Albanian contract, including "$12 million to $13 million a year increasing on an annual basis," were subject to an undisclosed "profit shar[ing] agreement" and 49% transfer of the S2 Albania entity that owned the rights to the contract;

e.   The omission of material facts relating to (a)-(d) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## L.   Fourth Quarter 2016

198.   On August 16, 2016, OSI issued a press release announcing its financial results for the fourth quarter of fiscal year 2016 ("4Q16") and annual results (the "August 16, 2016 Press Release"), which was attached an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date.

199.   In the August 16, 2016 Press Release, the Defendant Chopra touted the performance of OSI's turnkey contracts, stating, "*We are also very encouraged by the outstanding performance of our turnkey security screening services operations in fiscal 2016 and the pipeline of opportunities for further turnkey awards in fiscal 2017*."

200.   On the same day, OSI held a conference call to discuss and expand upon the Company's 4Q16 and annual financial results (the "August 16, 2016, Conference Call"). During the call, Defendant Chopra again trumpeted turnkey as a "key growth driver" and highlighted the performance of the Company's turnkey contracts, including Albania:

> **In turnkey services, our current programs in Albania, Mexico and Puerto Rico continue to perform well, and contribute significantly to our overall performance. This market represents a key growth driver for us going forward, as the potential turnkey pipeline continues to grow, and we believe we are in excellent position to capture additional turnkey services opportunities.**

201.   On the same call, Defendant Chopra had the following exchange with Larry Solow of CJS Securities:

> Solow: Okay. And then on turnkey, it sounds like, without getting into the real specific details, it sounds like your queue of opportunities is big as it has been in some time. And hopefully things start—it's just a matter of when you can close some deals. Is that a good assessment?

> Chopra: That's a good assessment. And again, I want to emphasize that most of these deals are—a [majority] of the deals are cargo-based. So, even at the end it becomes a sale of equipment, or it turns into a turnkey.

> **Our pipeline is very robust and strong. And we also, what we feel is, we have demonstrated that this can work. So, we have a big headstart from our competitors.**

202.   On the August 16, 2016, Conference Call, in response to questions from Jeff Martin of ROTH Capital Partners, LLC, Defendant Chopra attributed the delay in the Albania turnkey contract to newly elected government, as follows:

> Martin: Was wondering if you could give us a little more detail on the turnkey pipeline? I mean, it's understandable that timing is always unpredictable. If I am recalling correctly, Albania was your last win, which was approximately three years ago.

> Just curious if you have specific visibility on near-term projects that could close? Or if this is just a long lead cycle that there isn't a ton of visibility on?

> Chopra: Jeff, the way you're saying it is right. These are tough things to predict. **All we can tell you is, with the successes we've had—and keep in mind—Albania is a good example, although it's been three years, it also got sort of stopped when the election happened, and then it got**

*rejuvenated.* We are working for most of these turnkey projects in areas where there is some unpredictability, both volatility in the economy, volatility in their requirements, volatility in just the need for protecting the infrastructure.

203.   On the August 19, 2016, OSI filed an annual report on Form 10-K for the fiscal year 2016 with the SEC (the "FY16 Form 10-K") signed by Defendants Chopra, Edrick, and Mehra.

204.   In the FY16 Form 10-K, Defendants highlighted the Albanian contract's contribution to the Security division's revenues, stating:

Fiscal 2016 Compared with Fiscal 2015. Revenues for the Security division decreased 15% primarily as a result of a $66.4 million reduction in revenues associated with a Foreign Military Sale contract with the U.S. Department of Defense . . . . ***This decrease was partially offset by revenues from the commencement of our turnkey scanning operation in Albania during the year.***

205.   Thereafter, on October 21, 2016, the Company filed a Form DEF 14A with the SEC. In describing its executive compensation, which was tied to certain performance targets, the Company stated that its ***"key achievements" for fiscal 2016 included the "[s]ignificant 15-year booking and successful rollout of our turnkey screening solutions program in Albania*.**"

206.   Each of Defendants' Class Period statements set forth in ¶¶ 199-205 were materially false or misleading when made, or omitted material facts, including the following:

a.   As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b.   The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract

would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The purported revenues from the Albanian contract were subject to an undisclosed "profit shar[ing] agreement" and 49% transfer of the S2 Albania entity that owned the rights to the contract;

e. The new Albanian government did not simply halt progress on the contract, but did so in part because of OSI's collusive arrangement with ICMS, the corrupt terms and timing of the outgoing Albanian government's authorization of the 49% transfer, and the undisclosed means required to secure the Albanian contract in the first instance;

f. The omission of material facts relating to (a)-(e) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

## M.   First Quarter 2017

207.   On October 27, 2016, OSI held a conference call to discuss and expand upon the Company's 1Q17 results (the "October 27, 2016, Conference Call"). During the call, Defendant Edrick stressed the Company's "leadership role" in turnkey solutions:

> Over the past decade, we have demonstrated a strong track record of producing sales and earnings growth with strong cash flow generation

while simultaneously investing in product development and innovation for the future and making strategic acquisitions that serve us well. ***Our investments have enabled us to continue our leadership role of the turnkey screening solutions market space and have allowed us to introduce innovative products and solutions to the market across our various industries.***

208.   Defendant Chopra added that "*[t]he turnkey services pipeline continues to be strong*. . . ."

209.   On the October 31, 2016, OSI filed a quarterly report on Form 10-Q for the 1Q17 with the SEC (the "1Q17 Form 10-Q") signed by Defendants Chopra and Edrick. In the 1Q17 Form 10-Q, Defendants OSI, Defendants Chopra, and Edrick again highlighted :

> ***Revenues for the Security division for the three months ended September 30, 2016 increased primarily as a result of the following***: (i) $14.2 million from sales of our newly acquired subsidiary, AS&E; (ii) a significant increase in sales of our RTT product to European customers; and ***(iii) increased turnkey screening services revenues primarily as a result of our contract with the Albanian government.***

210.   On December 21, 2016, Defendants filed a Form 8-K attaching a copy of a Fifth Amendment to Credit Agreement as Exhibit 10.1. In the Fifth Amendment to Credit Agreement, Defendants represented that:

> Set forth on Schedule 3.12 is a complete and accurate list of all Subsidiaries, joint ventures and partnerships of the Credit Parties as of the Closing Date. Information on the attached Schedule includes the following: (a) the number of shares of each class of Equity Interest or other equity interests of each Subsidiary outstanding and (b) the number and percentage of outstanding shares of each class of Equity Interest owned by the Borrower or any of its Subsidiaries. The outstanding Equity Interest and other equity interests of all such Subsidiaries is validly issued, fully paid and non-assessable and is owned free and clear of all Liens (other than those arising under or contemplated in connection with the Credit Documents). ***There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interest of the Borrower or any Subsidiary, except as contemplated in connection with the Credit Documents.*** The Borrower shall update Schedule 3.12 from time to time, in accordance with Section 5.2, by providing a replacement Schedule 3.12 to the Administrative Agent.

---

211.  Each of Defendants' Class Period statements set forth in ¶¶ 207-210 were materially false or misleading when made, or omitted material facts, including the following:

    a.  As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

    b.  The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

    c.  The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

    d.  The purported revenues from the Albanian contract were subject to an undisclosed "profit shar[ing] agreement" and 49% transfer of the S2 Albania entity that owned the rights to the contract;

    e.  The omission of material facts relating to (a)-(d) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

**N.     Second Quarter 2017**

212.   On January 26, 2017, OSI issued a press release announcing its financial results for the second quarter of fiscal year 2017 ("2Q17") (the "January 26, 2017 Press Release"), which was attached as an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date.

213.   On the same day, OSI held a conference call to discuss and expand upon the Company's 2Q17 results (the "January 26, 2017, Conference Call"). During the call, Defendant Edrick clarified that the increase was, in part, due to the increase in revenue from the Albanian contract, stating:

> As mentioned previously, revenues in Q2 increased by 23% on a year-over-year basis. ***Revenues in the Security division increased by 49% primarily as a result of*** the inclusion of $29 million of revenues from the AS&E acquisition, a significant increase in sales of our RTT checked baggage systems to international customers ***and an increase in turnkey screening services revenue as a result of the program in Albania, which ramped up in fiscal 2016.***

214.   Defendant Chopra added that "***[i]n turnkey services, our programs in Puerto Rico, Mexico and Albania continue to perform well. Overall, we see the pipeline staying robust and we remain optimistic that OSI will capture new turnkey programs in the near future***."

215.   On the February 1, 2017, OSI filed a quarterly report on Form 10-Q for the 2Q17 with the SEC (the "2Q17 Form 10-Q") signed by Defendants Chopra and Edrick. In the 1Q16 Form 10-Q, Defendants OSI, Chopra, and Edrick again highlighted that the strength of the Security division's performance was due to the Albanian contract, stating:

> ***Revenues for the Security division for the three months ended December 31, 2016 increased primarily as a result of*** (i) $29.1 million from sales of our newly acquired subsidiary, AS&E; (ii) significantly increased sales of our RTT product to international customers; and ***(iii) increased turnkey screening services revenues as a result of our contract with the Albanian government.***
>
>                    *      *      *
>
> ***Revenues for the Security division for the six months ended December 31, 2016 increased primarily as a result of*** (i) $43.2 million from sales

of our newly acquired subsidiary, AS&E; (ii) significantly increased sales of our RTT product to international customers; and *(iii) increased turnkey screening services revenues as a result of our contract with the Albanian government.*

216. On February 8, 2017, Defendants participated in the Cowen Aerospace/Defense & Industrials Conference (the "February 8, 2017 Conference"). At the conference, Defendant Edrick stated:

> *One of the really interesting areas of our Security business is what we call turnkey.* So our basic business model in the past for Security had always been, we sell equipment and then we get some recurring revenue through service, spare parts, and maintenance. And we challenged ourselves a few years ago, to say, how can we expand that revenue potential and how can we expand those margins?
>
> And we thought there might be a customer set out there that either didn't have the capital or cash to buy the equipment upfront, or if they did, maybe they don't have the operational expertise to run it.
>
> And we formed this turnkey unit. And what we mean by that is we manufacture the equipment. We place it at the customer's site. We staff it up with our people, and then we charge a fee per scan or a fee per site per month. *And we enter into a long, multiyear contracts with these customers. And this has been extraordinarily successful for us. In just a few short years, this has gone from 0% of our Security business to about 30% today. So it's been very, very exciting. It's a nice revenue, higher margin business for us of a recurring nature.*
>
> *We have a strong first-mover advantage. Up to this point, we're really the only company out there with any significant contract wins in turnkey, and we're looking forward to continuing to maintain our leadership in this area.*

217. In response to questions from an audience member, Defendant Edrick lauded the Company's turnkey business and boasted that the business growing due to the Albanian contract:

> A: So we're talking about number being one or two in that area. *Within turnkey, we're a clear number one. Where we have the lion's share of that marketplace.*
>
> \*       \*       \*
>
> *A: Yeah. So, the turnkey business is growing a little bit organically as Albania became fully ramped up and now it's waiting for our next turnkey wins.*

---

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:17-cv-08841-SVW-AGR

78

218. On February 15, 2017, the Company entered into a purchase agreement (the "Purchase Agreement") for the issuance and sale of $250 million of the Company's OSI Bonds. On February 22, 2017, the Company closed the offering. On the same day, the Company filed a Form 8-K explaining the transaction and attaching a copy of the Purchase Agreement and indenture. According to the February 22, 2017, Form 8-K, the Initial Purchasers anticipated selling the OSI Bonds to qualified institutional buyers.

219. In the Purchase Agreement, OSI represented the following regarding its subsidiaries:

> Good Standing of Subsidiaries. Each "significant subsidiary" of the Company (as such term is defined in Rule 1-02 of Regulation S-X) (each, a "Subsidiary" and, collectively, the "Subsidiaries") has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its incorporation or organization, has corporate or similar power and authority to own, lease and operate its properties and to conduct its business as described in the General Disclosure Package and the Final Offering Memorandum and is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure to so qualify or to be in good standing would not result in a Material Adverse Effect. ***Except as otherwise disclosed in the General Disclosure Package and the Final Offering Memorandum, all of the issued and outstanding capital stock of each Subsidiary has been duly authorized and validly issued, is fully paid and non-assessable and is owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity. None of the outstanding shares of capital stock of any Subsidiary was issued in violation of the preemptive or similar rights of any security holder of such Subsidiary.*** The Company does not own or control, directly or indirectly, any corporation, association or other entity other than the subsidiaries listed in Exhibit 21 to the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2016, except as disclosed in the General Disclosure Package and the Final Offering Memorandum and such other subsidiaries none of which, in the aggregate, would constitute a "significant subsidiary" of the Company under Rule 1-02 of Regulation S-X. ***The only Subsidiaries of the Company are the subsidiaries listed on Schedule D hereto.***

220. Schedule D of the Purchase Agreement listed S2 Albania (Albania) as such a "Subsidiary."

221.   On the March 14, 2017, the Company participated in the ROTH Capital Partners Conference (the "March 14, 2017 Conference"). At the conference, Defendant Edrick touted the turnkey model:

> But, again, wherever there happens to be a significant tender taking place, we're generally playing in that tender. *That brings us to turnkey. . . And we were the first ones to do this, and to-date are still the only one to have had any significant contracts on this. We've won three deals. These are multi-year deals ranging so far anywhere between 6 and 15 years. And then just four, five short years since we launched this idea, this has already become north of 30% of our security division revenues. So, it's a nice business that has been highly successful for us.* It's a long sales cycle. Our goal is really to try to add one or two a year.

> We haven't exactly hit that goal. It tended to take us a little bit longer to add new contracts as with just so many intricacies in order to get these over the finish line. *But we're very excited and we're working on a number of opportunities on the turnkey side as we sit here today. We really have three main catalysts for growth as we look at it on the security side. Turnkey, which we just talked about, is one of them.*

222.   Each of Defendants' statements set forth in ¶¶ 213-217, 219-221 were materially false or misleading when made, and/or omitted material facts, including the following:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b. The secretive arrangement with ICMS combined with undisclosed favorable from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The purported revenues from the Albanian contract were subject to an undisclosed "profit shar[ing] agreement" and 49% transfer of the S2 Albania entity that owned the rights to the contract;

e. The omission of material facts relating to (a)-(d) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

**O.    Third and Fourth Quarter 2017**

223.   On April 26, 2017, OSI issued a press release announcing its financial results for the third quarter of fiscal year 2017 ("3Q17") (the "April 26, 2017 Press Release"), which was attached as an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date.

224.   On the same day, OSI held a conference call to discuss and expand upon the Company's 3Q17 results (the "April 26, 2017, Conference Call"). During the call, Defendant Edrick stated that:

> Over the past decade, we have a track record of producing sales and earnings growth with strong cash flow generation, while simultaneously investing in product development and innovation for the future in conjunction with strategic acquisitions. We feel these efforts have served us well. ***Our investments have enabled us to continue our leadership role in the turnkey screening solutions market space and have allowed us to introduce innovative products and solutions to the market across our industries.***

225. On May 24, 2017, Defendants participated in the B. Riley & Co. Institutional Investor Conference (the "May 24, 2017 Conference"). At the conference, Defendant Edrick boasted about the benefits of its current turnkey contracts, including Albania, stating:

> ***And to that end, we've landed three significant contracts in Mexico, Puerto Rico, and Albania. These are long-term contracts ranging from 6 to 15 years, and it really provides a nice recurring revenue at a nice margin for us. We're the clear leaders in the turnkey. We think we have a significant first-mover advantage, so we won 100% of the deals today. While that might not always be the case, we think we'll continue to win a disproportionate share, given our strong leadership position in this area.***

226. On June 7, 2017, Defendants participated in the Jefferies Global Healthcare Conference (the "June 7, 2017 Conference"). During the conference, Defendant Edrick touted the turnkey solution and its current turnkey contracts, including Albania, stating:

> A full turnkey solution, whereby, instead of selling them the equipment, we manufacture the equipment, we place it at the customer site, we own it, it sits on our balance sheet. We staff it up with our people, we enter into a long-term contract with the customer. And then we charge them a fee per scan or a fee per site per month. ***We call that turnkey, and it has been an extremely successful opportunity for us. We've landed major contracts in Mexico, Puerto Rico and Albania, we're the clear number one leader in this market space and we're looking to continue to expand it. So very exciting, the primary focus of this has been at borders and at ports, but can easily be expanded into other venues as well.***

227. On June 15, 2017, Defendants participated in the Drexel Hamilton Aerospace & Defense Conference (the "June 15, 2017 Conference"). At the conference, Defendant Edrick again trumpeted the Company's turnkey contracts, stating:

> ***And to this end, we've won three contracts in Puerto Rico, Mexico, and Albania. And it has led to a lot of that substantial increase that you've seen in the service revenue, in the service profit.***
>
> ***It's a very exciting model for us. We're clearly the market leader. In fact, no other company has won any other significant deal in this marketplace***, but it's a long sales cycle. Each of these deals we work on

generally take a number of years from start to finish to close the deal, but it's a very exciting area for us and continuing to focus here.

228. On August 9, 2017, Defendants participated in Jefferies Global Industrials Conference (the "August 9, 2017 Conference"). At the conference, Defendant Edrick stated in response to an analyst's question:

> **So the question about momentum in turnkey.** Yeah, we would love to be signing turnkey deals at a faster rate than we are. The reality is we're the only ones who have won a turnkey deal. **So, it's not that we're losing any turnkey deals to others, but it just takes a long time to get them over the finish line.**
>
> **Each of these contracts, we probably worked on for three to four years before we ultimately signed a contract with them.**

229. During the same conference, Defendant Edrick further touted the Company's turnkey business and its contracts, including in Albania, stating:

> Our first contract that we won was in Puerto Rico, a nice 10-year contract whereby we are screening all the containers that come into the port, into the Puerto Rico Ports Authority in San Juan. And we follow that up with a much larger contract in Mexico and **a third contract in Albania.**
>
> **And, in just a short period of time, this has already become a significant part of our overall business. We're excited about it. We're – in addition to pure turnkeys, we're looking at hybrid models as well where maybe we don't take on the full context of everything that's going on, maybe the customer might continue with some of those responsibilities. But a great area for us, providing excellent recurring revenue at higher margins than our regular business.**

230. On August 24, 2017, OSI held a conference call to discuss and expand upon the Company's 4Q17 and annual financial results (the "August 24, 2017, Conference Call"). During the call, Defendant Chopra also touted the Albania turnkey contract, stating:

> **Turning to turnkey services. Our current programs in Albania, Mexico and Puerto Rico continue to perform well.** As we have mentioned in the past, the potential customers that are seeking to buy cargo product or turnkey service model options are increasingly overall and we continue to look at moving from one to the other.

231. On the September 7, 2017, OSI filed an annual report on Form 10-K for with the SEC (the "FY17 Form 10-K") signed by Defendants Chopra, Edrick, and

Mehra.  In the FY17 Form 10-K, Defendants highlighted the increased revenue from the Albanian contract, stating:

> Fiscal 2017 Compared with Fiscal 2016. ***Revenues for the Security division increased primarily as a result of*** increased sales of cargo and vehicle inspection systems . . . and ***increased revenue from turnkey scanning operations as a result of a full year of operations in our Albanian program, which commenced in the second quarter of fiscal*** 2016, and our expanded operations within our Mexican program, which added several sites in the fourth quarter of the current year.
>
> \*     \*     \*
>
> Fiscal 2016 Compared with Fiscal 2015. Revenues for the Security division decreased primarily as a result of a $66.4 million reduction in revenues associated with a Foreign Military Sale contract with the U.S. Department of Defense . . . . ***This decrease was partially offset by revenues from the commencement of our turnkey scanning operation in Albania during the year.***

232.   Each of Defendants' Class Period statements set forth in ¶¶ 224-231 were materially false or misleading when made, or omitted material facts, including the following:

   a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

   b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

   c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory

---

1   action, and increased the risk that U.S. and foreign governments would

2   refuse to do business with OSI once the details surrounding the Albanian

3   turnkey contract were revealed;

4       d.  The purported revenues, profits, and margins from the Albanian contract

5   were subject to an undisclosed "profit shar[ing] agreement" and 49%

6   transfer of the S2 Albania entity that owned the rights to the contract;

7       e.  The omission of material facts relating to (a)-(d) above created a false

8   and/or misleading impression that the turnkey model would be the

9   primary driver of OSI's future growth and provide a sustainable

10   competitive advantage in the security industry.

11   **P.   First Quarter 2018**

12   233.   On October 26, 2017, OSI held a conference call to discuss and expand

13   upon the Company's results for the first quarter of fiscal year 2018 ("1Q18") (the

14   "October 26, 2017, Conference Call"). During the call, Defendant Edrick touted the

15   Company's leadership in turnkey solutions, stating:

16   > Over time, we have demonstrated a strong track record of sales and
17   > earnings growth with strong cash flow generation, while simultaneously
18   > investing in product development and innovation for the future and
19   > making strategic acquisitions that have served us well. ***Our investments
20   > have enabled us to continue our leadership role in the turnkey
21   > screening solutions market space and have allowed us to introduce
22   > innovative products and solutions to the market across our different
23   > industries.***

21   234.   Defendant Chopra also trumpeted the success of the Company's turnkey

22   contracts on the call, stating, "***Our turnkey solutions contracts in Mexico, Puerto***

23   ***Rico and Albania continue to perform well.***"

24   235.   On December 6, 2017, shortly after the MWR Report was published,

25   OSI issued a response, denouncing Muddy Waters' claims of corruption as

26   "misleading allegations" and represented that ***the "turnkey security inspection***

27   ***programs in Mexico and in Albania were the result of public tenders***." The

Company also represented that "***ICMS implemented all civil works construction for the program . . . [and] both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares***."

236. Each of Defendants' Class Period statements set forth in ¶¶ 233-235 were materially false or misleading when made, or omitted material facts, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA;

c. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed;

d. The omission of material facts relating to (a)-(c) above created a false and/or misleading impression that the turnkey model would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry.

**Q.     SOX Certifications**

237.   Each of the foregoing Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017, were certified by Defendants Chopra and Edrick, who each declared that:

1.  I have reviewed this Annual Report on Form 10-K of OSI Systems, Inc.;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.  ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

**(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

238. In the same Form 10-Ks, Defendants Chopra and Edrick also certified that "*The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods presented in the Report*."

239. Similarly, the foregoing Form 10-Qs, including those filed on October 25, 2013, January 30, 2014, May 2, 2014, October 24, 2014, January 27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016, October 31, 2016, February 1, 2017, April 27, 2017, and October 31, 2017, were each certified by Defendants Chopra and Edrick, who each declared that:

> **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;**
>
> *       *       *
>
> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

*(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

240.   The foregoing certifications and statements in ¶¶ 237-239 were materially false and misleading for the same reasons set forth in ¶¶ 137, 142, 149, 152, 162, 166, 172, 176, 179, 190, 197, 206, 211, 222, 232, and 236.

## R.    Internal Controls

241.   In addition to certifying the accuracy and truthfulness of the SEC filings, the Form 10-Qs filed on January 30, 2014, October 24, 2014, January 27, 2015, April 8, 2015, October 30, 2015, January 28, 2016 also certified that:

> Based upon an evaluation of the effectiveness of disclosure controls and procedures, our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") have concluded that, as of the end of the period covered by this Quarterly Report on Form 10-Q, *our disclosure controls and procedures as defined under Exchange Act Rule 13a-15(e) and 15d-15(e) were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission and is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure*.

242.   Certain of these Form 10-Qs, including those filed on October 25, 2013 and April 28, 2016,  also represented that:

> *We maintain disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is processed, recorded, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure*.

> We carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the disclosure controls and procedures as of September 30, 2013, the end of the period covered by this report. Based upon that evaluation, our management, including *our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of September 30, 2013*.

243.    Defendants made other similarly misleading statements to the market about their compliance procedures and internal controls. For example, during a Stephens Conference with investors on June 3, 2014, in response to an analyst's question about what measures the Company had taken to prevent another non-compliance issue, like the 2013 TSA debarment proceeding, Defendant Edrick reassured investors that "*we do think that we've established strong procedures, processes that will enable us to hopefully avoid such issues in the future. [ph] Our management has been strengthened significantly. Our compliance function has been upgraded significantly, and the oversight function overall as well. So we're hopeful that, that will take care of it*."

244.    Defendant Edrick confirmed this statement during the August 12, 2014 Conference, stating that "*We, as a company overall, I think our controls are actually quite strong*."

245.    Likewise, in a February 22, 2017 Form 8-K, which attached a Purchase Agreement for the OSI Bonds as Exhibit 1.1, the Company assured the market that:

> *The Company and each of its subsidiaries maintain effective internal control over financial reporting (as defined under Rule 13-a15 and 15d-15 under the 1934 Act Regulations) and a system of internal accounting controls sufficient to provide reasonable assurances that* (A) transactions are executed in accordance with management's general or specific authorization; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (C) access to assets is permitted only in accordance with management's general or specific authorization; (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and (E) the interactive data in eXtensible Business Reporting Language or incorporated by reference in the General Disclosure Package and the Final Offering Memorandum *fairly presents the information called for in all material respects and is prepared in accordance with the Commission's rules and guidelines applicable thereto.* Except as described in the General Disclosure Package and the Final Offering Memorandum, since the end of the Company's most recent audited fiscal year, there has been (1) *no material weakness in the Company's internal control over financial reporting* (whether or not remediated) and (2) no change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. The Company and each of its subsidiaries maintain an

effective system of disclosure controls and procedures (as defined in Rule 13a-15 and Rule 15d-15 under the 1934 Act Regulations) that are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and is accumulated and communicated to the Company's management, including its principal executive officer or officers and principal financial officer or officers, as appropriate, to allow timely decisions regarding disclosure.

246. The February 22, 2017 Form 8-K also certified that it complied with the Sarbanes-Oxley Act. It stated: "***There is and has been no failure on the part of the Company or any of the Company's directors or officers, in their capacities as such, to comply in all material respects with any provision of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith, including Section 402 related to loans and Sections 302 and 906 related to certifications***."

247. The Company also made statements throughout the Class Period regarding its specific policies and protocols aimed at complying with the FCPA. For example, in its Form 10-Ks filed on August 24, 2015, August 19, 2016, September 7, 2017, Defendants stated:

We are required to comply with the U.S. Foreign Corrupt Practices Act, which prohibits United States companies from engaging in bribery or making other prohibited payments to foreign officials for the purpose of obtaining or retaining business. ***It also requires us to maintain specific record-keeping standards and adequate internal accounting controls. In addition, we are subject to similar requirements in other countries***. Bribery, corruption, and trade laws and regulations, and the enforcement thereof, are increasing in frequency, complexity and severity on a global basis. ***Although we have internal policies and procedures with the intention of assuring compliance with these laws and regulations***, our employees, distributors, resellers and contractors involved in our international sales may take actions in violations of such policies. ***If our internal controls and compliance program do not adequately prevent or deter our employees, distributors, resellers, contractors and/or other third parties with whom we do business from violating anti-bribery, anti-corruption or similar laws and regulations, we may incur severe fines, penalties and reputational damage***.

248. The Company made similar representations in its Code of Ethics & Conduct, filed with the SEC on May 23, 2016 and September 7, 2017 (the "Code of Ethics"). In particular, the Code of Ethics stated that:

OSI is committed to compliance with U.S. and international government contracting.

\*     \*     \*

U.S. and international government employees are required to abide by strict ethical guidelines that restrict their ability to receive gifts, meals and entertainment. OSI's policy requires that you avoid providing gifts, hospitality, or entertainment to government officials in order to avoid the appearance of improper influence. Different gift rules apply when you are dealing with government employees. All employees, who interact with government employees or are involved in the company's government contracts or sub-contracts are required to review our Government Contracting Handbook and Anti-Corruption Compliance (ACC) Program for specific guidelines that provide specific limitations on gift giving and entertainment.

\*     \*     \*

***We are firmly committed to complying with international anti-corruption and anti-bribery laws including the U.S. Foreign Corrupt Practices Act (FCPA) and the U.K. Bribery Act. OSI's Anti-Corruption Compliance (ACC) Policy strictly prohibits making, offering, promising, or authorizing a corrupt payment of money, or anything of value, to a government official or any other person in order to obtain or retain business, or to direct business. or to achieve any business-related objective. You are also prohibited from receiving a corrupt payment of money, or anything of value, in connection with your employment with our company.*** All employees are required to read and abide by our Anti-Corruption Compliance Policy, which places strict guidelines; on extending gifts and entertainment, covering travel and accommodation expenses for third-parties, and interacting with OSl's business partners.

249. Each of Defendants' Class Period statements set forth in ¶¶ 241-248 were materially false or misleading when made, or omitted material facts because Defendants themselves disregarded any purported internal controls processes and procedures, failed to comply with and were not committed to anti-corruption laws and ethical standards, and concealed the Albanian arrangement from investors, as set forth in Section IV.

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

250. As described in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that the statements identified in Section V were materially false and

misleading and/or omitted material facts when made.  In addition to the specific facts enumerated above, the following facts also support a strong inference of scienter.

**A.    Top OSI Executives, Including Individual Defendants Chopra and Mehra, Directly Oversaw and Had Actual Knowledge of the Undisclosed Arrangement With ICMS**

251.   As set forth in Sections III and IV and corroborated by CW 1, OSI's S2 subsidiary (which operated its turnkey solutions business) was an extremely secretive entity overseen by a small and close-knit group of only three OSI executives, including Defendant Mehra and OSI's Senior Executive, Fleming, who founded S2 before it was acquired by OSI. These executives monitored and/or oversaw the negotiations and execution of the turnkey contracts, including for Albania.

252.   Moreover, CW 3 recalled that only a small group of individuals, consisting of Defendant Chopra, Defendant Mehra, Defendant Edrick, and OSI General Counsel Victor Sze, were privy to the details about the Company's turnkey contracts and participated in meetings regarding the contracts. CW 3 also stated there was a "hands off" attitude toward S2 and the Company was "hush hush" and very protective about S2.

253.   The documentary record surrounding the Albanian turnkey contract confirms that Defendant Mehra was directly involved and participated in the corrupt arrangement and 49% transfer of S2 Albania to ICMS.  Indeed, to effectuate the transfer, on September 6, 2013, Mehra personally signed the Power of Attorney that expressly authorized an OSI affiliated Albanian lawyer, Shijaku, to "***carry out the [] sale***" of 49% of S2 Albania to ICMS for "490 Albanian lekë" or $4.50.   In accordance with Mehra's instructions, just six days later, on September 16, 2013, Shijaku executed the formal sales contract transferring the 49% stake to ICMS for $4.50.   Because he himself authorized the transfer and participated in the secret arrangement with ICMS, Defendant Mehra had actual knowledge of the material facts concealed by Defendants during the Class Period.

254. Likewise, CW 3 confirmed that Mehra was directly involved in the negotiation of the Albania turnkey contract. Indeed, according to CW 3, Mehra had a role in the negotiation of the screening contracts as an active, if not the key, negotiator. CW 3 also recalled that Mehra went to Albania before the contract was signed and perhaps once after the contract began experiencing problems with the Albanian government.

255. This was consistent with Chopra's practice, according to CW 1, to get involved with any "big money" contract—such as the Albanian contract, which was one of only three purportedly highly-profitable turnkey contracts for the entire Company. Given his level of participation during the negotiations and his close familial and executive ties with Mehra, Defendant Chopra either knew, or was deliberately reckless in not knowing about the corrupt arrangement surrounding the Albanian contract, including the undisclosed profit-sharing arrangement with ICMS and transfer of 49% of S2 Albania to ICMS for less than $5.00.

256. Documentary evidence also shows that OSI's Senior Executive, Fleming, who became second-in-command of the closely held S2 Global team in 2014, had direct knowledge of and participated in the Albanian turnkey deal. Fleming was designated as the "registered administrator" of S2 Albania upon its formation in 2013, a position that was renewed on numerous occasions, including July 30, 2014, January 4, 2015, March 18, 2015, January 4, 2016, and May 26, 2017.

257. The sole purpose of S2 Albania, according to company documents, was the implementation of the $150 to $250 million contract with Albania as well as any other activity related to or required to enforce the agreement. As administrator of S2 Albania, during the Class Period, Fleming executed numerous resolutions and authorizations on behalf of S2 Albania purportedly related to this purpose, including to establish S2 Albania affiliates for border checkpoints, register materials with the Business National Center, and approve submission of financial statements.

258. Based on his position and his duty to execute resolutions on behalf of S2 Albania, Fleming knew or was deliberately reckless in not knowing about the undisclosed profit-sharing arrangement with ICMS and transfer of 49% of S2 Albania to ICMS for less than $5.00. In turn, the fact that Fleming was second in line to Mehra on the closely-held S2 executive team, as well as serving as an OSI executive, supports a strong inference that the Company itself and Individual Defendants knew, or were deliberately reckless in not knowing or disregarding, that their Class Period statements were false and/or misleading and omitted material facts.

**B.    The    Individual    Defendants'    Senior-Level    Positions, Micromanagement Styles, and Close-Knit Personal Relationships Reinforce a Strong Inference of Scienter**

259. The Individual Defendants' senior-level positions and personal relationships supports a strong inference that the they knew, or were deliberately reckless in not knowing or disregarding, that their statements regarding OSI's turnkey business, the Albanian contract, S2 Albania, and OSI's internal controls were false and/or misleading and omitted material facts.

260. In particular, throughout the Class Period, Defendant Chopra was the founder and CEO of OSI—the senior-most position within the Company. As CEO, Chopra was responsible for certifying and signing the Company's SEC filings during the Class Period. Moreover, according to CW 3, Chopra was one of a small secretive group of people privy to details about the Company's turnkey contracts and who participated in meetings regarding the contracts.

261. CW 2 likewise described Defendant Chopra as a micromanager who had a "win at all cost mentality." By way of example, CW 2 recalled that Company executives from all divisions would attend an offsite meeting, once per quarter, typically in Palm Springs. CW 2 attended several such meetings and observed that Chopra drilled down deeply and intensely, and demonstrated his knowledge of the Company's products and processes "inside out."

262.   Similarly, CW 1 recalled that Chopra became involved in a foreign military sales project calling for the sale of mobile screening trucks to Iraq through the U.S. Army. The execution of the contract should have fallen to CW 1's team but Chopra became very involved, directing CW 1 on which local agent to use and what tasks the local agent should perform (despite the fact that the agent was unqualified and couldn't perform the tasks required), and directly handling the negotiations. CW 1 recalled that Chopra offered the Iraqi government $500,000 in free X-ray equipment and metal detectors as an inducement to pick up an option to expand the contract. CW 1 also recalled that in 2015, in response to a government RFP that required a certain percentage of equipment to be "made in the USA" under the Trade Agreement Act, despite the fact that OSI's equipment was primarily made in Malaysia and the Company didn't have the capability to make the required equipment, Chopra told her "don't ask how we meet the requirement" and "don't ask the question, we'll take care of it."  Based on her personal interactions with Chopra, CW 1 believed Chopra had "extremely low ethics" and that he was never interested in compliance but simply wanted to "check the box." CW 1 also stated her belief that OSI was not an ethical company.

263.   Similarly, CW 3 reported that, prior to OSI's compliance problems with the TSA, Chopra did not care about compliance, was sloppy, and did not want to get caught. When describing Chopra's view of compliance CW 3 stated "the fish stinks from the head down." CW 3 also stated that after OSI's problems with the TSA, Chopra's compliance approach was that Chopra wanted to do enough to get the company "out of the penalty box" but did not want to necessarily do things right, he just did not want to get caught.

264.   Likewise, CW 2, reported that during her last years at the company, CW 2 was uncomfortable with things she saw, was asked to do, or to which she was required to turn a "blind eye." She said company sales personnel in foreign countries

did not understand FCPA. Similar to CW 1's account regarding OSI's non-compliance with "Made in the USA" requirements, CW 2 was told to certify a petition document stating that a product was built in the USA even though it meant he would be lying about the conditions under which the equipment was built. The impression CW 2 received from upper management was that such falsification was not a big deal. CW 2 said upper management's view was since the company's competitors did it, so could OSI/Rapiscan. CW 2 stated she was asked to "turn a blind eye" several times regarding where equipment for overseas projects was actually manufactured.

265.   Like Chopra, Defendant Mehra was a founding member of the OSI's executive team. Moreover, since 2014, Mehra has been the President of S2 Global, one of three members on S2's executive team, and, according to CW 3, Mehra was one of a handful of people privy to details about the Company's turnkey contracts and who participated in meetings regarding the contracts.

266.   Prior to acting as President of S2, during the time of the bidding and securing of the Albanian contract, Mehra was the President of Rapiscan, which was the party to the contract and documentation surrounding the 49% transfer of S2 Albania to ICMS.  As discussed in Section IV.E.3, as President of Rapiscan, Mehra himself directed and facilitated the transfer of 49% of S2 Albania to ICMS.

267.   Moreover, Defendant Chopra and Defendant Mehra are first cousins and are known to have business ties outside of the Company. According to CW 3, because Mehra reported to Chopra, they spoke frequently. In addition, since 1994, Defendants Chopra and Mehra have worked closely together as part of an Indian joint venture called ECIL-Rapiscan Security Products Limited. Defendant OSI owns a 36% interest, Defendant Chopra owns a 10.5% interest, and Defendant Mehra owns a 4.5% interest in ECIL-Rapiscan Security Products Limited.

268.  Defendant Edrick, at all relevant times, held the position of OSI's Executive Vice President and Chief Financial Officer. Like Chopra and Mehra, according to CW 3, Edrick was one of approximately five people privy to details about the Company's turnkey contracts and who participated in meetings regarding the contracts.  In addition to certifying and signing the Company's SEC filings during the Class Period, Defendant Edrick made statements about the Company's internal controls and the measures the Company had taken to prevent non-compliance issues, like the 2013 TSA debarment issue.

269.  By virtue of their high-level executive positions, Defendants Chopra, Mehra, and Edrick directly participated and were involved in both the management and day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company's important operations, including S2, its turnkey contracts, the contract with Albania, and the secretive arrangement and transfer of 49% of the Company's interest in S2 Albania to ICMS. Moreover, given their managerial positions and close personal and business relationships, the Individual Defendants would have kept each other apprised of issues within S2, including the profit-sharing arrangement and partnership with ICMS.

## C.   The Fraud Involved a Key Contract and Core Operation of the Company—Its Turnkey Business

270.  As OSI's most senior executives with direct control and supervision over its business, operations, and public statements, the Individual Defendants were knowledgeable about OSI's core business operations—including its Security division and that division's highly touted turnkey business.

271.  OSI's Security division was the Company's single most important division, accounting for 49%, 50%, 50%, and 58% of total revenues for fiscal years 2014, 2015, 2016, and 2017, respectively.

272.   Throughout the Class Period, Defendants repeatedly represented that the success of the key Security division was being driven by its turnkey business. As a result, both Defendants and the market were keenly focused on the Company's turnkey business and its three long-term turnkey contracts, including Albania. Indeed, Defendants consistently reported that turnkey service revenues were driving the Security division's growth and comprised a material portion of its backlog. For instance, during the January 28, 2014 Conference Call, Defendant Edrick touted that "[s]ales from our Security division increased 16% over the same quarter last year, *led by the year-over-year growth in turnkey services revenue*." Likewise, on the August 20, 2015 Conference Call, Defendant Chopra boasted that "[i]n turnkey services, our current programs continue to contribute strongly to our performance . . . The turnkey services market represents an outstanding growth opportunity, and as mentioned earlier, *we have realigned some of our leading resources to focus exclusively on this*."

273.   On the same call, Defendant Chopra highlighted the importance of the turnkey business, announcing that Defendant Mehra would exclusively focus on the turnkey "solutions" business:

> *Ajay Mehra*, who led Rapiscan to strong success over a number of years, *is now* focused *exclusively on the solutions business, reflecting the importance, and the priority we have, on growing our turnkey business*, expanding service and solutions to Security customers, as well as developing service offerings to other markets.

274.   Additionally, only three turnkey contracts existed during the Class Period, reinforcing the inference that Defendants were closely monitoring each contractual arrangement. Defendants also repeatedly cited the Albanian contract as one of the primary drivers of the Security division's revenues growth. For instance, comparing fiscal year 2017 with fiscal year 2016, Defendants stated in the FY17 Form 10-K that, "*Revenues for the Security division increased primarily as a result of . . . increased revenue from turnkey scanning operations as a result of a full year*

*of operations in our Albanian program, which commenced in the second quarter of fiscal 2016*," among other factors.

275.   The importance of the Security division and its turnkey business model to the Company's success and growth, as well as Defendants' own statements indicating that they were particularly focused on the turnkey business and the Albanian contract, raise a strong inference that they knew, or were reckless in not knowing or disregarding, that their Class Period statements were false and/or misleading and omitted material facts.

**D.    The Small Size and Closely-Held Structure of S2, Combined With the Limited Number of Turnkey Contracts and Defendants' Scrutiny of Foreign Transactions, Reinforces a Strong Inference of Scienter**

276.   As explained in Section IV.D and IV.E, during the Class Period (and to date) OSI only had three turnkey contracts, all run out of its S2 division.  Defendants deliberately kept those turnkey contracts and S2's secretive operations tightly controlled by a few individuals, including the Individual Defendants.

277.   In carrying out their turnkey business, Defendants also targeted foreign jurisdictions that were known for corruption and obscured certain financial and component details surrounding its turnkey contracts, despite repeated requests from analysts for more information regarding the turnkey deals.  Section IV.G. As a result, Defendants were required to, and represented that they did, maintain policies and procedures specifically to monitor corruption and bribery in foreign jurisdictions.

278.   For example, Defendants represented that:

We are required to comply with the U.S. Foreign Corrupt Practices Act, which prohibits United States companies from engaging in bribery or making other prohibited ***payments*** to foreign officials for the purpose of obtaining or retaining business. *It also requires us to maintain specific record-keeping standards and adequate internal accounting controls. In addition, we are subject to similar requirements in other countries. Bribery, corruption, and trade laws and regulations, and the enforcement thereof, are increasing in frequency, complexity and severity on a global basis. Although we have internal policies and procedures with the intention of assuring compliance with these laws and regulations*, our employees, distributors, resellers and contractors

involved in our international sales may take actions in violations of such policies.

279.   Furthermore, Defendants repeatedly acknowledged that they scrutinized their operations in "each country."  For example, the Company's January 30, 2014 Form 10-Q stated that the Company "*monitor[ed] [their] operations in each country and seek to adopt appropriate strategies that are responsive to changing economic and political environments* . . . ."

280.   The combination of these factors, including: (i) the small number of turnkey contracts; (ii) the closely-held nature of the S2 and turnkey operations and details surrounding the contracts; (iii) the notoriously high corruption rate in the countries where OSI was operating its turnkey business and related FCPA-mandated monitoring; and (iv) Defendants' close monitoring of foreign operations, support a strong inference that Defendants knew, or were reckless in not knowing or disregarding, that their Class Period statements were false and/or misleading and omitted material facts.

E.   **Defendants' Duty Under the Administrative Agreement With the U.S. Government to Implement Compliance Programs and Monitor Their Contractual Arrangements Supports Scienter**

281.   As set forth in Section IV.A, OSI's pattern of misconduct surrounding its contracts with the U.S. Government and its proposed "debarment" proceedings, ultimately forced the Company to enter into a detailed Administrative Agreement which required the Company to design and implement comprehensive policies, procedures and internal control systems, including for the "monitoring and auditing of contracts" and "business ethics" to ensure that its Security business "operates in compliance with all applicable laws [and] regulations."   The Administrative Agreement, which notably was executed two months *before* the Class Period (June 21, 2013), stated in relevant part:

> *Rapiscan agrees to maintain a self-governance program that includes compliance programs for internal controls, designed for the effective monitoring and auditing of contracts* and *grants, and a business ethics*

*program that covers all employees. The business ethics program shall be maintained with the goal that Rapiscan and each of its employees maintains the business honesty and integrity required of a government contractor and that Rapiscan operates in compliance with all applicable laws, regulations, and the terms of any contract*. Rapiscan represents that the business ethics program includes the following components;

A. Rapiscan employees are subject to a Code of Ethics and Conduct (Code of Conduct). The Code of Conduct *specifically addresses ethical business practices; securities laws; antitrust* and competition; *anti-corruption*; export control; political activities; conflict of interest; gifts and gratuities; employment laws; financial reporting; health and safety; and reporting suspected violations of law or the Code of Conduct. This Code of Conduct includes a non-retaliation policy, which prohibits retaliation against employees for reporting suspected violations of the Code. Rapiscan will provide to the DHS SDO a copy of the Code Ethics and Conduct within 30 days following the execution of this agreement.

282. The Administrative Agreement also required Defendants to maintain "robust" compliance, ethics and monitoring programs that would be overseen by the Company's General Counsel under the direct supervision of Defendant Chopra:

*Rapiscan has implemented and agrees to maintain a robust and functional program that includes business ethics, compliance programs, and internal controls to ensure that Rapiscan effectively monitors, audits, and communicates about its compliance and ethics obligations and its commitment to the highest standards of integrity and transparency.*

Both prior to and in response to TSA's Show Cause Letter, Rapiscan took and will maintain the following measures:

\* \* \*

*B. Development of an OSI Systems ("OSI") wide corporate* compliance *program. Corporate Compliance directly reports to OSI's General Counsel, who has and will continue to directly report to the Chief Executive Officer of OSI.* In accordance with the OSI Board Audit Committee Charter, the Audit Committee comprising independent directors are responsible for overseeing the OSI compliance functions and promoting communication with the other board members. OSI's Vice President, Internal Audit reports directly to OSI's Board, and is responsible for assessing the sufficiency and effectiveness of the company's compliance programs.

C. Created new position of Director, Corporate Compliance, with direct access to OSI's Board of Directors on compliance issues and related activities. Christopher Cook is Director of Corporate Compliance for OSI. . . . As Director of Corporate Compliance, Mr. Cook is responsible for, among other things;

*1. Designing, implementing and monitoring the compliance program;*

2. Reporting on a regular basis to the General Counsel;

3. Revising the *compliance* program periodically, as appropriate;

4. Developing, *coordinating* and participating in compliance training and education;

**5. Ensuring that contractors and agents are aware of Company compliance requirements; and**

**6. Independently investigating and acting on compliance matters.**

283.   As part of the Administrative Agreement, Defendants were also required to submit written reports to the federal government regarding the implantation of such changes. The agreement stated:

*Semi-annually, Rapiscan shall submit a written report to DHS describing the measures taken by Rapiscan during the semi-annual period to implement the business ethics program and to ensure compliance with this Agreement.* The reports shall be submitted in time to be received by the DHS SDO within 20 days of the end of the semi-annual period. The final report shall be presented to the DHS SDO no later than one month prior to the final day of this Agreement. The reports shall include the following:

*A. Any standards of conduct, ethics, or compliance training conducted, subject matter covered, and the number and types of people that attended;*

*B. Information notifications or initiatives related to the business ethics program;*

C. Information *required* by the terms of this Agreement;

*D. The initiation of and status of any ongoing investigation or legal proceedings involving Rapiscan related to the facts described herein;*

E. A statement by the Rapiscan verifying that the Code of Business Ethics and Conduct is being *maintained*; and

F. A statement of any problems or weaknesses identified through the Ethics and Business *conduct* process, corrective action proposed or initiated, and the status of any corrected action.

284.   As a result of the Administrative Agreement, Defendants were required to monitor its contracts—including its all-important Albanian turnkey contract—for any compliance, ethics, or legal issues. Defendants' required monitoring under this agreement, combined with the nature and importance of the Albanian turnkey

---

contract, gives rise to a further inference that Defendants were aware, or recklessly disregarded, the details of the corrupt arrangement with ICMS relating to the Albanian contract.

### F.   Defendants' Contradictory Explanations Regarding the Albanian Arrangement Reinforce a Strong Inference of Scienter

285.   As detailed in Section IV.H, on December 6, 2017, MWR revealed certain facts surrounding the Albanian turnkey deal, including reporting that OSI "likely bribed somebody by giving half of" the Albanian contract entity. In response, OSI issued a same-day press release, which **admitted** the previously hidden "partnership" and "profit share" with ICMS:

> Our Albania turnkey security inspection program is operated **in partnership with ICMS,** a local company with civil works construction capabilities in Albania, with a **profit share** in accordance with the terms of our **agreement with ICMS**.

286.   Despite these admissions, Defendants continued to mislead the market and omit material facts regarding the details of the Albanian arrangement.  In the same December 6, 2017 press release, for example, Defendants denied the MWR Report and created a false impression that the Albanian arrangement was above board, implying that the contract would not be subject to further scrutiny: "ICMS implemented all civil works construction for the program. As such, both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares."

287.   Notably, however, Defendants did not explain why, if the ICMS arrangement was legitimate based on "significant" investments from an unknown Albanian partner, the Company did not disclose the 49% transfer and profit-sharing arrangement earlier, or why the Company explicitly misrepresented that S2 Albania was a wholly-owned subsidiary.

288.   Defendants' explanations on December 6, 2017 are also contradicted by numerous facts relating to S2 and ICMS's disclosures, as set forth in the January 31,

2018 MWR Rebuttal. *See* ¶¶ 129-131. In that rebuttal, MWR established, among other things, the inconsistency between OSI's statement that ICMS Construction "made significant capital investments" and the fact that ICMS Construction was not an established construction company, had virtually no tangible assets, and was capitalized for only approximately $850, and that OSI provided virtually all of the funding to S2 Albania. More specifically, MWR Rebuttal stated:

- **We see no S2 Albania assets to which ICMS could conceivably have contributed.** As of December 31, 2015, S2 Albania had total assets of US$10.8 million. Virtually all of the assets – US$9.6 million – were PP&E. According to the footnotes, 98.5% of PP&E (US$9.6 million) were machines (i.e., likely equipment from OSIS) – with no construction or buildings disclosed at all.

- **We see no financial contribution from ICMS to S2 Albania.** S2 Albania's December 31, 2015 liabilities confirm that substantially all of S2 Albania's capitalization came from OSIS. The financials show US$11.7 million in payables to OSIS. (Note that S2 Albania had negative shareholders' equity of US$-1.1 million.)

- **We see no account evidencing investment in S2 Albania by ICMS or ICMS Construction.** We see nothing on ICMS's CY2016 balance sheet that could resemble a meaningful investment in S2 Albania. Of its US$3.06 million in assets as of December 31, 2016, US$2.97 million are current assets. (US$1.8 million – 59.6% – is prepaid expenses; the balance is substantially all cash and receivables.) Of the US$80,000 of non-current assets, 99.99% is PP&E.

289.   The timing of Defendants' December 6, 2017 press release further supports a strong inference of scienter.   Indeed, within hours of the first MWR Report, Defendants had admitted to a partnership with ICMS and profit-sharing agreement surrounding the Albanian contract.   In so admitting, Defendants did not claim that they had been previously unaware of the arrangement but, rather, claimed that even though they had gone to great lengths to hide the arrangement throughout the Class Period, it was entirely legitimate.   The fact that Defendants were able to so quickly confirm the arrangement with ICMS, and their failure to deny previous knowledge of that arrangement, further support the inference that they knew, or

recklessly disregarded, that their Class Period misleading statements and omissions were false and/or misleading and omitted material facts.

**G.    Defendants SOX Certifications Support an Inference of Scienter**

290.    Defendants Chopra, Edrick, and Mehra, as OSI's executive officers and/or directors, controlled the contents of the Company's public SEC filings during the Class Period. Each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance. By virtue of their respective positions and access to material non-public information regarding the Company, each knew or recklessly disregarded that the adverse facts alleged herein concerning the Albanian turnkey arrangement with ICMS had not been disclosed to, and were being concealed from the public, and that the positive representations made were materially false, and misleading. As a result, Defendants Chopra, Edrick, and Mehra were responsible for the accuracy of OSI's public SEC filings, and were therefore responsible and liable for the representations contained therein or omitted therefrom.

291.    As alleged herein, throughout the Class Period, Defendant Chopra signed the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017; and the Company's Form 10-Qs, including those filed on October 25, 2013, January 30, 2014, May 2, 2014, October 24, 2014, January 27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016, October 31, 2016, February 1, 2017, April 27, 2017, and October 31, 2017, each of which contained the material false and misleading statements alleged herein, as set forth above in Section V.

292.    Additionally, as alleged herein, throughout the Class Period, Defendant Edrick signed the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017; and the Company's Form 10-Qs, including those filed on October 25, 2013, January 30,

2014, May 2, 2014, October 24, 2014, January 27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016, October 31, 2016, February 1, 2017, April 27, 2017, and October 31, 2017, each of which contained the material false and misleading statements alleged herein, as set forth above in Section V.

293. Defendant Mehra signed the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017, each of which contained the misleading statements alleged herein as set forth above in Section V.

## H. Defendants' Insider Trading and Executive Compensation Structure Reinforce the Strong Inference of Scienter

### 1. Defendants' Stock Dispositions Support Scienter

294. During the Class Period, Defendants Chopra, Edrick and Mehra collectively dumped over **$51 million** in OSI common stock while in possession of adverse material, nonpublic information regarding the Company's turnkey operations and the secret Albanian arrangement with ICMS. As the result of Defendants' materially false and misleading statements and omissions, these stock dispositions were executed at artificially inflated prices under suspicious circumstances.

295. During the Class Period, Defendant Chopra disposed of 338,896 shares of OSI common stock at an average price of $74.38, for a total approximate value of **$25.2 million**. Defendant Mehra disposed of 226,978 shares at an average price of $74.24, for a total approximate value of **$17.5 million**. Defendant Edrick disposed of 112,524 shares at an average price of $77.35, for a total value of approximately **$8.8 million**. The Individual Defendants' trades are set forth in the following charts:

| Deepak Chopra | | | |
|---|---|---|---|
| Transaction Date | Shares | Price | Value Disposed |
| 9/3/2013 | 7,827 | $72.70 | $569,023 |
| 9/9/2013 | 5,088 | $72.07 | $366,692 |

| | | | |
|---|---|---|---|
| 8/11/2014 | 7,284 | $67.16 | $489,193 |
| 9/9/2014 | 5,088 | $68.85 | $350,309 |
| 9/25/2014 | 12,000 | $62.91 | $754,920 |
| 10/15/2014 | 12,000 | $60.69 | $728,280 |
| 11/17/2014 | 12,000 | $68.57 | $822,840 |
| 12/12/2014 | 30,000 | $70.18 | $2,105,400 |
| 12/12/2014 | 5,000 | $69.87 | $349,350 |
| 12/12/2014 | 10,000 | $69.65 | $696,500 |
| 12/12/2014 | 5,000 | $69.24 | $346,200 |
| 12/15/2014 | 12,000 | $68.33 | $819,960 |
| 3/16/2015 | 10,000 | $73.05 | $730,500 |
| 3/16/2015 | 2,500 | $73.05 | $182,625 |
| 4/17/2015 | 10,000 | $74.99 | $749,900 |
| 4/17/2015 | 2,500 | $74.99 | $187,475 |
| 5/18/2015 | 10,000 | $71.43 | $714,300 |
| 5/18/2015 | 2,500 | $71.43 | $178,575 |
| 6/18/2015 | 10,000 | $73.88 | $738,800 |
| 6/18/2015 | 2,500 | $73.88 | $184,700 |
| 9/9/2015 | 3,665 | $74.66 | $273,629 |
| 9/16/2015 | 60,000 | $72.28 | $4,336,800 |
| 11/25/2015 | 36,944 | $94.23 | $3,481,233 |
| 11/25/2015 | 5,000 | $94.30 | $471,500 |
| 11/25/2015 | 3,000 | $94.31 | $282,930 |
| 11/25/2015 | 2,000 | $94.18 | $188,360 |
| 12/7/2016 | 5,000 | $75.71 | $378,550 |
| 12/7/2016 | 50,000 | $75.91 | $3,795,500 |
| **TOTAL** | **338,896** | **$74.38** | **$25,274,044** |

| Ajay Mehra | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price** | **Value Disposed** |
| 9/3/2013 | 1,704 | $72.70 | $123,881 |
| 9/9/2013 | 1,957 | $72.07 | $141,041 |
| 8/11/2014 | 3,758 | $67.16 | $252,387 |
| 9/9/2014 | 1,410 | $68.85 | $97,079 |
| 9/26/2014 | 8,236 | $63.52 | $523,151 |
| 9/26/2014 | 7,666 | $63.52 | $486,944 |
| 10/29/2014 | 30,000 | $69.06 | $2,071,800 |
| 5/20/2015 | 15,461 | $71.87 | $1,111,182 |
| 5/21/2015 | 7,000 | $71.87 | $503,090 |

| 9/9/2015 | 1,410 | $74.66 | $105,271 |
| 9/16/2015 | 10,000 | $77.23 | $772,300 |
| 9/16/2015 | 12,419 | $76.04 | $944,341 |
| 9/17/2015 | 14,279 | $78.47 | $1,120,473 |
| 9/17/2015 | 9,000 | $78.47 | $706,230 |
| 11/20/2015 | 40,052 | $95.61 | $3,829,372 |
| 12/9/2016 | 11,019 | $78.09 | $860,474 |
| 12/12/2016 | 25,000 | $76.62 | $1,915,500 |
| 12/13/2016 | 25,000 | $75.96 | $1,899,000 |
| 8/18/2017 | 1,607 | $78.85 | $126,712 |
| **TOTAL** | **226,978** | **$74.24** | **$17,590,227** |

| Alan Edrick | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price** | **Value Disposed** |
| 9/3/2013 | 1,410 | $72.70 | $102,507 |
| 9/9/2013 | 1,881 | $72.07 | $135,564 |
| 8/11/2014 | 2,819 | $67.16 | $189,324 |
| 9/9/2014 | 1,410 | $68.85 | $97,079 |
| 12/11/2014 | 13,594 | $73.32 | $996,712 |
| 6/11/2015 | 20,000 | $73.06 | $1,461,200 |
| 9/9/2015 | 1,410 | $74.66 | $105,271 |
| 11/18/2015 | 18,105 | $87.61 | $1,586,179 |
| 11/19/2015 | 11,895 | $92.80 | $1,103,856 |
| 11/20/2015 | 5,000 | $95.51 | $477,550 |
| 3/14/2017 | 35,000 | $73.14 | $2,559,900 |
| **TOTAL** | **112,524** | **$77.35** | **$8,815,141** |

296.   Both the amount and timing of Defendants' trades were highly unusual and suspicious.  For example, the shares Chopra disposed of during the Class Period represented ***46%*** of his total reported holdings in OSI common stock at the beginning of the Class Period (10/1/2013), and ***56%*** of his average year-end stock holdings during the Class Period.  Additionally, only weeks after OSI announced that the Albanian government "halted further progress" on the turnkey contract, on September 11, 2014, the Company abruptly disclosed that Chopra had entered into a "Rule 10b5-1 trading plan" to immediately sell 48,000 shares of OSI common stock

for over $3 million in illicit proceeds.   The execution of this trading plan while knowingly concealing material adverse information surrounding the Company's turnkey operations and the corrupt arrangement with ICMS reinforces the highly unusual and suspicious nature of Chopra's trading.

297.   Likewise, the shares Mehra disposed of during the Class Period represented **69%** of his total reported holdings in OSI common stock at the beginning of the Class Period (10/1/2013), and **88%** of his average year-end stock holdings during the Class Period.   The shares Edrick disposed of during the Class Period represented **28%** of his total reported holdings in OSI common stock at the beginning of the Class Period (10/1/2013), and **30%** of his average year-end stock holdings during the Class Period.

298.   The timing and pricing of these trades further highlight their suspicious nature. Notably, each of the three Individual Defendants had record high sales in 2015—the height of the Class Period—precisely around the time that the Company settled on revised terms with the Albanian government in the fall of 2015.

## 2.   OSI's Executive Compensation Structure Supports Scienter

299.   OSI's executive compensation was highly contingent on the Company's financial metrics. According to the Company's proxy statements, OSI placed an "emphasis on pay-for-performance principles," such that it believed "that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis." Accordingly, during the Class Period, OSI executives' fixed compensation—i.e., base salary—was a small percentage of the total compensation, while "variable" compensation—i.e., annual cash incentive bonuses or performance-based equity incentive awards–comprised the majority of total compensation.

300.   For example, under the Company's Annual Incentive Bonus program, according to the Company's October 17, 2014 proxy statement, "[t]he Company grants annual incentive bonuses based in part on each executive's contribution to

enhancing long-term stockholder value." To that end, certain executives received annual incentive bonuses based on the Company's "annual operating achievement and near-term success," and quantitative factors such as "contributions to stockholder value" and "earnings per share and internal metrics."

301.   Indeed, stock price, i.e., stockholder value, was a major focus at the Company. For instance, in the November 21, 2013 proxy statement, the Company stated that:

> [U]nder our CEO's leadership, our stock price has increased 132% and 201% over the past three- and five-year periods, respectively, ending in fiscal 2013. We have achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business. Our CEO's pay over the past five-years ending in fiscal year 2013 has been closely aligned with our [total stockholder return] performance.

302.   Under this Annual Incentive Bonus program, in addition to their base salaries, Chopra earned $1,323,000 in 2013, $353,000 in 2014, and $700,000 in 2015; Edrick earned $340,000 in 2013, $160,000 in 2014, and $300,000 in 2015; and Mehra earned $325,000 in 2013, $125,000 in 2015, and $245,000 in 2017.

303.   As a result of the lucrative financial incentives offered by the Company, the Individual Defendants were highly motivated to artificially inflate the price of OSI stock by making false and misleading statements that concealed material facts surrounding its turnkey operations and the undisclosed Albanian arrangement with ICMS.

### 3.   Defendant Mehra's Compensation Was Closely Tied to the Performance of the Turnkey Business

304.   In addition to the executive compensation program, as discussed in various Company proxy statements, in 2015, OSI's Compensation Committee established a separate incentive program tied to the annual performance of the Company's turnkey solutions business in order to underscore its importance and to focus Defendant Mehra's attention on developing these opportunities. Incentives

under the turnkey incentive program were conditioned on the achievement of certain metrics based on the operating income and bookings of the Company's turnkey business.

305.   In 2016, Mehra vested 23,800 RSUs for achieving a bookings target of $225 million. In 2017, Mehra received $705,000 for exceeding the operating income target of $10 million in the turnkey segment.

306.   Moreover, in 2017, while it had "determined not to adjust any base salary levels" for any of its executive officers, the Company made an exception for Mehra, "whose salary was increased by approximately 14% to $400,000 to compensate him for taking on *significantly greater responsibility* for the oversight and management of the cargo and vehicle inspection *and turnkey business* lines within our Security division."

307.   Accordingly, Defendant Mehra was highly motivated to conceal the true facts surrounding the Albanian arrangement as they would negatively affect Defendant Mehra's personal compensation.

## VII.   LOSS CAUSATION

308.   As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, as alleged herein, OSI Securities traded at artificially inflated prices during the Class Period, including as high as $95.76 per share on October 12, 2017.

309.   Relying on the integrity of the market price for OSI Securities and public information relating to OSI, Plaintiffs and other Class members purchased or otherwise acquired OSI Securities at prices that incorporated and reflected Defendants' Class Period misrepresentations and omissions of material fact alleged herein.  As a result of their purchases of OSI Securities during the Class Period at artificially inflated prices, Plaintiffs and the Class suffered economic loss, i.e., damages under the federal securities laws.

310. Had Defendants been truthful about these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired their OSI Securities at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of OSI Securities.

311. The economic losses, *i.e.*, damages, suffered by Plaintiffs and other members of the Class were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated and/or maintained the price of the OSI Securities, and the subsequent significant decline in the value of OSI Securities when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.

312. These revelations and/or materializations of risk previously concealed by Defendants' fraud occurred through at least two partial corrective disclosures on: December 6, 2017, and February 1, 2018, as detailed below in Sections VII.A and B. The timing and magnitude of the declines in the price of OSI Securities negate any inference that the loss suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to the revelation of facts and/or materialization of the risks previously concealed by Defendants' fraudulent misleading statements and omissions.

## A.    December 6, 2017 Partial Disclosure

313. On December 6, 2017, the relevant truth and/or foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period began to be revealed and/or partially materialized. On that date, MWR issued a detailed report entitled "OSIS: Rotten to the Core," which revealed certain previously undisclosed facts regarding the Company's turnkey operations, including details about the corrupt Albanian

arrangement with ICMS and the overall lack of credibility at the Company.  As set forth above, the report revealed, *inter alia*, that the Company had transferred 49% of its Albanian contract entity to ICMS for approximately $4.50; OSI's accounts and SEC disclosures did not reflect the transfer; the transfer occurred under suspicious circumstances with a collusive partner; the transfer occurred the same week that the outgoing Albanian government left office; and OSI had been given favorable terms, including an 8% bonus on the contract by the outgoing Albanian government. The report also included a video discussing the details of the ICMS arrangement and revealing translations of previously undisclosed Albanian reports calling the contract the "theft of the century" and a "mafia" concession and raising questions like, "how did the doctor Olti Peçini  [buy] 49% of the shares of a concession worth 316 million USD for 490 lekë. Who is hiding behind the ICMS…?"  The report concluded that the Defendants obtained OSI's Albanian contract "through corruption," which put "at significant risk OSIS's Security Division contracts with U.S. and European government agencies."

314.   Within hours of the MWR Report, after admitting the significant "impact" that the facts and information contained in the MWR Report had on OSI's stock price, OSI issued a vague half-page response, admitting several crucial facts set forth in the report, including that OSI had entered into an undisclosed "partnership with ICMS" subject to a previously concealed "profit shar[ing]" agreement regarding the Albanian turnkey operation, S2 Albania.

315.   Nevertheless, the Company continued to mislead investors and deny the true facts surrounding the arrangement while continuing to conceal the foreseeable risks surrounding the deal.  For example, the Company dismissed the claims as "misleading allegations" and represented that the Albanian contract was secured as "the result of [a] public tender[]." The Company also vaguely asserted that "ICMS implemented all civil works construction for the program . . . [and] both we and

ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares."

316. None of these facts had previously been disclosed to investors during the Class Period. Moreover, no reasonable investor would have been aware of these facts or appreciated their significance given that the obscure documents underlying the MWR Report were published and located in Albania and required both the translation from the uncommon language of Albanian to English, and sophisticated expert forensic analysis piecing together the various details, Albanian financial information, and connections underlying the corrupt Albanian contract.

317. In addition, as set forth in ¶¶ 218-220, 222, 236 these statements were still materially misleading and contradicted the Company's own SEC reports and financial reporting, including a February 22, 2017 Form 8-K which listed S2 Albania as 100% owned by OSI "free and clear" of any "security interest, mortgage, pledge, lien, encumbrance, claim or equity." Indeed, MWR issued a second report on January 31, 2018 debunking Defendants' misleading explanations. *See* ¶¶ 129-131.

318. The information revealed in the December 6, 2017, MWR Report, which was partially confirmed by the Company, was proximately caused by, directly related to, and a foreseeable consequence of Defendants' misrepresentations and omissions as alleged herein. Moreover, the December 6, 2017 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' Class Period misstatements and omissions.

319. As a direct and proximate result of these partial disclosures, OSI's common stock price plummeted nearly 30% in a single day—from a close of $84.07 per share on December 5, 2017, to a close of $59.52 per share on December 6, 2017, partially removing a portion of the artificial inflation in OSI's common stock price.

320.   Similarly, as a direct and proximate result of these partial disclosures, the price of OSI Bonds, dropped precipitously by $162.62 or 15.67%—from a close of $1,037.50 on December 5, 2017, to a close of $874.88 on December 6, 2017, as some of the artificial inflation in the OSI Bonds was removed as a result of these partial disclosures.

321.   The market attributed the nearly 30% stock price decline to the facts revealed by the MWR Report. For example, in an article entitled, "$canner 'Muddy'ed," the *New York Post* reported:

> OSI Systems, the maker of airport scanning systems, ***lost nearly a third of its value on Wednesday after short seller Carson Block accused it of underhanded practices***. "We think this company is rotten to the core," Block's firm, Muddy Waters, said in a 19-page report. A potential $250 million contract OSI signed with Albania is tainted by corruption, Muddy Waters claimed. Late Wednesday, the company, based in Hawthorne, Calif., denied any wrongdoing and said its 'turnkey' contract was the result of public tenders.

322.   While acknowledging the effect of the December 6, 2017 disclosures on the price of OSI's stock, some analysts clung to Defendants' misleading denouncement of the MWR Report. For example, Roth issued a report entitled, "OSIS: Short Thesis Lacks Perspective," in which it reported that "the 30% decline yesterday is seemingly built on fear instigated by a short report that hypothesizes OSIS's turnkey projects are based on corrupt practices hinged on sophisticated forensics in the company's Albania and Mexico contracts." Based on Roth's "discussions with [OSI] management," it concluded that "the legal structure of this [Albanian] contract present no risk." On the same day, in an article entitled "In Need of a Security Blanket," Jefferies noted that "[a]s part of the contract, OSI has a local partner that invested funds and performed some of the civil work. The local partnership reduces the overall risk of the contract."

323.   Thus, despite the partial disclosure on December 6, 2017, which removed some of the artificial inflation in the price of OSI Securities, the price of

OSI Securities remained artificially inflated due to Defendants' continued misrepresentations and omissions.

**B.      February 1, 2018 Partial Disclosure**

324.   On February 1, 2018, additional adverse facts, relevant truth and/or foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions were further revealed and/or partially materialized. On that day, OSI issued a press release and SEC Form 8-K announcing the following:

> Following a report by a short seller, the ***Securities and Exchange Commission (SEC) commenced an investigation into the Company's compliance with the Foreign Corrupt Practices Act*** (FCPA). The U.S. Attorney's Office for the Central District of California (DOJ) has also said it intends to request information regarding FCPA compliance matters. ***The SEC and DOJ are also conducting an investigation of trading in the Company's securities, and have subpoenaed information regarding trading by executives, directors and employees, as well as Company operations and disclosures in and around the time of certain trades.*** In relation to the matters that are the subject of the trading-related investigation, the Company has taken action with respect to a senior-level employee. At this time, the Company is unable to predict what, if any, action may be taken by the DOJ or SEC as a result of these investigations, or any penalties or remedial measures these agencies may seek. The Company places a high priority on compliance with its anti-corruption and securities trading policies, and is cooperating with each of the government investigations.

325.   The information released by the Company on February 1, 2018 was proximately caused by, directly related to, and a foreseeable consequence of Defendants' Class Period misrepresentations and omissions. Furthermore, the SEC and DOJ's decisions to commence investigations into the Company's compliance with the FCPA and executives' stock trading were proximately caused by, directly related to, and a foreseeable consequence of Defendants' misrepresentations, omissions, and deceptive course of conduct during the Class Period. Thus, the February 1, 2018 disclosure revealed the materialization of the known foreseeable risks proximately caused by, and directly connected to, Defendants' Class Period misrepresentations and omissions.

326.   As a direct and proximate result of these partial disclosures, the price of OSI's common stock declined 18% from a close of $66.60 on February 1, 2018 to a close of $54.60 on February 2, 2018, thereby removing artificial inflation in OSI's common stock.

327.   Similarly, as a direct and proximate result of these partial disclosures, the price of OSI Bonds dropped by 5.94% or $54.57—from a close of $919.01 on February 1, 2018 to a close of $864.44 on February 2, 2018, as further inflation in the Bonds was removed as a result of Defendants' disclosures.

328.   Analysts latched on to the negative implications of the SEC and DOJ investigations and attributed the February 1, 2018 stock drop to the Company's disclosures. For example, in an article entitled, "Fundamentals Solid, but Investigation May Act as Overhang; D/G to Hold," Jefferies reported:

> Downgrading to Hold based on the overhang from investigations. After the close on Feb 1st, with the release of earnings, OSIS filed an 8-K disclosing that the SEC is investigating FCPA compliance, and the U.S. Attorney's Office for the Central District of California intends to request information on this matter. Separately, the SEC and DOJ are also conducting inquiries into the trading of the company's securities. Given these two investigations, we believe shares will be range bound until there is a final outcome. In our opinion, resolutions can take over a year and could weigh on valuation.

329.   Similarly, on February 6, 2018, ValueWalk issued a report, stating:

> Activist shorts update Shares in electronic system manufacturer *OSI Systems traded down more than 18% Thursday after the company announced that it is under investigation by the U.S. Securities and Exchange Commission (SEC) and the Department of Justice (DOJ) following the publication of two short reports by Muddy Waters Research.* In December, the short seller accused OSI of obtaining a major turnkey contract in Albania through corruption and on Thursday it published a follow-up report building on its previous allegations. Hours after the second report hit the wire, OSI announced that the SEC had commenced a probe into the company's compliance with the Foreign Corrupt Practices Act (FCPA). The company also said the SEC and DOJ are examining the trading of OSI's securities and have 'subpoenaed information regarding trading by executives, directors and employees, as well as company operations and disclosures in and around the time of certain trades.' 'We applaud the @TheJusticeDept and @SEC_Enforcement for moving quickly to investigate $OSIS for bribery. It's always good to see that FCPA matters,' Muddy Waters tweeted in response.

## VIII. CLASS ACTION ALLEGATIONS

330.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded OSI Securities and were damaged thereby.  Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

331.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the proposed Class.  At the end of the Class Period, OSI had approximately 19 million shares of common stock issued and outstanding, owned by thousands of persons, and actively traded on the NASDAQ.  Similarly, at the end of the Class Period, OSI had more than 470 million of outstanding bonds and other debt.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Record owners and other members of the Class may be identified from records maintained by OSI or its transfer agent, and may be notified of the pendency of this action by a combination of published notice and first-class mail, using the techniques and form of notice similar to that customarily used in class actions arising under the federal securities laws.

332.   There is a well-defined commonality of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of

the Class that predominate over questions that may affect individual Class members include:

a. whether Defendants' actions as alleged herein violated the federal securities laws;

b. whether Defendants' statements and/or omissions issued during the Class Period were materially false and misleading;

c. whether Defendants knew or were deliberately reckless in not knowing that their statements were false and misleading;

d. whether and to what extent the market prices of OSI publicly traded common stock and OSI Bonds were artificially inflated and/or distorted before and/or during the Class Period due to the misrepresentations and/or omissions of material fact alleged herein; and

e. whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

333.   Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired OSI Securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct as alleged herein.

334.   Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intend to prosecute this action vigorously. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

335.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the

wrongful conduct alleged herein.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## IX.   PRESUMPTION OF RELIANCE

336.   Plaintiffs and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.   the omissions and misrepresentations were material;

    c.   OSI Securities traded in efficient markets;

    d.   the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of OSI Securities; and

    e.   Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired OSI Securities between the time that Defendants made material misrepresentation and omissions and the time the concealed risks materialized or the true facts were disclosed.

337.   At all relevant times, the market for OSI's Securities was efficient for the following reasons, among others:

    a.   OSI common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b.   As a regulated issuer, OSI filed periodic public reports with the SEC and the NASDAQ;

    c.  OSI regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.  OSI was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

338. As a result of the foregoing, the market for OSI Securities promptly digested current information regarding OSI from all publicly available sources and reflected such information in the price of OSI Securities prices. Under these circumstances, all purchasers of OSI Securities during the Class Period suffered similar injury through their purchase of OSI Securities at artificially inflated prices and a presumption of reliance applies.

339. Further, at all relevant times, Plaintiffs and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other members of the Class would not have purchased or otherwise acquired OSI Securities at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

340.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

341.   None of the statements complained of herein was a forward-looking statement.   Rather, each was historical statements or a statement of purportedly current facts and conditions at the time such statement was made.

342.   To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

343.   To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of OSI who actually knew that such statement was false when made.

344.   Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

# XI. CAUSES OF ACTION UNDER THE EXCHANGE ACT

## COUNT I

### Asserted Against All Defendants for
### Violations of Section 10(b) of the Securities Exchange
### Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

345. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and all other members of the Class against OSI and the Individual Defendants.

346. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, regarding the intrinsic value of OSI Securities, as alleged herein; (ii) artificially inflate the price of OSI Securities; and (iii) cause Plaintiffs and other members of the Class to purchase OSI Securities at artificially inflated prices that did not reflect their true value. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

347. Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain the artificially inflated price of OSI Securities in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

348.   Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of OSI's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  Defendants did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business, which operated as a fraud and deceit upon the purchasers of OSI Securities during the Class Period.

349.   Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in press releases, conference calls, SEC filings, news media, blogs, and OSI's website.

350.   Defendants are further liable for the false and misleading statements made by OSI's officers, management, and agents in press releases, conference calls, conferences with investors and analysts, news media, blog reports, and OSI's website, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

351.   Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of OSI Securities.   By concealing material facts from investors, Defendants maintained the Company's artificially inflated securities prices throughout the Class Period.

352.   Without knowledge of the fact that the price of OSI Securities was artificially inflated, and relying directly or indirectly on the false and misleading

statements and omissions made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class purchased or acquired OSI Securities during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of OSI Securities.

353.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the intrinsic value of OSI Securities, Plaintiffs and other members of the Class would not have purchased or acquired their OSI Securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices they paid.

354.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

355.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of OSI Securities during the Class Period.

## COUNT II

### Asserted Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

287.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiff and all other members of the Class against the Individual Defendants.

288.   At all relevant times during the Class Period, as set forth in Section III.B.2, *supra*, Chopra was the Company's CEO and a member of the Company's Board of Directors; Edrick was the Company's CFO; and Mehra was an Executive Vice President of OSI, and a member of the Company's Board of Directors.  As such, the Individual Defendants had regular access to non-public information about OSI's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

289.   The Individual Defendants acted as controlling persons of OSI and the other Individual Defendants within the meaning of 20(a) of the Exchange Act as alleged herein, as they possessed direct or indirect power to direct or cause the direction of the management and the policies of the Company and persons who engaged in the unlawful conduct complained of herein in violation of Section 10(b). Due to their control, the Individual Defendants are jointly and severally liable for any false and misleading statements, omissions, or conduct alleged herein that are attributable to OSI or other person they controlled.

290.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

291.   In particular, each of these Individual Defendants had direct and supervisory involvement in and control of the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the

particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

292.   As set forth above, OSI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of OSI Securities during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding Plaintiffs and the members of the Class damages and interest thereon;

C.     Awarding Plaintiffs and the Class's reasonable costs, including attorneys' and experts' fees; and

D.     Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XIII.   JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: May 4, 2018                    Respectfully submitted,

                                                     **KESSLER TOPAZ**
                                                       **MELTZER & CHECK, LLP**

                                                     /s/ Eli R. Greenstein

---

ELI R. GREENSTEIN (Bar No. 217945)
egreenstein@ktmc.com
STACEY M. KAPLAN (Bar No. 241898)
skaplan@ktmc.com
PAUL A. BREUCOP (Bar No. 278807)
pbreucop@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff Arkansas Teacher Retirement System and Plaintiff John A. Prokop and Lead Counsel for the Putative Class*

**KIESEL LAW LLP**
PAUL R. KIESEL (Bar No. 119854)
kiesel@kiesel.law
HELEN ZUKIN (Bar No. 117933)
zukin@kiesel.law
CHERISSE HEIDI A. CLEOFE (Bar No. 290152)
cleofe@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

*Liaison Counsel for the Putative Class*