**KESSLER TOPAZ MELTZER & CHECK, LLP**
ELI R. GREENSTEIN (Bar No. 217945)
egreenstein@ktmc.com
STACEY M. KAPLAN (Bar No. 241989)
skaplan@ktmc.com
JENNY L. PAQUETTE (Bar No. 321561)
jpaquette@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff Arkansas Teacher Retirement System and Plaintiff John A. Prokop and Lead Counsel for the Putative Class*

[Additional Counsel on signature page.]

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM and JOHN A. PROKOP, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>OSI SYSTEMS, INC., DEEPAK CHOPRA, ALAN EDRICK, and AJAY MEHRA,<br><br>Defendants. | Case No. 17-cv-08841-VAP-SKx<br><br>**CONSOLIDATED CLASS ACTION**<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Virginia A. Phillips |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 8

III. PARTIES .......... 8

A. Plaintiffs .......... 8

B. Defendants .......... 9

1. Corporate Defendant OSI .......... 9

2. Individual Defendants .......... 9

C. Relevant Non-Parties .......... 11

IV. BACKGROUND AND OVERVIEW OF DEFENDANTS' SECURITIES LAW VIOLATIONS .......... 12

A. Prior to the Class Period, OSI's Core Business Was Under Pressure .......... 13

1. Under Defendant Mehra's Leadership, Rapiscan Is Repeatedly Accused of Defrauding the U.S. Government .......... 14

2. OSI Moves Defendant Mehra to S2 After the U.S. Government Demands His Removal from Rapiscan .......... 15

3. After Defendants Repeatedly Defraud OSI's Biggest Customer, the Company's Core Business Struggles .......... 17

B. As OSI's Traditional Business Stagnates, OSI Touts S2's Turnkey Business as the Key to the Company's Future .......... 18

C. OSI Touts the Purported Benefits of the Turnkey Model .......... 20

D. After Defendants Repeatedly Hype the Turnkey Business, the Market Pressures Them for a Third Turnkey Contract .......... 21

E. Defendants Mislead Investors about OSI's New Turnkey Contract in Albania and the Overall Success of Its Turnkey Business .......... 22

1. Defendants Misleadingly Promote the Albanian Contract as Proof of the Turnkey Model's Success .......... 23

2. Defendants Continue to Misleadingly Tout the Progress of the Albanian Contract and the Turnkey Business Overall .......... 24

3. Defendants' Statements Knowingly Conceal Corrupt Arrangements Underlying the Albanian contract ............ 25

a. Unbeknownst to Investors, Defendants Sell Nearly Half of OSI's Rights to the Albanian Contract Entity ............ 26

b. Defendants Concealed the Corrupt Arrangement of the Albanian Contract that Secured Highly Favorable Terms for the Company ............ 31

4. Defendants Mislead Investors Regarding the Suspension of the Contract ............ 33

5. OSI Obtains a Less Favorable Contract Through Arbitration ............ 34

6. Defendants Falsely Represent that OSI Owns S2 Albania in Its Entirety ............ 35

F. Defendants' Misconduct in Albania Subjected OSI to Significant FCPA Risk that Jeopardized the Entire Company ............ 36

G. Defendants' Opaque Turnkey Business Model Enabled Their Fraud ............ 37

1. OSI's Turnkey Business Existed Only in Jurisdictions Where Oversight Was Minimal and Corruption Was Prevalent ............ 37

2. The Company's Financial Treatment of Turnkey Contracts Obscured Details About the Business ............ 38

H. The Relevant Truth Is Slowly Revealed ............ 39

I. The Omitted Information Regarding the Albanian Arrangement Was Not Publicly Available and Was Obscured from Reasonable Investors ............ 44

V. DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS ............ 50

A. August 21, 2013 Press Release ............ 50

B. Second Quarter 2014 ............ 53

C. March 2014 Analyst Conferences ............ 55

D. May 14, 2014 Oppenheimer Industrial Conference ............ 58

E. June 3, 2014 Stephens Spring Conference ............ 60

F. June 4, 2014 Jefferies LLC Healthcare Conference ............ 63

G. August 12, 2014 Oppenheimer Technology, Internet & Communications Conference ............ 65

H. August 14, 2014 Jefferies Global Industrials Conference ............ 67

I. Fourth Quarter 2014 ............ 70

J. First and Second Quarter 2015 ............ 73

K. Fourth Quarter 2015 ............ 76

L. First and Second Quarter 2016 ............ 78

M. Third Quarter 2016 ............ 81

N. Fourth Quarter 2016 ............ 84

O. Second Quarter 2017 ............ 87

P. Third and Fourth Quarter 2017 ............ 94

Q. First Quarter 2018 ............ 97

VI. DEFENDANTS HAD A DUTY TO DISCLOSE THE FACTS SURROUNDING THE ALBANIAN CONTRACT AND OSI'S SECRET ARRANGEMENT WITH ICMS WHICH WERE HIGHLY MATERIAL TO OSI INVESTORS ............ 100

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ............ 101

A. Top OSI Executives, Including Individual Defendants Chopra and Mehra, Directly Oversaw and Had Actual Knowledge of the Undisclosed Arrangement with ICMS ............ 102

B. Defendants' Repeated Discussions and Oversight of the Albanian Contract During Executive Meetings Reinforces Scienter ............ 104

C. The Individual Defendants' Senior-Level Positions, Micromanagement Styles, and Close-Knit Personal Relationships Reinforce a Strong Inference of Scienter ............ 106

D. The Fraud Involved a Key Contract and Core Operation of the Company—Its Turnkey Business ............ 109

E. The Small Size and Closely-Held Structure of S2, Combined With the Limited Number of Turnkey Contracts and Defendants' Scrutiny of Foreign Transactions, Reinforces a Strong Inference of Scienter ............ 111

F. Defendants' Duty Under the Administrative Agreement With the U.S. Government to Implement Compliance Programs and Monitor Their Contractual Arrangements Supports Scienter ............ 112

G. Defendants' Contradictory Explanations Regarding the Albanian Arrangement Reinforce a Strong Inference of Scienter ..... 115

H. Defendants SOX Certifications Support an Inference of Scienter ..... 117

I. Defendants' Insider Trading and Executive Compensation Structure Reinforce the Strong Inference of Scienter ..... 118

1. Defendants' Stock Dispositions Support Scienter ..... 118

2. OSI's Executive Compensation Structure Supports Scienter ..... 121

3. Defendant Mehra's Compensation Was Closely Tied to the Performance of the Turnkey Business ..... 122

VIII. LOSS CAUSATION ..... 123

A. December 6, 2017 Partial Disclosure ..... 124

B. February 1, 2018 Partial Disclosure ..... 127

IX. CLASS ACTION ALLEGATIONS ..... 129

X. PRESUMPTION OF RELIANCE ..... 131

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 133

XII. CAUSES OF ACTION UNDER THE EXCHANGE ACT ..... 134

XIII. PRAYER FOR RELIEF ..... 138

XIV. JURY DEMAND ..... 138

This is a class action for violations of the federal securities laws brought by Lead Plaintiff Arkansas Teacher Retirement System ("Lead Plaintiff") and named plaintiff John A. Prokop (collectively, "Plaintiffs"), individually and on behalf of all persons who purchased or otherwise acquired OSI Systems, Inc.'s ("OSI" or the "Company") common stock and 1.25% convertible senior notes due 2022 ("OSI Bonds") (collectively, "OSI Securities") between August 21, 2013 and February 1, 2018, inclusive (the "Class Period").[1] Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC") thereunder (17 C.F.R. § 240.10b-5), against: (i) OSI; (ii) OSI's Chief Executive Officer ("CEO") Deepak Chopra ("Chopra"); (iii) OSI's Chief Financial Officer ("CFO") Alan Edrick ("Edrick"); and (iv) OSI's Executive Vice President and Director, Ajay Mehra ("Mehra") (collectively, "Defendants").

Plaintiffs allege the following based upon personal knowledge with respect to Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation undertaken by Court-appointed Lead Counsel, Kessler Topaz Meltzer & Check, LLP ("Lead Counsel") and its agents, including Albanian consultants and an Albanian-speaking attorney. Lead Counsel's investigation included, *inter alia*, the review and analysis of: (i) public filings by OSI with the SEC; (ii) public reports and news articles regarding OSI, including online news sources; (iii) research reports regarding OSI by securities and financial analysts; (iv) economic analyses of securities price movements and data; (v) transcripts of investor calls and conferences with OSI senior management; (vi) interviews with former OSI employees (identified herein as Confidential Witnesses ("CW __"); (vii) public documents from Albania, reviewed and/or translated into English by an Albanian-speaking attorney; and (viii) other publicly available material and data identified herein. Lead Counsel's and its agents' investigation into the factual allegations contained herein is continuing and many of the facts supporting Plaintiffs' allegations are

---

[1] Excluded from the Class are Defendants, directors and officers of OSI, and their families and affiliates.

known only to Defendants or are exclusively within Defendants' custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. OSI manufactures and sells electronic scanning systems and components for homeland security, healthcare, defense, and aerospace. During the Class Period, the Company generated more than 50% of its revenues from its core Security division, operated primarily through its Rapiscan Systems, Inc. ("Rapiscan") subsidiary, which sells and provides services for X-ray security and inspection systems to detect explosives, weapons, drugs, and other illegal goods.

2. Before the Class Period, Rapiscan's largest and most important customer was the U.S. Government, including the Department of Homeland Security ("DHS") and the Transportation Security Administration ("TSA"). These government entities purchased OSI's security and inspection systems for use at airports, border crossings, shipping ports, military installations, and other locations.

3. From approximately 2011 to 2013, OSI was plagued by multiple scandals involving its contracts with the U.S. Government. *First*, in November 2012, a U.S. Congressman sent a letter to the TSA stating that Rapiscan "may have attempted to defraud the Government" by "knowingly manipulating" body scanner tests and concealing information relating to its contracts with the TSA.[2] These allegations led to the U.S. Government's issuance of a "show cause" letter and "Notice of Proposed Debarment" of Rapiscan from future DHS contracts.

4. *Second*, OSI was accused of misleading the U.S. Government from 2010 through 2013 regarding its checkpoint baggage and parcel scanners, including concealing the use of unapproved Chinese components to repair and manufacture scanners in violation of its contract with the TSA. OSI's actions resulted in the termination of a

[2] Throughout this Complaint, all emphasis is added unless otherwise noted.

$67.1 million contract with the DHS and an "Administrative Agreement" with the DHS which concluded, *inter alia*, that Rapiscan "provided false or misleading information to the Government." This conduct led to a federal civil securities fraud lawsuit that ultimately settled for $15 million in 2015. It also resulted in the effective ouster of Defendant Mehra—Chopra's first cousin who led Rapiscan during its government contract schemes—from his role as President of Rapiscan. As detailed herein, however, Mehra was simply transferred to another OSI division that soon became the hub of Defendants' newest fraudulent scheme.

5. In the wake of these scandals, and with its core government business waning, Defendants realized that OSI needed to convince investors that the Company was nevertheless positioned to report strong profits and growth. Defendants thus embarked on an intensive campaign to shift investor focus to a new business model called "turnkey security screening solutions," that purportedly would "transform the Company" and provide future growth and more consistent revenues.

6. Defendants represented that under the Company's "turnkey" business model, operated through its "S2 Global" subsidiary, OSI provided full turnkey services to support foreign governments and customs officials with the installation, maintenance, and operation of the Company's security inspection products—as well as the construction, staffing, and long-term operation of security screening checkpoints. The turnkey model differed from OSI's traditional equipment sales business in that the customer did not own the equipment but instead paid a subscription or per-scan fee. During the Class Period, Defendants repeatedly told investors that its turnkey model was OSI's most promising new business segment that would provide higher profit margins, greater revenue visibility and consistency, and substantial growth opportunities in international markets.

7. To support this turnkey narrative, Defendants needed to show the market and analysts that foreign governments were willing to pay exorbitant fees for long-term service contracts, as opposed to simply buying the equipment and running it themselves (which was far cheaper). Leading up to the Class Period, however, the Company had only

booked a total of ***two*** turnkey contracts in Mexico and Puerto Rico and had not announced a new major turnkey deal since 2012. This caused intense pressure from analysts who repeatedly questioned Defendants about the timing of the next big turnkey contract.

8. On August 21, 2013, the first day of the Class Period, Defendants finally announced a new long-term turnkey contract with the government of Albania, then controlled by the Prime Minister Sali Berisha ("Berisha") and his Democratic Party. According to the Company, the Albanian turnkey contract provided a 15-year term and $150 million to $250 million in revenues. The Albanian government later valued the contract at upwards of 316 million euros (approximately $346 million) based on the per-scan fee structure. The Company's press release announcing the deal quoted Defendant Mehra as stating: "our selection [for the Albanian contract] ***reinforces the attractiveness and compelling value of our turnkey service model***."

9. Throughout the Class Period, Defendants continued to tout the Company's turnkey business model, and in particular, the Albanian contract, as evidence of the acceptance and success of the turnkey solution. For example, on January 28, 2014, Defendant Chopra proclaimed, "***[a]fter winning the new turnkey services contract earlier this year in Albania, we have clearly established our leadership in growing this particular service segment*** and expect to continue to leverage our position for further growth." Similarly, on March 4, 2014, the Company's CFO, Defendant Edrick, stated that the turnkey model provided the Company with a "first-mover advantage" over competitors:

> ***[W]hat's been driving the growth over the past year has been largely dominated by our turnkey security solutions. We pioneered this area***. …There's only been three contracts of this type awarded to the world. And to date, well, we've won all three. So today, ***we have 100% market share in that area***.

10. Defendants continued to represent that the turnkey model "has been ***extraordinarily successful for us***" and "in just a few short years, ***this has gone from 0%***

***of our Security business to about 30% today***. So it's been very, very exciting. It's a nice revenue, higher margin business for us of a recurring nature."

11. Unbeknownst to investors, Defendants' representations regarding the success and sustainability of the turnkey model, including the Albanian contract, were materially false and misleading and deliberately concealed material facts. Most prominently, Defendants concealed that the Company's Albanian turnkey contact was subject to a secret and corrupt[3] arrangement whereby OSI surreptitiously transferred 49% of its Albanian contract entity and lucrative "profit shar[ing]" rights to an undisclosed Albanian shell entity owned by an Albanian dentist, Olti Peçini ("Peçini"), with reported ties to the outgoing Albanian government that issued the contract to OSI.

12. Under the hidden arrangement, OSI agreed to set up an Albanian business subsidiary, S2 Albania SHPK ("S2 Albania"), to service and own rights and obligations of the Albanian turnkey contract. OSI then transferred 49% of that company to an Albanian holding company—Inspection Control & Measuring Systems SHPK ("ICMS")—for a price of only 490 Albanian lekë—***the equivalent of $4.50***. This arrangement, personally overseen and executed by Defendant Mehra, also included an undisclosed "profit shar[ing]" agreement with ICMS relating to the Albanian turnkey contract. Notably, the Albanian Minister of Finance's approval of the 49% transfer to ICMS occurred only a ***few days*** before his party left office and the new regime came to power.

13. None of these facts were disclosed to investors. Indeed, throughout the Class Period, Defendants continued to conceal the corrupt Albanian arrangement while repeatedly touting the significance of the Albanian turnkey deal as demonstrating widespread acceptance of the "transformative" new business model. Defendants' statements were materially misleading to investors because they created the false impression that OSI's turnkey model was thriving and would drive OSI's growth when, in

[3] "Corrupt" has been defined as, *inter alia*: "Having or showing a willingness to act dishonestly in return for money or personal gain." *Corrupt*, https://www.lexico.com/en/definition/corrupt (last visited June 13, 2019)

fact, its only turnkey contract in years had been secured through a secret arrangement that transferred 49% of the contract entity for $4.50 and leached away the Company's actual profits from the deal. In an SEC filing which included crucial bond offering documents issued to investors in February 2017, OSI falsely represented that it owned "***all*** of the issued and outstanding capital stock" of its subsidiaries, including "***S2 Albania***," despite knowing that 49% of that subsidiary and lucrative profit-sharing rights had been transferred to ICMS years earlier for only the paltry sum of $4.50. The S2 Albania subsidiary was highly material to investors as it owned the rights to the Albanian contract and was created for the specific purpose of implementing the contract, holding the related assets and generating profits. Indeed, the S2 Albania subsidiary was listed as a material subsidiary in OSI's SEC filings.

14. At the same time Defendants were concealing the corrupt Albanian arrangement, they also were dumping hundreds of thousands of shares of OSI stock at artificially inflated prices, collectively pocketing more than ***$51 million*** in proceeds. Defendants' stock dispositions represented large percentages of their total stock holdings and were suspiciously timed to take advantage of OSI's inflated stock price. Indeed, during the middle of the Class Period, only two weeks after OSI disclosed that the new Albanian government "halted further progress" on OSI's turnkey contract, Defendant Chopra entered into a Rule 10b5-1 stock "trading plan" to facilitate the immediate sale of 48,000 shares of OSI stock to unsuspecting investors for millions of dollars in illicit proceeds. As detailed below, both the SEC and U.S. Attorney's Office for the Central District of California ("DOJ") are now investigating OSI's executives' stock trading and the Company's "operations and disclosures in and around the time of certain trades."

15. On December 6, 2017, Muddy Waters Research ("MWR"), a sophisticated financial analyst firm, issued a detailed report exposing certain facts surrounding the corrupt Albanian contract, including the previously undisclosed transfer of 49% of OSI's Albanian turnkey entity to ICMS (the "December 6, 2017 MWR Report"). The December 6, 2017 MWR Report concluded that OSI was "rotten to the core" and

"obtained a major turnkey contract in Albania through corruption." The report included translations from previously undisclosed Albanian documents and reports calling OSI's turnkey contract the "theft of the century" and a "Mafia of scanning concession." One such report asked "***how did the doctor Olti Peçini [buy] 49% of the shares of a concession worth 316 million USD for 490 lekë. Who is hiding behind the ICMS . . .?!***"

16. Within hours of the December 6, 2017 MWR Report, Defendants issued a cryptic press release admitting certain core facts underlying the report—namely, the previously undisclosed partnership and "profit shar[ing]" arrangement with ICMS surrounding the Albanian contract. Defendants continued, however, to falsely deny and conceal certain details and known risks surrounding the contract, and misleadingly suggested that the deal was legitimate because ICMS purportedly had "construction capabilities in Albania" and had made some (undisclosed) "significant capital investments toward the implementation of the program in a value well beyond the par value of shares." Following these revelations (and despite Defendants' misleading statements regarding ICMS and the Albanian contract arrangement), the price of OSI's common stock and OSI Bonds plummeted by more than 29% and 15%, respectively, causing significant damage to OSI investors.

17. Less than eight weeks later, on February 1, 2018, OSI abruptly announced that it was the target of investigations by both the SEC and DOJ regarding its compliance with the Foreign Corrupt Practices Act ("FCPA"). The same disclosure revealed that "[t]he SEC and DOJ are also conducting an investigation of ***trading in the Company's securities***, and have subpoenaed information regarding ***trading by executives***, directors and employees, as well as Company operations and ***disclosures in and around the time of certain trades***." Upon this further revelation of previously concealed risks associated with Defendants' misleading statements, omissions, and stock trading, the price of the Company's common stock and OSI Bonds dropped another 18% and about 6%, respectively, causing further damage to Class members.

18. Defendants' fraudulent conduct during the Class Period has caused significant damage to investors and long-term injury to the Company and its stock price.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, OSI's principal executive offices are located within this District.

22. In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

23. Lead Plaintiff Arkansas Teacher Retirement System is a large pension fund for Arkansas's public school and education employees, with approximately $15 billion in assets under management and provides retirement, disability, and survivor benefits for more than 120,000 members. Lead Plaintiff purchased the OSI Securities, as set forth in its certification filed with the Court (Dkt. 46-1), at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

24. Named plaintiff John A. Prokop purchased OSI common stock, as set forth in his certification filed with the Court (Dkt. 46-2), at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

### B. Defendants

#### 1. Corporate Defendant OSI

25. OSI is incorporated in Delaware with its "World Headquarters" located in Hawthorne, California. OSI designs, develops, manufactures, and provides services related to electronic systems and components for applications in homeland security, healthcare, defense, and aerospace, through several wholly-owned subsidiaries, including Rapiscan Systems and S2 Global. OSI does business both domestically and internationally, including in Albania and Mexico. OSI common stock trades on the NASDAQ under the ticker symbol "OSIS."

#### 2. Individual Defendants

26. Defendant Chopra is the founder of OSI and, at all relevant times, was the Company's President, CEO, and Chairman of the Company's Board of Directors. In these roles, Chopra certified and signed the Company's Form 10-Ks, including the 10-K filed on August 27, 2014, and the Company's Form 10-Qs, including the 10-Q filed on April 28, 2016.

27. Defendant Edrick is, and at all relevant times was, OSI's Executive Vice President and CFO. Edrick has over 25 years of financial management and public accounting experience, including mergers and acquisitions and regulatory compliance. As CFO of OSI, Edrick certified and signed the Company's Form 10-Ks, including the 10-K filed on August 27, 2014, and the Company's Form 10-Qs, including the 10-Q filed on April 28, 2016. Edrick also signed the Company's Form 8-K filing on February 22, 2017, which represented that OSI owned the equity in S2 Albania "free and clear" of any other interest, encumbrances, or rights to the entity.

28. Defendant Mehra is, and at all relevant times was, OSI's Executive Vice President, the President of OSI Solutions Business, and a member of OSI's Board of Directors. Mehra currently serves as the President of S2 Global—a position held since 2014. From 1998 to 2015, Mehra was the President of OSI's Security division. Mehra also served as President of OSI's subsidiary, Rapiscan Systems, from September of 2007

until his removal in August of 2014. Prior to serving as Executive Vice President of OSI, Mehra was the Company's CFO from November 1992 through November 2002. Mehra signed the Company's Form 10-Ks, including the 10-K filed on August 27, 2014. Mehra reported to Defendant Chopra and is Chopra's first cousin.

29. Defendants Chopra, Edrick, and Mehra are referred to collectively herein as the "Individual Defendants."

30. Defendants are liable under Section 10(b) for making false and misleading statements and omitting material adverse facts and/or participating in the fraudulent course of conduct alleged herein. In addition, each of the Individual Defendants was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, as they possessed direct or indirect power to direct or cause the direction of the management and the policies of the Company and persons who engaged in the unlawful conduct complained of herein in violation of Section 10(b). Due to their control, the Individual Defendants are jointly and severally liable for any false and misleading statements, omissions, or conduct alleged herein that are attributable to OSI or other person they controlled.

31. Because of their positions and responsibilities, each of the Individual Defendants had access to the adverse undisclosed information about OSI's turnkey business and operations, including details about its turnkey contract with Albania via access to internal corporate documents, conversations and contact with other corporate officers and directors, attendance at meetings, and receipt of and/or access to reports and other information provided to them. Each of the Individual Defendants, by virtue of his high-level position, was directly involved in the operations of OSI at the highest levels and was privy to confidential information concerning the Company.

32. Their positions of control and authority as officers or directors also enabled these Individual Defendants to control the content of the SEC filings, press releases, and other public statements of OSI during the Class Period. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports and press

releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.

33. During the Class Period, each of the Individual Defendants substantially approved, participated in the preparation of, furnished information in connection with, and had ultimate authority for OSI's SEC filings, press releases, and public statements and engaged in conduct that made it necessary or inevitable that material misrepresentations or omissions would be made to investors based on that conduct.

34. Defendants were obligated to refrain from issuing false and misleading public filings and were prohibited from using the instrumentalities of interstate commerce or the U.S. mails to: (i) employ any device, scheme or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice or course of business which operates or would operate as a fraud upon any person. Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of OSI Securities.

35. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of OSI Securities by disseminating materially false and misleading statements and/or concealing material adverse facts about OSI's turnkey operations, including its contract with Albania. Defendants' course of conduct deceived the investing public and caused Plaintiffs and other members of the Class to be damaged as a result of their acquisition of OSI Securities.

**C. Relevant Non-Parties**

36. CW 1 was a Vice President of OSI's Rapiscan division in 2014 and 2015. CW 1 was part of the team that was brought in after the TSA threatened Rapiscan with

debarment.[4] In CW 1's role, CW 1 was involved with Rapiscan's contracts in foreign countries, dealt directly with the TSA, and spoke numerous times with Chopra and Mehra.

37. CW 2 was employed as a Director at Rapiscan from at least 2007 through mid to late 2013. In CW 2's position at Rapiscan, CW 2 had direct access to the U.S. Government, including Customs and Border Protection, the State Department, and the Commerce Department. CW 2 was also involved in Rapiscan's international operations, particularly when problems arose with foreign sales. During her tenure at the Company, CW 2 attended a couple of the Company's once-per-quarter meetings with executives from all divisions, including Defendant Chopra.

38. CW 3 was a Rapiscan Executive from 2013 through 2015. CW 3 had direct communications with Defendant Mehra until February 2014, when Mehra was removed from his position. Thereafter, CW 3 had direct communications with Defendant Chopra. CW 3 was familiar with the Albanian turnkey contract from conversations with Mehra.

39. Jonathan Fleming ("Fleming") founded S2 Global in 2009 and assisted in the merger of S2 Global into OSI in 2010. Fleming was the President of S2 Global until 2014, when Mehra was named President of S2 Global. Since 2014, Fleming has been the Executive Vice President of S2 Global. Since March 19, 2013, Fleming has been the administrator of Rapiscan's Albanian subsidiary S2 Albania.

## IV. BACKGROUND AND OVERVIEW OF DEFENDANTS' SECURITIES LAW VIOLATIONS

40. OSI operates through three primary divisions: (i) Security; (ii) Healthcare; and (iii) Optoelectronics and Manufacturing. The Security division is the largest and most important, representing approximately 50% of the Company's net revenues between 2013 and 2017. Defendant Edrick described OSI's Security business as "our biggest business." As a result, investors and analysts were highly focused on OSI's Security division during the Class Period.

[4] To preserve anonymity, all CWs are referred to herein using feminine pronouns.

41. OSI's Security division consists of two segments: (i) Rapiscan, which designs, manufactures, markets, and sells security inspection systems; and (ii) S2, which provides what the Company calls "turnkey security screening solutions," as described in detail in Section IV.B below. Historically, OSI focused on its Rapiscan equipment business. However, with the Company's traditional business model faltering, Defendants told investors that its new turnkey business would drive OSI's future growth.

**A. Prior to the Class Period, OSI's Core Business Was Under Pressure**

42. Traditionally, OSI's "base business model" was the manufacture and sale of security equipment through Rapiscan. These products include systems for baggage and parcel inspection, cargo and vehicle inspection, checked baggage screening, people screening, and radiation detection. The products are used for security purposes at locations such as airports, border crossings, shipping ports, military and other government installations, and freight forwarding facilities. In addition to equipment sales, Rapiscan also generated revenues by providing "after-market support," including the sale of spare parts and maintenance services. Rapiscan's main customers were domestic and foreign government agencies, including the TSA, the DHS, U.S. Customs and Border Protection, Puerto Rico, Mexico, and Albania.

43. Leading up to the Class Period, Rapiscan's single largest customer was the U.S. Government, which provided a substantial portion of the Company's revenue. As OSI disclosed in 10-K Forms between 2009 and 2013, "[t]he U.S. government currently plays an important role in funding the development of certain of our security and inspection systems and sponsoring their deployment at airports, ports, military installations and border crossings." Moreover, according to a December 9, 2013 Bloomberg article titled, "OSI Tumbles on Possible Contract Ban for Chinese Parts," between 2009 and December 2013, OSI received a total of $463 million in U.S. Government contracts—nearly a third of the Security division's total reported net revenue for the same period.

### 1. Under Defendant Mehra's Leadership, Rapiscan Is Repeatedly Accused of Defrauding the U.S. Government

44. Defendant Mehra—who is Defendant Chopra's first cousin—served as the President of Rapiscan since at least 2005. Under his leadership, Rapiscan's relationship with the U.S. Government deteriorated between 2009 and 2013 when Rapiscan was accused of two separate schemes to mislead the government. These scandals led to the cancellation of multi-million dollar contracts with the U.S. Government, subjected the Company to increased scrutiny, and caused Rapiscan to lose market share.

45. *First*, Rapiscan was accused of fraud in connection with a $173 million contract awarded by the TSA in 2009 for "whole-body imaging" scanners to be used for security screening in U.S. airports (the "2009 Contract"). In November 2012, the TSA issued a show cause letter alleging that Rapiscan failed to fully disclose issues it discovered during the development of body scanners under the 2009 Contract. Shortly thereafter, Congressman Mike Rogers (then Chairman of the Homeland Security Subcommittee on Transportation Security) asserted that OSI "***may have attempted to defraud the Government*** by knowingly manipulating an operational test of [the] . . . software in the field in order to have a successful outcome."

46. On January 17, 2013, OSI announced that the TSA had canceled the $173 million 2009 Contract with Rapiscan. Four months later, OSI announced that the DHS had issued a "Notice of Proposed Debarment" in connection with the TSA's show cause letter, which "allege[d] that Rapiscan ***failed to disclose*** a defect with the Products and replaced hardware in the Products without being granted proper governmental approval." The Notice of Debarment proposed prohibiting Rapiscan from doing any future business with the U.S. Government.

47. *Second*, Rapiscan was accused of fraud in connection with a $325 million contract awarded in 2010 (before the first scandal was exposed) by the TSA for checkpoint baggage and parcel scanners (the "2010 Contract"). On November 20, 2013, the TSA issued Rapiscan another show cause letter regarding Rapiscan's use of

unapproved components for the scanners, concluding that Rapiscan "***provided false or misleading information to the Government***," which "was a sufficient independent basis for TSA to terminate" the contract. As a result, the TSA canceled the $67 million 2010 Contract on December 4, 2013. Thereafter, OSI issued a press release admitting that the component change "did not meet the contractual requirement of obtaining TSA's approval in advance."

### 2. OSI Moves Defendant Mehra to S2 After the U.S. Government Demands His Removal from Rapiscan

48. Defendants' repeated scandals with the U.S. Government had serious implications for the Company. A debarment from the DHS would prevent OSI from contracting with the U.S. Government in the future, jeopardizing hundreds of millions of dollars in Company revenue. To avoid this outcome, OSI made several concessions to the U.S. Government, including the removal of Defendant Mehra as President of Rapiscan and the imposition of extensive compliance requirements.

49. As discussed above, Mehra was Rapiscan's President during the time it repeatedly misled the U.S. Government. According to CW 1, the TSA saw Defendant Mehra as "slick," "not trustworthy," a "PNG" or *persona non grata*, and not willing to meet government compliance requirements.[5] CW 1 also noted that, in conversations between CW 1 and the TSA after the misconduct occurred, the TSA often asked CW 1 whether Defendant Mehra, specifically, had been involved in any way with their contract because the TSA did not trust Mehra and believed that he was not willing to satisfy contract compliance requirements, and that he would push non-compliance forward. Thus, the TSA did not want Mehra involved in any TSA contracts after the threat of debarment and pushed to have Mehra terminated.

50. CW 1 explained that the Company agreed to terminate Mehra as President of Rapiscan as part of a consent decree with the TSA. Instead of removing Mehra from OSI

5 "*Persona non grata*" means an unacceptable or unwelcome person, and is typically used to indicate a person who is prohibited from entering a location.

altogether, however, and despite the allegations of fraud at Rapiscan under his watch—in 2014 OSI ***promoted*** Mehra to ***President of S2 Global***. In this position, Mehra would oversee the Company's all-important turnkey solutions business—which Defendant Edrick called "one of the most exciting areas within our Security business," an area that "really significantly transformed our overall financial [situation]," the "number one" "biggest growth opportunit[y] for us in Security," and "a tremendous opportunity for us." In short, rather than terminating Mehra for spearheading multiple schemes, OSI put him in charge of one of the most important businesses in the Company—one which the Company told investors was going to fill the revenue hole and credibility gap created by those schemes.

51. In addition to "removing" Defendant Mehra, OSI was subjected to additional compliance requirements that further burdened OSI's business in the U.S. In particular, OSI entered into a 30-month administrative agreement ("Administrative Agreement") with the DHS whereby the Company agreed to certain compliance upgrades and organizational improvements, made certain personnel changes, and created additional positions dedicated to compliance and quality assurance.

52. More specifically, the Administrative Agreement required Rapsican to "maintain a self-governance program that includes compliance programs for internal controls, designed for the effective monitoring and auditing of contracts and grants, and a business ethics program that covers all employees." It also required Rapiscan to "maintain a robust and functional program that includes business ethics compliance programs, and internal controls to ensure that Rapiscan effectively monitors, audits, and communicates about its compliance and ethics obligations and its commitment to the highest standards of integrity and transparency." Additionally, the reporting requirements required that Rapiscan "submit a written report to DHS describing the measures taken by Rapiscan during the semi-annual period to implement the business ethics program and to ensure compliance with [the] Agreement."

### 3. After Defendants Repeatedly Defraud OSI's Biggest Customer, the Company's Core Business Struggles

53. Leading into the Class Period, OSI's misfeasance was taking a serious toll on the Company's core Security business. According to CW 2, the Company's actions in connection with the U.S. Government contracts were "grossly unethical," ultimately cost the Company millions of dollars, and had a major effect on sales, operations, and morale. Indeed, the combined value of the two contracts the TSA suspended was $498 million.

54. Moreover, as the misconduct relating to the U.S. Government was playing out, the Company's body scanners were losing competitive edge and market share and becoming backlogged. As Defendant Edrick summarized, "So if you go back for our last four, five conference calls, we've been telling everybody about body scanners we haven't sold any units over the last two years. ***So the great growth that we had in Security in 2011 and 2012 lot of people thought it came from body scanners. It didn't, we didn't sell any units in those periods. And we said further that we don't expect to be selling any body scanners to the TSA going forward***."

55. The U.S. Government problems also threatened OSI's reputation and sales, including future U.S. Government contracts. For example, Oppenheimer commented that "[t]he risk is that the probe metastasizes into something bigger, threatening Rapiscan's reputation, broader TSA business (estimated at 5-10% of revenue), and US certification of the new RTT product." Likewise, Stephens reported that "[t]he greater concern . . . is the reputational harm caused by the missteps with the TSA, which is strong reference customer for international sales efforts. That reputational impact will be difficult and take time to assess."

56. Further compounding the fallout from the Company's efforts to mislead the U.S. Government, Rapiscan's TSA contracts had been procured under a temporary stimulus package that was set to expire. Specifically, in the aftermath of the 2008-2009 financial crisis, Congress enacted the American Recovery and Reinvestment Act of 2009 to provide temporary stimulus funding for government agencies, including the DHS,

which purchased security equipment from Rapiscan. According to CW 2, prior to the Company's issues with the U.S. Government, Rapiscan had received a "bump" in its sales due to the ARRA, which was set to expire.

57. Due to all of these negative factors, between 2013 and 2015, the Company laid off employees in multiple rounds. In 2013, according to CW 2, there were at least three rounds of layoffs. In 2015, according to CW 1, the Company laid off several members of senior leadership who had been hired to try to regain the TSA's confidence in Rapiscan.

### B. As OSI's Traditional Business Stagnates, OSI Touts S2's Turnkey Business as the Key to the Company's Future

58. In early 2013, as OSI's core Rapiscan Security business in the U.S. floundered, OSI shifted its focus to its second business model in the Security division—turnkey solutions. Defendant Edrick described this shift at a February 26, 2013 Morgan Stanley Technology, Media & Telecom Conference, stating: "***[o]ne of the areas that we've really been trying to grow is our turnkey business***." Likewise, at the June 4, 2013 Stephens Spring Investment Conference (the "June 4, 2013 Conference"), Defendant Edrick stated that the Company's Security business "has been growing significantly and ***we've been transforming our business model . . . with some new turnkey services***, which has led to some significant operating margin expansion, not only within the Security division but all of OSI."

59. OSI's turnkey model differed significantly from its traditional equipment sales business. Under OSI's traditional model, OSI simply sold security equipment to a customer, who then owned the equipment. By contrast, under its turnkey model, OSI's customers did not buy or own the security equipment but instead paid a subscription or pay-as-you-go plan such as a per scan fee.

60. According to Defendants, a standard turnkey contract works as follows: Rapiscan manufactures the requested product (i.e., scanners, equipment, installations) and sells it to S2, which then installs it at the customer's location. While OSI continues to

own the equipment—i.e., it still appears on OSI's balance sheet—the customer has the right to use it. OSI then presents the customer with a number of add-on services, including design and construction of the security checkpoint site(s), installation of the equipment at the site(s), selecting, training, and managing the personnel operating the site(s), operation of the equipment, and maintenance and security of the site(s).

61. Defendants hailed the turnkey model as the Company's most critical business opportunity. As Defendant Edrick stated at the March 11, 2014 ROTH Capital Partners Conference (the "March 11, 2014 Conference"), "***Turnkey . . . we view it as perhaps our largest growth opportunity***." Likewise, at a May 14, 2014 Oppenheimer Industrials Conference, Defendant Edrick stated, "[I]f you look at the Security business, I'd say the three biggest growth opportunities for us in Security would be***, number one would be Turnkey. That's a tremendous opportunity for us***."

62. As Defendant Chopra further stated at the March 10, 2015 ROTH Growth Stock Conference (the "March 10, 2015 Conference") that turnkey was "***one of the fastest growing segments***." Similarly, at the June 3, 2015 Jefferies Global Healthcare Conference (the "June 3, 2015 Conference"), Defendant Edrick stated, "***[Turnkey screening solutions] represents one of our biggest growth opportunities***." At CFA Society of Minnesota's InvestMNt Conference on August 5, 2015 (the "August 5, 2015" Conference), Defendant Edrick stated, "***When we think about what are our three biggest growth opportunities in security, one I would say would be turnkey, which we just talked about***." And, on June 7, 2016, Defendant Edrick highlighted the benefits of the turnkey business at a Jefferies Healthcare Conference (the "June 7, 2016 Conference"), stating, "***turnkey is really the fastest-growing area for us . . . . They are substantially higher margin than our corporate averages and has really enabled a lot of the EPS and EBITDA growth that we have seen over the last several years***."

63. Additionally, Defendants repeatedly touted OSI as a "pioneer" in the turnkey industry—being the first of its competitors to offer the service and the only Company in the world to obtain three such contracts. Indeed, throughout the Class Period, Defendants

consistently boasted that the Company had "***100% market share***" of the turnkey security business. As Defendant Edrick explained at a March 4, 2014 Morgan Stanley Technology, Media and Telecom Conference:

> [R]eally, ***what's been driving the growth over the past year has been largely dominated by our turnkey security solutions. We pioneered this area*** . . . . There's only been three contracts of this type awarded to the world. And to date, well, we've won all three. So today, ***we have 100% market share in that area***.

64. Similarly, at a Jefferies Global Industrials Conference on August 14, 2014, Defendant Edrick stated: "[T]here have been three contracts awarded in the world. ***So, right now, we're batting a thousand, and we think that first mover advantage is going to lead to substantial capturing of future business going forward*** . . . ."

### C. OSI Touts the Purported Benefits of the Turnkey Model

65. In addition to assuring the market that the Company's turnkey business would drive growth, Defendants also boasted that the turnkey model had numerous other purported advantages to its financials. For instance, Defendants repeatedly emphasized that turnkey contracts generate higher profit margins than standard equipment contracts for the Company. According to CW 1, OSI considered its turnkey contracts to be "cash cows." Although the Company deliberately refused to disclose the exact margins it was seeing on these contracts during the Class Period, Defendants repeatedly represented to the market that OSI's turnkey margins were "***significantly above our corporate average or our Security division average. [And] they are very, very favorable***."

66. Additionally, Defendants praised the turnkey contracts as providing a consistent long-term and recurring revenue stream. As Defendant Edrick stated during a February 8, 2017 conference, the turnkey model "has been extraordinarily successful for us. . . . ***It's a nice revenue, higher margin business for us of a recurring nature***." Similarly, at the March 11, 2014 Conference, Defendant Edrick stated that "[t]he new turnkey revenues is really an exciting business model in order to have ***recurring revenues***

as substantially higher margins makes a big impact for us and ***gives us a great deal of visibility as we look forward***." And, at a June 4, 2014 Jefferies LLC Healthcare Conference (the "June 4, 2014 Conference"), Defendant Edrick further trumpeted margins resulting from turnkey contracts, stating that "***the return on invested capital is extremely attractive and we'd be happy to sign these type of contracts any day of the week***."

### D. After Defendants Repeatedly Hype the Turnkey Business, the Market Pressures Them for a Third Turnkey Contract

67. Before the Class Period, OSI had secured only two turnkey contracts—one in Puerto Rico in 2010 and another in Mexico in 2012. Given Defendants' repeated representations that turnkey would drive future growth, analysts began pressing Defendants on new turnkey deals to demonstrate that the new model was sustainable. Defendants insisted that new turnkey opportunities were on the horizon. For instance, in a February 13, 2013 report, Oppenheimer recounted discussions with OSI management, stating:

> Turnkey solutions. ***OSIS continues to work on approximately half a dozen potential deals.*** Sales cycles remain long and render the timing of deal closings unpredictable. But OSI believes the competitive differentiators that allowed it to win PR/Mexico still hold and will allow it to add an average of at least one incremental deal a year.

68. Similarly, a month after OSI lost a contract with the TSA, at a February 26, 2013 conference, Defendant Edrick stated:

> [T]here is a customer set out there that is very interested in the turnkey. So ***we're pursuing additional turnkey opportunities. They are generally longer sales cycles, but we're working through those, some of those we've been working on for some time and I think we're going to see some nice rewards and in the future.***

69. As a result of these promises, analysts expected to see OSI announce a new turnkey contract within the year. In a May 9, 2013 report, for example, CRT Capital Group stated, "***New turnkey win expected this calendar year.*** We would expect it to be bigger than Puerto Rico on a revenue generating basis . . . ." Likewise, at the June 4, 2013

Conference, Stephens analyst Timothy Quillin ("Quillin") asked about future turnkey opportunities: "[C]an you talk about the turnkey services business both in Puerto Rico, maybe how Puerto Rico helped you win Mexico and then maybe how Mexico ***might help you win the next project***?"

70. Defendants' promise of a new turnkey contract assuaged analyst concerns about the Company's struggling Rapiscan business. For instance, Stephens commented in a March 27, 2013 report that "Dysfunction in the U.S. Government procurement process and economic sensitivity internationally has resulted in longer sales cycles in the Security business," but highlighted "opportunities for new turnkey contracts . . . ." Similarly, in an August 14, 2013 report, Stephens expressed optimism about OSI's turnkey prospects, stating "[t]urnkey pipeline still looks good, we think. The Company's pipeline of turnkey contracts has grown over the past few months, and management remains optimistic about the prospects of another turnkey award by the end of the calendar year." In short, with its Rapiscan business faltering and its credibility under scrutiny, the Company desperately needed another turnkey win to convince the market that its turnkey business would reduce dependence on the U.S. Government and drive growth in its key Security division.

### E. Defendants Mislead Investors about OSI's New Turnkey Contract in Albania and the Overall Success of Its Turnkey Business

71. The Class Period begins on August 21, 2013, when the Company announced its highly anticipated third turnkey contract in Albania. In an August 21, 2013 press release entitled, "***OSI Systems Receives a Fifteen-Year Agreement to Provide Turnkey Screening Services in Albania***," the Company announced that "[the] Government of Albania has awarded its Security division, Rapiscan Systems, a fifteen-year contract to provide turnkey cargo and vehicle security screening services at various sites throughout the country." The Company touted that it expected total gross revenues from the Albanian contract to "***range from $150 million - $250 million over the term of the agreement***."

72. As discussed below, throughout the Class Period, Defendants made a series of false and/or misleading statements and/or omissions of material fact concerning OSI's Albanian turnkey contract, its turnkey business generally, and the Company's ownership interest in the Albanian subsidiary that held the rights to the Albanian contract.

### 1. Defendants Misleadingly Promote the Albanian Contract as Proof of the Turnkey Model's Success

73. Immediately upon announcing the Albanian contract, Defendants hailed the deal as proof that the Company's turnkey model was a success. For instance, in the August 21, 2013 press release, Defendant Chopra stated:

> ***This significant award from Albania to provide turnkey screening services*** builds upon similar long-term agreements awarded by the Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive ***turnkey screening services continues to be well received in the marketplace***.

74. In the same press release, Defendant Mehra represented that "[t]he Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud ***to have been selected*** to execute this critical program. ***Our selection reinforces the attractiveness and compelling value of our turnkey service model***."

75. Throughout the Class Period, Defendants continued to tout the Albanian deal as proof of the sustainability of the turnkey model. At the Company's January 28, 2014 conference call for the second quarter of fiscal year 2014 ("2Q14") (the "January 28, 2014 Conference Call"), for instance, Defendant Edrick highlighted that the Albanian contract validated the turnkey model: "Although this new 15-year contract is not expected to contribute much to the top line in fiscal '14, we expect that it could contribute more substantially in fiscal '15 and beyond and ***further validates the increasing acceptance of this model in the global market for security screening solutions***." Likewise, on the same call, Defendant Chopra boasted: "***[a]fter winning the new turnkey services contract***

***earlier this year in Albania, we have clearly established our leadership in growing this particular service segment***."

### 2. Defendants Continue to Misleadingly Tout the Progress of the Albanian Contract and the Turnkey Business Overall

76. In the months following the announcement of the Albanian contract, Defendants repeatedly trumpeted the progress of the Albanian contract, creating the misleading impression that the Albanian contract faced no impediments and would soon generate considerable revenues. For instance, at the January 28, 2014 Conference Call, Defendant Edrick stated: "***[W]e have been busy preparing to go live before fiscal year end for our latest turnkey contract award in Albania***." On the same call, Defendant Chopra stated: "***I should mention here that the build-out phase for the Albanian turnkey services project is well underway, and we're happy to announce that it'll start generating revenues before the end of the fiscal year***."

77. Defendants continued to make similar statements in 2014. Defendant Edrick confirmed the progress of the Albanian contract at a March 4, 2014 Morgan Stanley Technology, Media, and Telecom Conference, stating that "***Albania, we're ramping up as we speak***." Edrick reiterated this status update at the March 11, 2014 Conference, stating: "***[a]nd most recently earlier in our fiscal year, we sold our third deal in Albania, which we're ramping up right now. So very, very exciting for us. It's really changed our profile significantly***." Likewise, on an April 30, 2014 conference call ("April 30, 2014 Conference Call"), Defendant Chopra emphasized: "[r]egarding Albania, we are making progress and we are on track. But I don't think so there will be any contribution in revenue in Q4. But we are moving on target. We're working diligently with it and looking forward to 2015."

78. Defendants' statements regarding the success of the turnkey business continued into 2015 at the ROTH Growth Stock Conference (the "March 10, 2015 Conference"), for example, Defendant Chopra touted the turnkey business as a "growing opportunity," as well as OSI's position as "a pioneer in that [turnkey business]." Chopra

further discussed the importance of the turnkey business, stating that OSI was "***well positioned to further revenue, earnings and EBITDA growth; market share gains*** and a very strong pipeline of new products driven by R&D . . . Significant growth in service revenues." Chopra emphasized the importance of the turnkey model as being "***one of the fastest growing segments and with high gross margins" and as a "large addressable market for turnkey security solutions*** . . . ."

79. During the August 20, 2015 Conference Call, Defendant Chopra highlighted the importance of the turnkey business, announcing that Defendant Mehra would exclusively focus on the turnkey "solutions" business:

> ***Ajay Mehra***, who led Rapiscan to strong success over a number of years, ***is now*** focused ***exclusively on the solutions business, reflecting the importance, and the priority we have, on growing our turnkey business***, expanding service and solutions to Security customers, as well as developing service offerings to other markets.

80. Defendants also repeatedly boasted about the performance of OSI's turnkey business overall. For example, during an April 27, 2016 Conference Call, Defendant Chopra proclaimed that "***[o]n the turnkey services front, Mexico, Puerto Rico and Albania turnkey screening service contracts continue to perform well and we continue to add new opportunities to the turnkey pipeline***." Similarly, on an August 16, 2016 conference call, Chopra emphasized that the turnkey "***market represents a key growth driver for us going forward . . . we believe we are in excellent position to capture additional turnkey services opportunities***."

### 3. Defendants' Statements Knowingly Conceal Corrupt Arrangements Underlying the Albanian contract

81. Unbeknownst to investors, Defendants' statements touting the Albanian turnkey contract and the momentum it purportedly conferred on the Company's critical turnkey business were highly misleading. While speaking on these subjects, Defendants concealed, *inter alia*, that: (i) the Albanian contract was subject to a secret arrangement whereby OSI sold 49% of its Albanian subsidiary that held the rights to the $150 to

$250 million Albanian contract to a suspicious holding company owned by an Albanian dentist for only $4.50; (ii) OSI was not entitled to all of the contract's profits as it had entered into a secret "profit share" arrangement with the dentist's company; and (iii) the 49% transfer occurred under suspicious circumstances the same week that the outgoing Albanian government (who had given OSI extremely favorable terms on the contract) left office. As a result, investors were left with the impression that OSI had a lucrative new turnkey contract and that its turnkey business was growing as planned when, in fact, Defendants had virtually given away half of the contract in order to secure it.

#### a. Unbeknownst to Investors, Defendants Sell Nearly Half of OSI's Rights to the Albanian Contract Entity

82. According to the May 10, 2013 Official Gazette of the Government of Albania (the "May 10, 2013 Official Gazette"), on April 10, 2013, Rapiscan officially entered into a turnkey contract with Albania's Ministry of Finance for the financing, establishment, and operation of scanning services for containers and other vehicles. The contract was signed by then-President of S2 Global, Fleming, and then-Minister of Finance, Ridvan Bode, a member of the Albanian Democratic Party. According to S2 Albania's Historical Register, on May 22, 2013, OSI, through Rapiscan, registered an Albanian corporation, S2 Albania, to accept the rights and obligations of the contract. According to S2 Albania's "Articles of Association" signed by Fleming and dated March 19, 2013, the entity was formed for the "execution of the concession agreement, as well as any other activity related to such matter, or required in order to fulfill it."

83. Unbeknownst to the market, on August 30, 2013, Minister of Finance Ridvan Bode—the member of the Democratic Party who signed the Albanian contract—approved a sale of 49% of S2 Albania to an Albanian entity called ICMS. Under the Albanian contract, OSI was required to obtain government approval for the transfer of more than 25% of S2 Albania. On September 6, 2013, Defendant Mehra—who also oversaw the prior misconduct at Rapiscan—authorized the sale of 49% of S2 Albania to ICMS. More specifically, on September 6, 2013, Mehra signed a Power of Attorney in Los Angeles

explicitly authorizing an Albanian attorney named Endrit Shijaku ("Shijaku") to "carry out the [] sale" of S2 Albania to ICMS "for 490 Albanian lekë" (the equivalent of ***$4.50***), sign the contract transferring 49% of S2 Albania to ICMS, and execute any necessary steps to complete the sale. The Power of Attorney was not readily available to a reasonable investor, as explained in detail in Section IV.I below. Below are the relevant portions of the Power of Attorney, a full copy of which is attached hereto as Exhibit A:

| | |
|---|---|
| Mr. Endrit Shijaku, born on 6 June 1974 resident in Tirana, holder of the Albanian ID No. 032276700, (the "**Representative**" | Z. Endrit Shijaku, lindur me 6 Qershor 1974, ne Tirane banues ne Tirane mbajtes i Leternjoftimit ID me Nr. 032276700, "**Perfaqsuesi**"): |
| to represent the Company in relation to the sale to ICMS of 490 quotas (only) that the Company holds (amongst others) in S2 Albania shpk a company established under the laws of the Republic of Albania registered with the commercial register held by the National Registration Centre under NIPT: L31722010Q (the "**Sale**"). | te perfaqsoje Shoqerine ne lidhje me shitjen tek ICMS te 490 kuotave qe Shoeria zoteron ne shoqerine S2 Albania nje shoqeri e themeluar sipas se drejtes se Republikes se Shqiperise e regjistruar ne regjistrin tregtar te mbajtur nga Qendra Kombtare e Regjistrimit me NIPT: L31722010Q (me poshte referuar si "**Shitja**") |
| The Representative has the power to carry out the above mentioned Sale of quotas for a purchase price that is equal to 490 Albanian leke. | Perfaqesuesi k ate drejten qe te beje shitjen e kuotave te mesiperme per nje cmim te barabarte me 490 leke shqiptare. |
| The Representative shall have the power to conclude any contract and take and steps make any filings that may be required in order to complete the above described Sale and register it with the Albanian National Registration Centre. | Perfaqesuesi ka te drejte te lidhe cdo kontrate dhe te ndermarre cdo hap apo te beje cdo kerekse qe mund te jete e nevojshme per te perfunduar. Shitjen e pershkruar me larte dhe per ta regjistruar ate prane Qendres Kombtare te Regjistrimit ne Shqiperi. |
| The representative has also the right to: | Perfaqsuesi ka gjithashtu te drejte te: |
| effect all such action as they deem necessary or useful for the above as well as receive declarations and documents including forms; the Representative is authorized and shall have the right to effect all payments and fees for such registrations. | kryeje te gjitha veprimet e nevojshme apo te dobishme lidhur me sa me siper si dhe te marre ne dorezim deklarata dhe dokumenta duke perfshire dhe formulare; Perfaqesuesi eshte I autorizuar dhe ka te drejten te kryeje te gjitha pagesat e likuidoje te gjitha detyrimet e tarifat per keto regjistrime. |
| All acts performed by the Representative pursuant to this power of attorney shall be considered valid and regular as if conducted by the Company itself. | Te gjitha veprimet e kryera nga perfaqsuesi sipas kesaj prokure konsiderohen te vlefshme dhe te rregullta si te ishin kryer nga vete Shoqeria. |
| For the Company: | Per Shoqerine |
| Ajay Mehra, Director<br>Rapiscan Systems, Inc. | Ajay Mehra, Director<br>Rapiscan Systems, Inc. |

84. Pursuant to Defendant Mehra's instructions, on September 16, 2013, Shijaku secretly signed the formal contract for the sale of 49% of S2 Albania to ICMS for approximately $4.50. As Defendants later admitted following the December 6, 2017 MWR Report, S2 Albania also entered into an undisclosed "profit shar[ing]" agreement with ICMS relating to the Albanian turnkey contract. The contract, like the Power of Attorney, was not readily available to a reasonable investor, as explained in detail in Section IV.I below.

85. Below is a copy of the relevant portion of the sale contract reflecting the purchase price, a full copy of which is attached hereto as Exhibit B:

**QUOTA PURCHASE AND SALE CONTRACT**

**THIS CONTRACT** (the "**Contract**") dated 16.09. 2013 is made among:

**Rapiscan Systems Inc**, with its registered seat at 2805 Columbia Street, Torrance, California 90503 (the "**Seller**"), represented through Power of Attorney by Endrit Shijaku; and

**Inspection Control & Measuring Systems Sh.p.k.,** a company organized under the laws of Albania with registration number K81902014E with offices located at R. Kongresi Lushnjes, Tirane, Albania (**"ICMS"**) represented by its administrator z. Olt. Lecin. (the "**Purchaser**").
lindur 19/08/1977 Tirane
mbajtes i leternjoftimit
r. H70819177O

**ARTICLE I - DEFINITIONS**

**Section 1.01. Definitions**

Wherever used in this Contract, unless stated otherwise or the context otherwise requires, the following terms shall have the following meanings:

| | |
|---|---|
| "Quota" | means each of the quotas of the Company with a nominal value of ALL 1 each. |
| "Company" | means S2 Albania shpk a company established under the laws of the Republic of Albania registered with the commercial register held by the National Registration Centre under NIPT: L31722010Q. |
| "Leks" or "ALL" | means the lawful currency of the Republic of Albania. |
| "Purchase Price" | means ALL 490 (four hundred ninety leke). |

**ARTICLE II - PURCHASE AND SALE OF THE QUOTAS**

**Section 2.01. Purchase Price**

The Seller hereby sells to the Purchaser and the Purchaser hereby purchases from the Seller 490 Quota in the Company with a total nominal value of ALL 490 representing 49% of the entire registered capital of the Company in consideration for the Purchase Price ("**Target Quotas**").

For the avoidance of doubt, the Seller shall – upon registration of the above sale - continue to hold the 510 quotas in the Company with a nominal value of ALL 510 representing 51% of the Quotas of the Company.

86. According to S2 Albania's Historical Register, on September 19, 2013, OSI completed the transfer of the 49% ownership in S2 Albania. Below is the relevant excerpt of S2 Albania's Historical Register, reflecting the 49% transfer.

**HISTORIKU I REGJISTRIMIT**

| Data e regjistrimit | Ndryshimi i te dhenave te regjistruara |
|---|---|
| 19/09/2013 | Numri i ceshtjes: CN-194966-09-13<br>Arsyet e hapjes se ceshtjes: Depozitimi i Kontrates se Shitjes se 49 % te kuotave nga shoqeria "Rapiscan Systems, Inc" ne favor te shoqerise "ICMS" sh.p.k , date 16.09.2013.<br><br>***Kane ndodhur ndryshimet e meposhtme tek ortaket juridik:***<br>***eshte shtuar ortaku: ("ICMS") Numri i aksioneve "490,00***<br>***Perqindja ne kapital "49,00 Kontributi ne para "490,00***<br>***Kane ndryshuar te dhenat per ("Rapiscan Systems, Inc") , Vlera e Kontributit ishte ("1.000,00") u be ("510,00")***<br>***Kane ndryshuar te dhenat per ("Rapiscan Systems, Inc") , Përqindja e Kapitalit ishte ("100,00") u be ("51,00")***<br>***Kane ndryshuar te dhenat per ("Rapiscan Systems, Inc") , Numri i aksioneve ishte ("1.000,00") u be ("510,00")*** |

87. According to ICMS's Historical Register, at the time of the transfer, ICMS's sole shareholder was Peçini. Below is the relevant excerpt of ICMS's Historical Register:

| | | |
|---|---|---|
| | aktivitetin. | |
| 10. Administratori/ët | Olti Peçini | |
| 10.1 Afati i emërimit | Nga: 07/09/2010 | Deri: 31/12/2020 |
| 11. Procedura e emërimit nëse ndryshon nga parashikimet ligjore | | |
| 11.1 Kufizimet e kompetencave (nëse ka) | | |
| 12. Ortakët | OltiPeçini | |
| 12.1 Vlera e kapitalit | Para: 70.000.000,00 | Natyre: |
| 12.2 Numri i pjesëve | 100,00 | |
| 12.3 Pjesëmarrja në përqindje (%) | 100,00 | |
| *- Të përfaqësuarit, (Plotësohet vetëm nëse zotëron kuotën si përfaqësues)* | | |

Kopje nga web

88. Peçini is an Albanian dentist, according to a list published by "Rreth Shendetit Publik" (an Albanian public health organization).[6] He has owned several companies in Albania, including a cleaning service and an insurance brokerage, according to searches on Albania's National Business Center. He also founded the Salus Hospital in Tirana, Albania according to the Salus Hospital website.[7] But he had no reported experience in providing security services on par with the Albanian contract. Indeed, Peçini's only ostensible connection to the Albania turnkey contract was his relationship with then-Prime Minister Berisha (a doctor himself), who—according to a January 14, 2012 press release by the Albanian Council of Ministers titled, "PM Berisha attends inauguration of Italian-Albanian SALUS hospital"—attended and spoke at the inauguration of the Salus Hospital that Peçini founded. At the time of the 49% transfer, records show that ICMS appears to have lacked any material assets aside from its ownership of S2 Albania. According to ICMS's fiscal year 2013 financial statements, ICMS had liabilities that exceeded its less than one million dollars in assets and was operating at a loss of over $100,000.

89. Although Peçini only paid $4.50 for a 49% stake in the lucrative S2 Albanian contract entity, he used his secretly-procured stake in S2 Albania to immediately secure a €1.9 million loan. More specifically, according to a Pledge Agreement dated December 7, 2013, Peçini pledged 49% of ICMS's shares for a €1.9 million loan from the National Bank of Commerce sh.a. According to a Decision of the General Assembly of ICMS issued on December 11, 2013, ICMS's credit agreement with the National Bank of Commerce sh.a. prohibited ICMS from selling its shares in S2 Albania without approval from the National Bank of Commerce sh.a.

[6] Available at (http://shendetipublik.com/al/wp-content/uploads/bsk-pdf-manager/34_lista_e_stomatologeve_me_te_dhena.pdf).

[7] Available at (http://www.salus.al/rreth-nesh/#vizioni).

#### b. Defendants Concealed the Corrupt Arrangement of the Albanian Contract that Secured Highly Favorable Terms for the Company

90. In addition to concealing their sale of half of the entity with the rights to the Albanian contract for less than $5, Defendants also concealed various indicia of corruption that permeated the history of the Albanian contract, including special favors, a non-competitive bid, and approval of the transfer of 49% of S2 Albania by the outgoing Albanian government, ***only days before the new government took office***.

91. In particular, OSI was pursuing the Albanian contract since at least late 2011 when Albania was governed by the Democratic Party led by then-Prime Minister Berisha—a cardiologist and professor in the Faculty of Medicine at the University of Tirana (in the same city as the hospital founded by Peçini). Almost immediately, OSI began receiving favorable treatment from Albania's government. As first reported by MWR in its December 6, 2017 report exposing certain details surrounding the Albanian turnkey contract, on November 11, 2011, Berisha's government granted OSI an ***8% bonus on its bid***—thereby giving OSI a significant advantage against any potential competitors. More specifically, a decision of the Council of Ministers of the Government of Albania signed by Berisha awarded a "bonus of 8% for the technical and financial result in the procedure selective bidding (unsolicited proposal)."

92. In 2012, the Albanian government issued a request for proposal for the Albanian contract, according to the May 10, 2013 Official Gazette. However, several previously untranslated Albanian reports—which were only reported in Albania, in the language of Albanian, and remained unknown to market analysts and investors until the December 6, 2017 MWR Report—evidence signs of collusion. For example, according to a September 19, 2014 *Monitor* (an Albanian language publication) article titled, "'Rapiscan' requires the revocation of recommendations for scanning of containers, Competition revokes it,"[8] the Albanian Competition Authority concluded that the bid was

---

[8] Originally titled: "'Rapiscan' kërkon revokimin e rekomandimeve për skanimin e kontejnerëve; Konkurrenca e rrëzon."

not a public tender where bidders were on the same footing. Additionally, in a November 26, 2014 *Gazeta Telegraf* article titled, "Brace: Berisha laments, the energy price will not be over 10 ALL," Erion Brace—a member of the Socialist Party in the Albanian Parliament—argued that the money from the Albanian contract went into the pockets of Berisha and the ministers who signed the contract. Moreover, at a July 7, 2015 meeting of the Albanian Committee for Economy and Finances, Brace criticized the contract because OSI's bid was the only offer. As MWR later reported on December 6, 2017, OSI originally proposed a €32 scanning fee, yet the Democratic government inexplicably awarded Rapiscan a contract with a €39 scanning fee, and agreed to pay the scanning fee to OSI for *all* customs declarations, even if OSI did not scan them.

93. In June 2013, Berisha's party lost power and began transitioning to a new administration. On September 6, 2013, Defendant Mehra approved the sale of 49% of S2 Albania to ICMS and the contract was signed on September 16, 2013—***within days*** of the departure of the Berisha government.

94. Unbeknownst to investors, immediately after Berisha's departure from Office, the newly-elected government denounced the contract. By June 2014, the Albanian Competition Authority recommended the revision of the contract. Business opposition by this time was also considerable due to the extremely high service fee, according to a July 13, 2015 *Monitor* article titled, "New 'Tax' on Customs" (the "July 13, 2015 Article").

95. As a result of this opposition, the new government refused to implement the contract and attempted to unilaterally terminate it, according to the July 13, 2015 Article.

96. None of these facts were disclosed to investors. To the contrary, when Defendants disclosed in late-August 2014 that the Albanian government was "halting further progress" of the turnkey contract, they continued to knowingly conceal the true facts and corrupt history of the deal, including the 49% transfer and profit-sharing agreement with ICMS.

### 4. Defendants Mislead Investors Regarding the Suspension of the Contract

97. By August 2014, OSI's troubles in Albania were still entirely unknown in the United States, including by investors, analysts, and U.S. media. On August 25, 2014, Defendants cryptically informed investors of the Albanian government's decision to suspend the contract, stating that:

> Last year, we announced a 15-year contract that we received from the government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country of Albania. ***Unfortunately, we recently learned that the customer, the Albanian newly elected government, has halted further progress on the contract and put into doubt the continuation of the program. The program had been proceeding smoothly and ahead of schedule. We intend to strongly enforce our contractual rights and hope to reach an amicable outcome. I would also note here that no revenues from Albania are included from this contract in the revenue guidance we are providing for fiscal 2015. You can understand that, under the circumstances, we cannot comment further at this time***.

98. Additionally, OSI's Form 10-K for fiscal year 2017 further stated that "in August 2013, we announced a 15-year contract award from the Government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country. ***We were recently notified that the Government of Albania has halted further progress on the contract. We have begun proceedings to protect our legal rights***."

99. Defendants' statements were highly misleading because they led investors to believe that the contract had simply been halted by a change in power in Albania, rather than as a result of corruption in the procurement of the Albanian contract and the secret arrangement with ICMS and Peçini. Indeed, Defendants continued to conceal, *inter alia*: (i) their 49% transfer of S2 Albania to Peçini, who was associated with the outgoing Albanian administration, for $4.50; (ii) the Company's joint venture and profit-sharing agreement with ICMS; (iii) the 8% bonus and more favorable contract terms that Berisha inexplicably awarded the Company during its bid; (iv) accusations reported in Albania that the Company's bid had been collusive; and (v) the undisclosed opposition to the deal

due to allegations of corruption. Moreover, because all of these facts and accusations were partially reported only in Albania (and in Albanian), OSI's investors remained completely in the dark.

**5. OSI Obtains a Less Favorable Contract Through Arbitration**

100. Unable to proceed under the contract, OSI brought an action against the Government of Albania before the International Court of Arbitration. On April 28, 2015, OSI settled the case under less favorable contract terms, to be effective by October 31, 2015, according to Law No. 75/2015 of the Assembly of the Republic of Albania.

101. Under the renegotiated contract, OSI's payment terms were contingent on the amount of each customs declaration. For example, for all customs declarations over 1,000 euros, OSI would be paid a scanning fee of 22 euros—i.e., 17 euros or approximately 44% less than the fee in the original contract. Moreover, for customs declarations under 1,000 euros, Albania would charge a fee of 5 euros. On June 5, 2015, the Council of Ministers of Albania submitted the renegotiated concession to the Albanian Assembly, and stated that the value of the contract had been reduced from approximately 316 million euros to 210 million euros, according to a December 9, 2017 Lapsi article titled, "The scan concession crashes Ball with Berisha"—a difference of 106 million euros.

102. As MWR later revealed in its December 6, 2017 report, previously untranslated Albanian reports pointed to the contract as evidence of collusion and corruption with the former government, and highlighted the exorbitant fees to be imposed under the contract. A July 7, 2015 Pamfleti Online article called the Albanian contract a "Mafia of scanning concession," while Ora News published in Albanian a television news program called, "Rapiscan, Theft of the Century" referring to the Albanian contract.[9]

103. Until the December 6, 2017 MWR Report was published, however, neither analysts nor investors were aware of the material facts concealed by Defendants. Indeed,

[9] Originally titled: "Rapiskan, vjedhja e shekullit."

it was not until MWR undertook a comprehensive investigation, including hiring investigators, obtaining documents directly from Albania, translating previously undisclosed Albanian reports, and piecing together the ties between these many scattered and obscure pieces of information that these previously undisclosed facts were revealed to OSI investors.

104. When Defendants announced the reinstatement of the Albania deal, Defendants continued to mislead investors and deliberately concealed the secret arrangement with ICMS and the corruption underlying the contract. More specifically, on October 13, 2015, OSI issued a press release (the "October 13, 2015 Press Release") announcing that "***the Company has commenced the operations phase with the Government of Albania to provide turnkey cargo and vehicle security screening services at multiple sites throughout the country. The Company currently anticipates total revenues to be approximately €200 million over the multi-year term of the agreement***." The new value of the Albanian contract was approximately ***116 million euros less*** than the reported value of 316 million euros prior to the halting of the contract.

### 6. Defendants Falsely Represent that OSI Owns S2 Albania in Its Entirety

105. Defendants went to great lengths to conceal their joint venture with ICMS from investors. This was crystallized in the offering documents for the Company's issuance of $250 million in OSI Bonds in February 2017. In Exhibit 1.1 to the Purchase Agreement for the notes, OSI explicitly misrepresented to investors that "all of the issued and outstanding capital stock of each Subsidiary" listed in Schedule D (which included S2 Albania) was "***owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity***." In other words, the Company explicitly represented that it owned 100% of the equity interest in S2 Albania when, in reality, Defendants had sold 49% of S2 Albania for less than five dollars.

### F. Defendants' Misconduct in Albania Subjected OSI to Significant FCPA Risk that Jeopardized the Entire Company

106. Defendants' wrongdoing in connection with the Albanian contract and their related misstatements and omissions created the significant and foreseeable risk that OSI would be investigated for violations of the FCPA.

107. Congress enacted the FCPA in 1977 after revelations of widespread global corruption, including the SEC's discovery that more than 400 companies had paid hundreds of millions of dollars in bribes to foreign officials to secure business overseas. The FCPA addresses the problem of international corruption in two ways: (i) anti-bribery provisions; and (ii) accounting provisions.

108. The FCPA's anti-bribery provisions prohibit U.S. persons and businesses from offering to pay, paying, promising to pay, or making or authorizing a payment of money or anything else of value to a foreign official in order to influence any act or decision in his or her official capacity or to secure any other improper advantage for the purpose of obtaining or retaining business. Many FCPA enforcement actions involve bribes to obtain or retain government contracts.

109. The DOJ and SEC both have authority to enforce compliance with the FCPA. Failure to comply with any of the FCPA's provisions can result in civil or criminal penalties, including substantial fines, prohibitions on operations in an industry or particular country, or disbarment from doing business with the federal government. These penalties also cause material damage to a company's brand, business, and operating results and often involve costly investigations and remediation efforts.

110. As discussed above, Defendants' conduct during the Class Period created a material and entirely foreseeable risk that OSI would be subjected to an investigation and potential criminal and civil penalties—which could prohibit OSI from doing business with the U.S. and foreign governments. Defendants knew that such a result would be devastating for OSI. Indeed, they repeatedly touted the Company's "international operations as providing an important strategic advantage over competitors" and

"significant growth opportunities" during the Class Period. In fact, when OSI announced on February 1, 2018 that it was the target of investigations by both the SEC and DOJ regarding its compliance with the FCPA, the price of the Company's common stock and OSI Bonds dropped another 18% and about 6%, respectively, as discussed in Section VIII.B below.

### G. Defendants' Opaque Turnkey Business Model Enabled Their Fraud

111. As part of their attempt to mislead investors, Defendants created a business model that allowed them to conceal crucial details of their turnkey operations and their contracts in general. Indeed, the Company worked in foreign jurisdictions that had little oversight but had notoriously high corruption and purposefully refused to provide crucial details regarding the turnkey business and contracts.

#### 1. OSI's Turnkey Business Existed Only in Jurisdictions Where Oversight Was Minimal and Corruption Was Prevalent

112. OSI sought to do business in foreign jurisdictions that allowed the Company to operate without the stringent reporting and ethics standards required in the U.S. According to the Company, it sought to do business with countries where a "fear of corruption" existed and the government might be looking to lend credibility to their programs. As Defendant Edrick explained:

> We are dealing with governments, and we are not generally dealing with the Western world. ***Most of the turnkeys we are looking at are not in the US or Western Europe. They are in places that have other unique challenges. . . . [O]thers might have other concerns in their particular country such as fear of corruption and things like that. And being able to outsource it to another Company could lend greater credibility to the overall program***.

113. For instance, Albania's dismal record on transparency and corruption was notorious. In 2013, when OSI secured its Albania turnkey contract, "[c]orruption in all branches of government was pervasive," and "officials frequently engaged in corrupt practices with impunity," according to the State Department. Indeed, in 2013, Albania ranked 116th on Transparency International's Corruption Transparency Index. Because OSI's turnkey business was exclusively located in foreign jurisdictions where corruption

was pervasive and the governments lacked transparency, Defendants were able to conceal its corrupt arrangements, as they did in Albania.

### 2. The Company's Financial Treatment of Turnkey Contracts Obscured Details About the Business

114. Although Defendants enthusiastically promoted the importance of the Company's turnkey contracts, they repeatedly refused to provide financial details for the contracts or turnkey services more generally, which facilitated Defendants' fraud.

115. For example, Defendants refused to disclose OSI's actual profit margins from its turnkey contracts or distinguish between non-turnkey and turnkey financial results. At a May 14, 2014 Oppenheimer Industrials Conference, Defendant Edrick unequivocally stated, "***[W]e don't break out the margin specifically between Turnkey and non-Turnkey***." Nevertheless, Edrick did not hesitate to emphasize that "[t]he overall margin improvement has been largely driven by the uptick in revenues associated with the Turnkey business."

116. Nor did Defendants provide insight into turnkey revenues. For instance, on the April 30, 2014 Conference Call, in response to questions from an analyst regarding "Security bookings" and the "number for Security funded backlog," Defendant Edrick stated, "***We don't break down our revenues precisely between turnkey and non-turnkey as a matter of course***." When pressed for more information regarding the turnkey business, Defendant Edrick declined to provide it, stating: "***We don't break out our turnkey revenues.*** But I think you have a pretty good idea of the range of what our turnkey revenues are. ***But we don't break that out separately***."

117. Because Defendants did not disclose margins or revenues specifically due to turnkey, they were able to conceal the financials associated with the Albanian contract, including the profits that S2 Albania shared with ICMS.

### H. The Relevant Truth Is Slowly Revealed

118. Defendants' scheme began to unravel on December 6, 2017, when MWR issued a detailed report titled, "OSIS: Rotten to the Core." The December 6, 2017 MWR Report revealed, among other things:

> There was an ***unannounced transfer of 49%*** of OSIS's project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for ***consideration of less than $5.00***. To be clear, this company (S2 Albania SPHK) is the company to which all rights and obligations under the turnkey contract award belong, so 49% of the company is presumably worth many millions of dollars. It appears to us that ***OSIS's accounts do not reflect the transfer – there are no deductions for non-controlling interests in the income statement, and February 2017 bond offering documents appear to show the subsidiary as 100% owned by OSIS***.
>
> * * *
>
> Yet, when asked about the delay in implementing the contract in Albania, ***management never spoke of the 49% share transfer for approximately $4.50***; nor of the additional eight points former PM Berisha awarded; nor of the company's physician joint venture partner; nor of the excessive scanning fees and the breadth of their imposition; and, they never attempted any explanation for what was fueling the new government's challenge to the concession agreement. Instead, in the midst of all of this movement and chaos in Albania, management's discussion of the problem evoked stillness . . . .

119. The December 6, 2017 MWR Report stated that "it appears OSIS's accounts are misstated because they likely do not reflect the transfer of almost half of its Albanian subsidiary, S2 Albania SHPK" and that "Albania awarded OSIS the concession for cargo scanning under a turnkey contract in August 2013." It also revealed that "[t]he Albanian government required OSIS to form an Albanian subsidiary to own all rights and obligations of the concession. OSIS formed S2 Albania SHPK on March 19, 2013. OSIS used its wholly-owned subsidiary Rapiscan Systems, Inc. to hold its shares in S2 Albania SHPK." The December 6, 2017 MWR Report noted that:

> Turnkey contracts seem particularly well-suited to corruption. If a government is only purchasing scanning equipment, it is relatively easy for an internal auditor to spot an overpayment because the equipment is somewhat commoditized. However, when bundling in various bespoke services, the pricing suddenly becomes much more opaque. Given this

> reality, it is perhaps not surprising that the turnkey contracts to date are in jurisdictions not known for their strong governance.

According to MWR, this demonstrated that the Albanian contract was obtained "through corruption," which put "at significant risk OSIS's Security Division contracts with the U.S. government and European government agencies." MWR also noted that "OSIS could face liability under the Foreign Corrupt Practices Act ('FCPA'), which could be in the many hundreds of millions of dollars."

120. In response to these revelations, the price of OSI Securities plummeted. By mid-day, *MT Newswires Live* had issued a report titled, "Market Chatter: OSI Systems Falls to 13-Month Low; [MWR] Said to Unveil Short Position Tied to Corruption Accusations," stating, "OSI Systems (OSIS) shares fell by more than 21% Wednesday to their lowest level in more than a year after a major Wall Street hedge fund established a short position in the company amid allegations of corruption and unsustainable earning expectations."

121. Before the close of business that same day, Defendants issued a terse half-page response confirming certain facts, including ICMS's ownership and profit-sharing in S2 Albania, but denying any wrongdoing:

> Our Albania turnkey security inspection program is operated in ***partnership with ICMS***, a local company with civil works construction capabilities in Albania, ***with a profit share*** in accordance with the terms of our agreement with ICMS. ICMS implemented all civil works construction for the program. As such, both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares.

122. Despite these admissions of the previously undisclosed "partnership" and "profit share" with ICMS, the Company characterized MWR's conclusions regarding corruption in Albania as "misleading allegations" and represented that the Albanian contract was secured as "the result of [a] public tender[]." Notably, however, the Company never explained why, if the partnership was above board, OSI never disclosed it.

123. Following these disclosures, the price of OSI Securities fell precipitously. OSI's common stock price plummeted nearly 30% in a single day—from a close of $84.07 per share on December 5, 2017, to a close of $59.52 per share on December 6, 2017, wiping out $465.7 million in market capitalization. Additionally, on December 6, 2017, OSI's common stock traded on extremely heavy volume of 10,596,800 shares—significantly higher than the 209,128 average daily trading volume during the Class Period. OSI Bonds, likewise, dropped precipitously by $162.62 or 15.67%—from a close of $1,037.50 on December 5, 2017, to a close of $874.88 on December 6, 2017.

124. The market attributed the decline to the facts revealed by MWR. For example, in a December 7, 2017 article titled, "$canner 'Muddy'ed," the New York Post reported:

> OSI Systems, the maker of airport scanning systems, ***lost nearly a third of its value on Wednesday after short seller Carson Block accused it of underhanded practices*** . . . . 'We think this company is rotten to the core,' Block's firm, [MWR], said in a 19-page report. . . . A potential $250 million contract OSI signed with Albania is tainted by corruption, [MWR] claimed. . . . Late Wednesday, the company, based in Hawthorne, Calif., denied any wrongdoing and said its 'turnkey' contract was the result of public tenders.

125. Later that month, according to the December 9, 2017 Lapsi Article, the head of Albania's Parliamentary Group of the Socialist Party, Taulant Balla, issued a series of accusations against Berisha regarding the Albanian contract and asked for Berisha's prosecution. The article further noted that, according to Balla, Berisha engaged in a $122.5 million corruption—49% of the value of the Albanian contract.

126. On January 31, 2018, MWR addressed OSI's December 6, 2017 response (the "January 31, 2018 MWR Report"), providing further facts debunking OSI's representations regarding the ICMS partnership:

- First, OSIS's statement that "ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares" is greatly misleading because it appears from the various entities' financials that OSIS has provided virtually all funding to, and investment in, S2 Albania.

- Second, OSIS appears to have sought to conceal its joint venture with ICMS from its investors, which we see no reason to do if this arrangement were legitimate.

- Third, even if ICMS were the greatest construction company in the world, how would it be entitled to half of the economics of the concession for pouring concrete when OSIS is providing the key equipment, technology, knowhow, and financing?

- Fourth, we are fairly certain that ICMS is not the greatest construction company in the world – or even in Albania. ICMS's construction affiliate was formed only eight months before OSIS was awarded the concession – its capitalization was only ~US$850, and it was then sold to ICMS's physician shareholder also for ~US$850. Moreover, it has virtually no tangible assets. If it's really this easy and cheap to get a nine-figure construction contract, then we at MWR are wondering why we're in the relatively impoverished world of hedge funds.

- Fifth, the timeline of this "partnership" is beyond suspicious – with the requisite approval of the transfer of shares taking place on the day the outgoing Minister of Finance left and the new one was seated.

127. Additionally, the January 31, 2018 MWR Report stated that "OSIS's response seems greatly misleading when it implies that ICMS has made capital contributions that are on par with those of OSIS (and thus somehow justifying half of the concession)." MWR also provided further facts contradicting OSI's explanation:

- **We see no S2 Albania assets to which ICMS could conceivably have contributed.** As of December 31, 2015, S2 Albania had total assets of US$10.8 million. Virtually all of the assets – US$9.6 million – were PP&E. According to the footnotes, 98.5% of PP&E (US$9.6 million) were machines (i.e., likely equipment from OSIS) – with no construction or buildings disclosed at all.

- **We see no financial contribution from ICMS to S2 Albania.** S2 Albania's December 31, 2015 liabilities confirm that substantially all of S2 Albania's capitalization came from OSIS. The financials show US$11.7 million in payables to OSIS. (Note that S2 Albania had negative shareholders' equity of US$-1.1 million.)

- **We see no account evidencing investment in S2 Albania by ICMS or ICMS Construction.** We see nothing on ICMS's CY2016 balance sheet that could resemble a meaningful investment in S2 Albania. Of its US$3.06 million in assets as of December 31, 2016, US$2.97 million are current assets. (US$1.8 million – 59.6% – is prepaid expenses; the

> balance is substantially all cash and receivables.) Of the US$80,000 of non-current assets, 99.99% is PP&E.
>
> We also see nothing on the CY2016 balance sheet of ICMS Construction, which is an affiliate of ICMS, that evidences investment in S2 Albania. (Note that ICMS Construction does not own the equity in S2 Albania.) ICMS Construction has a total of US$704,000 of assets, of which US$647,000 are receivables. There is no meaningful PP&E or investments. ICMS Construction had $627 million of revenue in 2015, which means it undertook no significant construction prior to 2016.
>
> * * *
>
> ICMS was not an established construction company in Albania, and its construction affiliate, ICMS Construction (100% owned by the doctor who owns ICMS) was formed by a single shareholder on January 29, 2013, only eight months before the award of the concession. When formed, it was called Bledi Construction and had capital of $850. Approximately one and one half months after formation (March 11, 2013), it changed its registration status from "active" to "suspended", during which time it would not have been permitted to conduct business. On June 21, 2013, Bledi changed its status back to "active". The next day – only two months before the award of the concession – it was sold to ICMS…for $850. A few days after that, the name was changed to ICMS Construction. (In 2016, the shares were transferred from ICMS to Dr. Olti Peçini again for $850.)

128. The January 31, 2018 MWR Report concluded by citing further evidence that ICMS Construction was a farce, noting that, at the end of 2015, ICMS Construction had "$1,300 cash," "zero inventory," "$20,000 in plant and machinery," and "office equipment of just $514 . . . ."

129. The very next day, on February 1, 2018, the Company issued a press release, filed with the SEC on Form 8-K, disclosing that the SEC had commenced an investigation into the Company's actions. More specifically, the Company announced:

> Following a report by a short seller, the Securities and Exchange Commission (SEC) commenced an investigation into the Company's compliance with the Foreign Corrupt Practices Act (FCPA). The U.S. Attorney's Office for the Central District of California (DOJ) has also said it intends to request information regarding FCPA compliance matters. The SEC and DOJ are also conducting an investigation of trading in the Company's securities, and have subpoenaed information regarding trading by executives, directors and employees, as well as Company operations and disclosures in and around the time of certain trades. In relation to the matters that are the subject of the trading-related investigation, the Company has taken action

> with respect to a senior-level employee. At this time, the Company is unable to predict what, if any, action may be taken by the DOJ or SEC as a result of these investigations, or any penalties or remedial measures these agencies may seek. The Company places a high priority on compliance with its anti-corruption and securities trading policies, and is cooperating with each of the government investigations.

130. On this news, the price of OSI Securities fell precipitously. OSI common shares declined from a close of $66.60 on February 1, 2018, to $54.60 on February 2, 2018, a drop of 18%, losing $227.6 million in market capitalization. On February 2, 2018, OSI's common stock traded on heavy volume of 3,294,200 shares—significantly higher than the 209,128 average daily trading volume during the Class Period. Additionally, OSI Bonds dropped by 5.94% or $54.57—from a close of $919.01 on February 1, 2018, to a close of $864.44 on February 2, 2018.[10]

131. Although Defendants touted the Albanian contract in 2013 as a validation of the Company's turnkey business, OSI did not sign a single additional turnkey contract for over five years. On January 23, 2019, the Company announced a new turnkey contract with the government of Guatemala—another country known for corruption that is ranked near the bottom of the Transparency International's Corruption Transparency Index (#144 of 180 countries).

### I. The Omitted Information Regarding the Albanian Arrangement Was Not Publicly Available and Was Obscured from Reasonable Investors

132. Prior to the publication of the December 6, 2017 MWR Report, the information needed to understand the true facts surrounding the Albanian arrangement was not reasonably available to the market or OSI investors. No reasonable investor would have had the insight or expert analysis capabilities that MWR utilized in order to

---

[10] On June 5, 2019, the Company issued a press release announcing that the SEC and the DOJ "have informed the Company that they have closed their respective investigations into possible violations of the Foreign Corrupt Practices Act by the Company." On information and belief, the investigation of OSI's stock "trading by executives, directors and employees" as well as "Company operations and disclosures in and around the time of certain trades" is still ongoing.

compile the information revealed in its report. Prior to MWR exposing the information relating to the Albanian arrangement, reasonable OSI investors had no reason to: (i) question the legitimacy of the Albanian contract; (ii) conduct in-depth research into Albanian corporate and financial records, financial ties between ICMS and OSI, the illegitimacy of ICMS as a purported "construction" company, or Olti Peçini's ties to ICMS and the outgoing Albanian government who approved the contract; (iii) suspect that such Albanian records or information existed online in Albanian government archives; (iv) understand that such a site existed on an Albanian domain that would not be readily available in a Google search outside of Albania; or (iv) recognize or understand that some of the obscure documents underlying the December 6, 2017 MWR Report were located solely in hard copy in Albania and/or required translation from Albanian. Nor did OSI investors have the knowledge and sophisticated expertise in forensic and financial analysis that was required to analyze and piece together the various factual details, Albanian financial information, and connections underlying the Albanian contract, including the various ICMS corporate records regarding its so-called "construction" business and arrangement with S2 Albania.

133. ***OSI Investors Had No Reason to Suspect or Research an Undisclosed Partnership with Anyone, Let Alone ICMS***. First, in order to figure out that OSI was misleading investors, OSI investors would have needed some reason to suspect that something was amiss with the Albanian turnkey contract and investigate. However, there was no indication to the market that OSI had sold any portion of the Albania turnkey contract at all, let alone 49%. Nor did investors have any reason to suspect that ICMS even existed, or that ICMS or an Albanian dentist named Olti Peçini were in any way relevant to OSI's Albanian turnkey contract. Therefore, investors had no reason to seek out such obscure information, even if it existed somewhere in the public domain.

134. ***The Profit Sharing Agreement Between S2 Albania and ICMS Was Not Publicly Available (in Albania or the U.S.)***. Even if investors had been on notice that there may be a partnership arrangement surrounding the Albanian contract (which they

were not), they would have next needed to locate, decipher, and connect numerous complex pieces of financial, corporate, and contractual information necessary to understand the arrangement. However, the "profit shar[ing]" agreement was not available anywhere (either in Albania or the US) and its existence was not disclosed to investors until Muddy Waters exposed the partnership, and OSI was forced to admit the arrangement in their December 6, 2017 press release immediately after the publication of the December 6, 2017 MWR Report.

135. ***The 49% Transfer Agreement to ICMS Was Obscured in Albanian and Required Sophisticated Analysis***. Even if an investor somehow suspected that OSI had sold significant rights to the Albanian turnkey contract, he/she would have then needed to locate the transfer agreement itself, showing the 49% transfer to ICMS for 490 lekë. As set forth below, this information would not have been reasonably accessible to OSI investors. Even if an investor could access the Albanian National Business Center website,[11] the text is written in Albanian. Moreover, the purported "translate" function is not reasonably operable, as the function works only on select portions of the site and does not translate certain content, including downloadable documents such as the transfer agreement. Additionally, using the "translate" function on certain pages within the website simply redirects the user back to the website home page.

136. For example, if an investor identified the website and attempted to use the search function to find "S2 Albania," the site would have populated search results with descriptions written entirely in Albanian, as shown below. It also would have set forth options such as "look for active licenses," "download simple extract," or "download historical extract," none of which provides the information needed to connect the dots:

[11] http://www.qkr.gov.al




137. Even if the investor was able to decipher the Albanian descriptions and then opted to download the simple or historical extract, the site would have downloaded a PDF of the selected extract document to the user's device—which would have been in Albanian. The site did not include an option to download these PDF documents in an English version, and the PDF files downloaded directly to a user's computer—therefore, they existed entirely outside the website and the website's translate function would not exist in any capacity in relation to such documents. The "look for active licenses" option, on the other hand, would have populated a pop-box as part of the website, which would also have been in Albanian, but would not allow the user to utilize the translate function, as shown below:




Accordingly, the information needed to identify, analyze, and piece together the ICMS transfer agreement was highly obscure and not reasonably available to OSI investors (in English or otherwise).

138. ***The Power of Attorney ("POA") Record Authorizing the ICMS Transfer Required an In-Person Visit to Albania***. The POA document that (i) authorized the 49% transfer to ICMS and (ii) disclosed Defendant Mehra's personal involvement in orchestrating the ICMS arrangement also was not reasonably available to investors. Indeed, in the December 6, 2017 MWR Report, it stated that an in-person visit to Albania was required in order to obtain the "POA." As a result, an investor would have needed to first understand that this document existed and was important, and then would have had to travel to Albania in order to obtain it in person.

139. ***The Facts and Financial Information Regarding ICMS's Financial Condition and Purported "Construction" Business Were Obscured from Investors and Required Sophisticated Expert Analysis***. Additional facts and financial information necessary to understand the full extent of OSI's partnership with ICMS were also obscured from the market. As set forth in ¶¶ 16, 84, 204-05, following the December 6,

2017 MWR Report, OSI issued a press release admitting the "profit shar[ing]" agreement and partnership with ICMS, but continued to falsely represent that ICMS was a legitimate construction firm that had made substantial investments in S2 Albania. MWR published the January 31, 2018 MWR Report exposing the illegitimacy of ICMS and Defendants' statements regarding its investments in S2 Albania, which was followed by OSI's revelation of the DOJ and SEC investigations on February 1, 2018.

140. The facts exposed in the January 31, 2018 MWR Report were not reasonably available to the market as they were gleaned from calendar year financial reports for S2 Albania, ICMS, and ICMS Construction, which were available only in-person from the registries of S2 Albania and ICMS in Albania. Further, these documents were obscured from investors because as of December 2017, S2 Albania had not yet filed its CY2016 financials, which included details regarding its balance sheet (assets and liabilities), income statement, and cash flow information. Moreover, even if investors were able to reasonably access ICMS's Albanian corporate records, they still required sophisticated expert financial and corporate accounting analysis to expose the inaccuracies in OSI's December 6, 2017 representations about ICMS, including with respect to ICMS's corporate financial records, its lack of investments in S2 Albania, and ICMS's lack of any legitimate record as a purported "construction" company.

141. ***Additional Facts Regarding the Albanian Arrangement Were Obscured from Investors***. Finally, several additional pieces of information required to understand the full extent of the Albania arrangement were partially reported only in Albania, and then only in Albanian, including: (i) information regarding Peçini ownership of ICMS and the fact that he was associated with the outgoing Albanian administration; (ii) the 8% bonus and more favorable contract terms that Berisha inexplicably awarded the Company during its bid; (iii) accusations reported in Albania that the Company's bid had been collusive; and (iv) the undisclosed opposition to the deal due to allegations of corruption. As a result, OSI's investors remained completely in the dark. Further, the January 31, 2018 MWR Report revealed evidence that ICMS could not have earned its 49% stake in

S2 Albania and thus no "partnership" truly existed, including: (i) virtually all of the assets of S2 Albania were PP&E, which were primarily machines that were likely from OSI, and there were no constructions or buildings disclosed to which ICMS could have contributed; (ii) there were no financial contributions from ICMS to S2 Albania found; and (iii) nothing in ICMS's CY2016 balance sheet showed any meaningful investment in S2 Albania.

142. ***MWR Is a Sophisticated Financial Expert***. MWR was founded by Carson S. Block, who was named as one of the 50 "Most Influential Thinkers" in finance and investing by Bloomberg Markets Magazine in 2011. It was not until MWR undertook a comprehensive investigation, including hiring investigators, interviewing former OSI and Rapiscan employees, obtaining documents directly from Albania, translating previously undisclosed Albanian reports, engaging in sophisticated financial analysis, and piecing together the ties between these many scattered and obscure pieces of information, that these previously undisclosed facts were finally revealed to OSI investors.

## V. DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

### A. August 21, 2013 Press Release

143. On August 21, 2013, the Company issued a press release titled, "***OSI Systems Receives a Fifteen-Year Agreement to Provide Turnkey Screening Services to Albania***." In that press release, the Company announced that "***the Government of Albania has awarded its Security Division, Rapiscan Systems, a fifteen-year contract to provide turnkey cargo and vehicle security screening services at various sites throughout the country***." The press release explained that "[t]he Company currently anticipates that total gross revenues may ***range from $150 million - $250 million over the term of the agreement***."[12]

---

[12] Each of Defendants' statements in Section V that is alleged to be false and misleading is highlighted in ***bold and italics***.

144. In the August 21, 2013 press release, Defendant Chopra further stated:

> ***This significant award from Albania to provide turnkey screening services builds upon similar long-term agreements*** awarded by the Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive turnkey screening services ***continues to be well received in the marketplace***. Our experience and capability to develop and integrate leading edge inspection technologies coupled with our depth of operational expertise is unmatched in the industry and we believe ***makes us uniquely qualified to secure and manage such complex programs***.

145. Defendant Mehra bolstered Defendant Chopra's statement by representing that "[t]he Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud to have been selected to execute this critical program. ***Our selection reinforces the attractiveness and compelling value of our turnkey service model***."

146. Each of Defendants' statements set forth in ¶¶ 143-45 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone was "selected to execute" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality, 49% of the "significant award" had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality the "selection" of OSI and "award[] its Security Division, Rapiscan Systems," was only

achieved through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The Company's secret arrangement with ICMS and undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that the "significant award" of the contract "reinforced" the "compelling value of our turnkey service model" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be a primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, including as proof of the "the attractiveness and compelling value of our turnkey service model" and the anticipated "total gross revenues," they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

## B. Second Quarter 2014

147. On January 28, 2014, Defendants held a conference call to discuss the Company's 2Q14 financial results. During the call, Defendant Edrick touted the Company's turnkey contract with Albania, stating that the contract "***further validates the increasing acceptance of this model in the global market for security screening solutions***."

148. Defendant Chopra echoed Defendant Edrick's positive comments about the Company's turnkey operations and emphasized the Albanian contract:

> Moving on to the other activities in our Security division. . . . ***After winning the new turnkey services contract earlier this year in Albania, we have clearly established our leadership in growing this particular service segment*** and expect to continue to leverage our position for further growth.

149. Each of Defendants' statements set forth in ¶¶ 147-48 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Chopra's statement that OSI "w[on] the new turnkey services contract" and that the contract "further validate[d]" the

turnkey business model created the false and misleading impression that OSI alone "won" the contract, that the contract would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The Company's secret arrangement with ICMS and undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendant Chopra's statements that OSI "h[ad] clearly established [its] leadership in growing this particular service segment" and that the Albania contract "further validate[d] the increasing acceptance of [the turnkey] model" because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth

and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants made positive comments about the Company's turnkey operations, stating that the Albanian contract "further validates the increasing acceptance of this model" they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

**C. March 2014 Analyst Conferences**

150. On March 4, 2014, Defendant Edrick appeared at the Morgan Stanley Technology Media Conference on behalf of the Company and continued to tout the Company's turnkey success:

> ***[W]hat's been driving the growth over the past year has been largely dominated by our turnkey security solutions. We pioneered this area. We won our first contract in Puerto Rico, and we followed it up in Mexico which has been a big driver of our growth. There's only been three contracts of this type awarded to the world. And to date, well, we've won all three. So today, we have 100% market share in that area***.

151. During a question and answer session with an analyst, Defendant Edrick further elaborated:

> <A>: Edrick>: ***We think our first-mover advantage is going to give us more than our fair share in this. We're working on a number of opportunities.*** It's hard to say what that cadence will exactly be. But we feel confident that this is going to be a major growth driver for us going forward.
>
> <Q>: How did that change the financial picture for the company over time?

<A - Alan I. Edrick>: ***Changes it pretty dramatically***.

<Q>: Yeah.

<A - Alan I. Edrick>: You know, when you started to see Mexico ramp up in the early part of calendar 2013; I think people started to get a sense. But it's a recurring revenue stream, so it gives us much greater visibility.

<Q>: But taken over a fairly long period of time, right? It's not like a software product where it's one or two years versus . . . .

<A - Alan I. Edrick>: You're exactly right. Mexico is a six-year contract, Puerto Rico a 10-year contract, Albania a 15-year contract.

<Q>: Yeah.

<A - Alan I. Edrick>: ***So it is over a much longer period of time, great revenue visibility and much higher margins. While we haven't disclosed what those margins are, you can kind of begin to feel the impact when you see our financials as we've been ramping up***.

152. Defendant Edrick reiterated his statements about the importance of the Company's turnkey operations, including Albania, at the March 11, 2014 Conference: "***[M]ost recently earlier in our fiscal year, we sold our third [turnkey] deal in Albania, which we're ramping up right now. So very, very exciting for us. It's really changed our profile significantly***." Similarly, Edrick represented:

> ***Turnkey, which we talked about before, we view it as perhaps our largest growth opportunity***. This is really a market outside the United States, outside of Western Europe, so look in places such as Latin America, Middle East, Eastern Europe. We think there's substantial growth opportunities here. ***We have a nice pipeline of opportunities. We've landed three deals. We [won] 100% of all deals landed to this point. We believe we have a great first mover advantage***. While we may not always [ph] bag 1,000, we think we're going to win more than our fair share.

153. Each of Defendants' statements set forth in ¶¶ 150-52 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract

entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Edrick's representations created the false and misleading impression that OSI alone had "landed" and "won" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Further, Edrick's statements left investors with the impression that OSI had fairly "won" the contract on the merits of its turnkey business, when in reality it had "landed" the deal only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendant Edrick's statements that the contract reinforced the turnkey "growth opportunity" and it gave OSI a "great first mover advantage" and "really changed our profile significantly" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendant Edrick's statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey

model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendant Edrick spoke about and affirmatively touted the Albanian contract as the Company's growth driver and "largest growth opportunity," he had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

## D. May 14, 2014 Oppenheimer Industrial Conference

154. On May 14, 2014, Defendant Edrick appeared at the Oppenheimer Industrial Conference, during which he touted the Company's "first-mover advantage" against competitors in turnkey:

> There has been three contracts in the world that have been awarded to date in the order of Puerto Rico, Mexico, and Albania. ***So we've won all three. So while we're batting 1.000 today, and we think we have a good first-mover advantage that we won't always win 100% of them. But we think we're in great shape***. And we have a real nice pipeline of opportunities. These are long sales cycle products.

155. Defendants' statements set forth in ¶ 154 were materially false or misleading when made, and/or omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS)

whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "won" and been "awarded" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality, it had "won" and been "awarded" the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The Company's secret arrangement with ICMS and undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendant Edrick's statements that OSI "ha[d] a good first-mover advantage," had "won all three" turnkey contracts, and was "batting 1.000" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving, would be a primary driver of OSI's future growth, and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants made positive comments about the Company's turnkey operations, stating that they had "won all three" turnkey contracts and their "first-mover advantage," they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding OSI's ownership of these contracts, the vitality and sustainability of the turnkey business, the arrangement underlying the contracts, and the foreseeable risks associated with the ICMS arrangement.

**E. June 3, 2014 Stephens Spring Conference**

156. During the June 3, 2014 Stephens Spring Conference, Defendant Edrick further emphasized the Company's turnkey solutions, as follows:

> <Q - Timothy J. Quillin>: . . . In the Security business, I think over the past, let's say, three years or so, one of the big changes has been that you've won some big and small turnkey services, outsource services contract where you own the equipment. Your employees run the equipment and you get paid on a per site or per scan basis. Why has that business model proved to be popular? What's the pipeline look like of additional opportunities?
>
> <A - Alan I. Edrick>: . . . You talk about the pipeline of opportunities, we are working on a number of deals. We're very excited about those opportunities. It's a long sales cycle. As we've gone through these other contracts, they generally ranged from the time we started talking to the time we executed the contract, anywhere between a couple of years to maybe as much as four years. I would say initially, it was a missionary sale, and we had to talk about a concept or a theory. And now hopefully, we're moving a

> little bit beyond that as we're able to take potential future customers, we can take into Puerto Rico, we can take into Mexico, and they can see for themselves just how seamless an operation it is.
>
> It really works extremely efficiently and it's a very, very sophisticated operation. So we're encouraged by that and we're looking forward to winning new turnkeys in the future, ***while today we've been successful on winning all turnkeys awarded today, 100%, we're not saying in the future, we'll always win 100% but we think our first-mover advantage is significant and is going to allow us to win perhaps more than our fair share of deals going forward***.

157. Defendants' statement set forth in ¶ 156 was materially false or misleading when made, and/or omitted material facts necessary to make the statement, in light of the circumstances under which it was made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "been successful on winning" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The Company's secret arrangement with ICMS and undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations

and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that "we've been successful on winning all turnkeys awarded today, 100%," and "our first-mover advantage is significant" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statement above was materially misleading to investors because it created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants made positive comments about the Company's turnkey operations, stating that they had "been successful in winning all turnkeys awarded" and "our first-mover advantage is significant," they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the

viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

### F. June 4, 2014 Jefferies LLC Healthcare Conference

158. On June 4, 2014, the Company participated in the Jefferies LLC Healthcare Conference (the "June 4, 2014 Conference"). At the conference, Defendant Edrick touted the turnkey model:

> Let's start talking about maybe one of the most exciting areas within our Security business, and that's turnkey. I started off the conversation telling you a little bit about this. But really the value proposition is for customers that either don't have the capital or the money to spend upfront or perhaps don't have the operational expertise to do it, we provide a full turnkey solution. And what we mean is we manufacture the equipment, we place it at the customer location, but we still own it, it's on our balance sheet. We staff it up with our people and then we charge a fee per scan or a fee per site per month. We determine what might be right for the customer.
>
> ***We sort of pioneered this model. And to-date we've won all contracts in the turnkey arena. While we think we have a nice first-mover advantage and hopefully we'll win more than our fair share in the future, clearly we're not going to win 100% going forward. But we really like our position***.

159. Each of Defendants' statements set forth in ¶ 158 was materially false or misleading when made, and/or omitted material facts necessary to make the statements, in light of the circumstances under which they was made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "won" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly "won" the contract on the

merits of its turnkey business, when in reality it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The Company's secret arrangement with ICMS and undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that "to-date we've won all contracts in the turnkey arena" and "we have a nice first-mover advantage" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants made positive comments about the Company's turnkey operations, stating that they had "pioneered this model," had "won all contracts in the turnkey arena," and had a "nice first-mover advantage," they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding OSI's ownership of these contracts, the vitality and sustainability of the turnkey business, the arrangement underlying the contracts, and the foreseeable risks associated with the ICMS arrangement.

### G. August 12, 2014 Oppenheimer Technology, Internet & Communications Conference

160. On August 12, 2014, Defendant Edrick appeared at another Oppenheimer Conference—the Technology, Internet & Communications Conference (the "August 12, 2014 Conference") and again touted the Company's turnkey operations: "***And we won our first contract in Puerto Rico, followed that up with a win in Mexico and then Albania. And this recurring revenue at higher margin has really been a key to our success***."

161. During the August 12, 2014 Conference, in response to questions from Yair Reiner, an analyst with Oppenheimer, Defendant Edrick promoted the turnkey contracts as driving growth:

> ***Turnkey, so this is the area that we might consider maybe our most exciting opportunity for growth. These are the three contracts I referred to you earlier in Puerto Rico, Mexico and Albania. Very exciting area for us. It really has changed the landscape not only for our Security business but for OSI Systems overall. It's higher margin and recurring revenue***.
>
> This is as much an IP project as it is an equipment project. The stuff we're doing is highly sophisticated. ***We think we have a nice first-mover advantage***.
>
> ***Today we've won a 100% of the turnkey projects that have been awarded in the world. And while we don't profess to be able to maintain 100%, we think our first-mover advantage will allow us to win hopefully more than our fair share of future turnkey awards***.

162. Each of Defendants' statements set forth in ¶¶ 160-61 was materially false or misleading when made, and/or omitted material facts necessary to make the statements, in light of the circumstances under which they was made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "won" and "been awarded" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly "won" the contract on the merits of its turnkey business, when in reality it had "been awarded" the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The Company's secret arrangement with ICMS and the undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendant Edrick's statements that OSI had a "first-mover advantage," and

that its turnkey business was an "exciting opportunity for growth" and provided "recurring revenue at higher margin has really been a key to our success" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants made positive comments about the Company's turnkey operations, stating that they had "won a 100% of the turnkey projects that have been awarded in the world," and had a "nice first-mover advantage," they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding OSI's ownership of these contracts, the vitality and sustainability of the turnkey business, the arrangement underlying the contracts, and the foreseeable risks associated with the ICMS arrangement

**H. August 14, 2014 Jefferies Global Industrials Conference**

163. On August 14, 2014, the Company participated in the Jefferies Global Industrials Conference (the "August 14, 2014 Conference"). At the conference, Defendant Edrick again touted the turnkey contracts and the Company's "first mover" advantage:

> [W]e challenged ourselves to say, how can we expand our revenues, and how can we expand our margins. And we said, well, what if there is a customer segment out there that maybe doesn't have the capital to buy the equipment upfront, or if they do, perhaps they don't have the operational expertise to run the equipment. Or if they have that, maybe there's a third reason that they'd like to outsource the operation altogether. And to that end, we set up a business specifically focused on this a few years back, and ***we've won three contracts now in Puerto Rico, Mexico and Albania***.
>
> ***And there have been three contracts awarded in the world. So, right now, we're batting a thousand, and we think that first mover advantage is going to lead to substantial capturing of future business going forward***, though we don't expect to win 100% going forward all the time.

164. Each of Defendants' statements set forth in ¶ 163 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "won" and had been "awarded" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly "won" the contract on the merits of its turnkey business, when in reality, it had been "awarded" the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be

terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that "there have been three contracts awarded in the world. So, right now, we're batting a thousand, and we think that first mover advantage is going to lead to substantial capturing of future business going forward" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendant Edrick's statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendant Edrick made positive comments about the Company's turnkey operations, he had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing

agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

**I. Fourth Quarter 2014**

165. On August 25, 2014, Defendants held a conference call to discuss the Company's 4Q14 financial results ("the August 25, 2014 Conference Call"). During that call, Defendant Chopra stated:

> Last year, we announced a 15-year contract that we received from the government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country of Albania.
>
> ***Unfortunately, we recently learned that the customer, the Albanian newly elected government, has halted further progress on the contract and put into doubt the continuation of the program. The program had been proceeding smoothly and ahead of schedule. We intend to strongly enforce our contractual rights and hope to reach an amicable outcome. I would also note here that no revenues from Albania are included from this contract in the revenue guidance we are providing for fiscal 2015. You can understand that, under the circumstances, we cannot comment further at this time***.

166. On August 27, 2014, OSI filed a Form 10-K, signed by Defendants Chopra, Mehra, and Edrick, to report the Company's financial results with the SEC ("FY14 10-K").

167. The FY14 10-K further stated the following regarding the Albania turnkey contract:

> The loss or termination of a contract by such an institution, even if for reasons unrelated to the quality of our products or services, could therefore have a more wide-spread and potentially material adverse effect on our business, financial condition and results of operations. ***For example, in August 2013, we announced a 15-year contract award from the Government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country. We were recently notified that the Government of Albania has halted further progress on the contract. We have begun proceedings to protect our legal rights***.

168. Each of Defendants' statements set forth in ¶¶ 165 and 167 was materially false or misleading when made, and/or omitted material facts necessary to make their

statements, in light of the circumstances under which they were made, not misleading, because:

a. The new Albanian government did not simply halt progress on the contract, but did so in part because of OSI's collusive arrangement with ICMS, the corrupt terms and timing of the outgoing Albanian government's authorization of the 49% transfer, and the undisclosed means required to secure the Albanian contract in the first instance. Once Defendants spoke about the Albanian contract, including that the Albanian government had "halted progress" on the contract, they had a duty to disclose the material facts regarding the underlying reasons for the stoppage of the contract, as they were necessary to ensure that investors were not misled regarding the true source of the "halting," the actual value of the contract if and when renewed, the amount of revenues that would actually go to OSI, the arrangement underlying the contract, and the foreseeable risks associated with the ICMS arrangement;

b. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendant Chopra's statement that the Albanian government had halted further progress on the contract with Albania, but that OSI intended to enforce its "contractual rights," and OSI's inclusion of S2 Albania in its FY14 10-K as a subsidiary of OSI without any disclosure regarding ICMS's 49% ownership stake and profit sharing rights in S2 Albania were materially false and/or misleading because they created the impression that the halting of the contract was illegitimate and that government intervention was not a foreseeable risk;

c. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements were misleading because they concealed the real risks associated with the contract as a result of their corrupt arrangement;

d. The new Albanian government did not simply halt progress on the contract, but did so in part because of OSI's collusive arrangement with ICMS, the corrupt terms and timing of the outgoing Albanian government's authorization of the 49% transfer, and the undisclosed means required to secure the Albanian contract in the first instance. Information about the Company's turnkey business and contracts were highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

e. Defendants' statements were materially misleading to investors because they created the false impression that Defendants' turnkey business was thriving prior to intervention by the Albanian government. Defendants' statements that the government intervention "put into doubt the continuation of the program" and that Defendants would "enforce [their] contractual rights" and "protect [their] legal rights" created the impression that the program would continue to thrive were it not for these intervening circumstances, rather than

these circumstances being the result of the materialization of risks known to and concealed by Defendants. Information about the Company's turnkey business and contracts were highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

f. Once Defendants made comments about the Company's turnkey operations and the reasons that the Albanian government had halted progress on the contract, they had a duty to disclose the material facts in (a)-(d) above as they were necessary to ensure that investors were not misled regarding the value of the reasons for the government intervention, the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

### J. First and Second Quarter 2015

169. On March 3, 2015, Defendant Edrick appeared at Morgan Stanley's Technology Media & Telecom Conference and provided a detailed explanation of the Company's turnkey business:

> The security business has been growing the fastest for us and in most [of] the areas that we've been and we tend to be number one or number two. . . . And when we look at it sort of break it down, we might break it down into cargo products, baggage and parcel inspection products, maybe some people screening and turnkey. And what turnkey is in the technology world, it's sort of equivalent to a SaaS model rather than software-as-a-service, its security screening as a service. ***And we're clearly the number one in this market and is rapidly growing for us, and it's a high margin area.***

170. In response to questions by analyst David Chen of Morgan Stanley, Defendant Edrick explicitly discussed the current status of the Albania contract:

> <Q - David Chen>: Okay. So you've announced two so far Mexico and Puerto Rico?
>
> <A - Alan I. Edrick>: Correct. ***We had won a third one as well called Albania. Shortly after winning that, there was a change in the administration. So we've cautioned The Street to exclude that from future***

> ***prospects in terms of what we're looking at, but there is always opportunity to rekindle that.***

171. Each of Defendants' statements set forth in ¶¶ 169-70 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "won" the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly "won" the contract on the merits of its turnkey business, when in reality it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details

surrounding the Albanian turnkey contract were revealed. Thus, Defendant Edrick's representations that OSI was "clearly the number one in this market" that "is rapidly growing for us, and it's a high margin area" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement. Further, the statements that the halting of the contract was merely due to a "change in the administration" and could be "rekindle[d]" at any time created a misleading impression that the halting of the deal was solely due to turnover in the Albanian government rather than the undisclosed favorable terms and arrangement with ICMS;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants made positive comments about the Company's turnkey operations, they had a duty to disclose the material facts in (a)-(c) above, as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

**K. Fourth Quarter 2015**

172. On October 13, 2015, OSI issued a press release announcing that "the Company has commenced the operations phase with the Government of Albania to provide turnkey cargo and vehicle security screening services at multiple sites throughout the country. ***The Company currently anticipates total revenues to be approximately €200 million over the multi-year term of the agreement*.**"

173. Defendant Chopra added: "***With Albania now operational, along with the Puerto Rico and Mexico turnkey programs, we continue to innovate and differentiate ourselves in the turnkey solutions space where we expect to experience additional growth*.**"

174. Each of Defendants' statements set forth in ¶¶ 172-73 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, OSI's statement that it anticipated "total revenues to be approximately €200 million over the multi-year term of the agreement created the false and misleading impression that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality, 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality, it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that the Company expected €200 million from the contract and "we continue to innovate and differentiate ourselves in the turnkey solutions space where we expect to experience additional growth" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, including the anticipated "total revenues to be approximately €200 million over the multi-year term of the agreement," they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the actual value, the amount of revenues that would actually go to OSI, the arrangement underlying the contract, the prospects for the Company's turnkey business, and the foreseeable risks associated with the ICMS arrangement.

## L. First and Second Quarter 2016

175. On October 29, 2015, OSI issued a press release announcing its financial results for the first quarter of fiscal year 2016 ("1Q16") (the "October 29, 2015 Press Release"), which was attached as an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date. On the same day, the Company held a conference call to discuss the results of 1Q16 (the "October 29, 2015 Conference Call"). On the call, Defendant Edrick also trumpeted the commencement of the Albanian turnkey contract:

> ***We were pleased to reach agreement with the Government of Albania on certain contract changes, which led to the commencement of activities. We expect to ramp up to our full run rate this fiscal year.***
>
> ***This 15-year contract for turnkey cargo and vehicle security screening services at various checkpoints throughout the country is valued at approximately EUR200 million. Initial site operations are going smoothly*** and we look forward to increasing revenues from this contract throughout this fiscal year as new sites come online.
>
> ***Following Puerto Rico and Mexico, this is the third major turnkey services program now in operation. Similar to that in Mexico, Albania's service cost is based on a fixed amount per site per month.***

176. On January 27, 2016, OSI issued a press release announcing its financial results for the second quarter of fiscal year 2016 ("2Q16") (the "January 27, 2016 Press Release"), which was attached as an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date. On January 27, 2016, OSI held a conference call

to discuss and expand upon the Company's 2Q16 financial results. During the call, Defendant Edrick had the following exchange with analyst Josephine Millward of The Benchmark Company:

> Millward: What do you have in your backlog for Albania, Alan? It's not the EUR 200 million, right? You don't have all of it in there?
>
> Edrick: ***That's correct. We only include five years worth of revenues on Albania in our backlog, so that's in the neighborhood of $60 million, plus or minus.***

177. Defendant Edrick further touted the growth opportunity of OSI's turnkey services and the performance of the Albanian contract, stating:

> ***In turnkey services, another major growth opportunity for us with a long sales cycle, we continue to see a strong pipeline. We are optimistic of landing new turnkey deals*** and have added additional resources to support these opportunities. However, the timing of these deals has been and will continue to be influenced by the macroeconomic factors discussed earlier. ***Our most recent turnkey contract in Albania is performing well, and we expect to be fully operational within this quarter. In addition, our other turnkey programs continue to perform well.***
>
> ***We are well situated for growth in products and services including turnkey programs*** and have a strong balance sheet that can easily absorb the capital requirements from longer lead time builds or turnkey opportunities that often require significant initial capital outlay. . . . ***The strength in our backlog and bookings trend and continued strength in foreseeable demand for our products globally gives us confidence in the second half and delivering a very strong Q4 in security.***

178. On March 15, 2016, Defendants participated in the ROTH Conference. Defendant Chopra touted the turnkey business and the Albanian contract at the conference:

> ***One of the big growth opportunities for us is in the large-scale turnkey screening solutions with significant global expansion opportunities. . . . [T]he latest win was Albania. So that in this space, this is a new evolving market because you're trying to get to be a service provider in the security field to your customer. And a site to have a site to show is a big win for us*** . . . . Margins tend to be very good compared to selling just the equipment.

179. Each of Defendants' statements set forth in ¶¶ 175-78 was materially false or misleading when made, or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, for example, Defendant Edrick's statements that the Albanian contract "is valued at approximately EUR200 million," and was a "big win" created the false and misleading impression that the Albanian contract was awarded solely and would inure solely to the benefit of OSI, when in reality, 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality, it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants'

statements that the Albania contract was a "big win" and "another major growth opportunity for us with a long sales cycle" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because the purported €60 million in "backlog" revenues from the Albanian contract was subject to an undisclosed "profit shar[ing] agreement" and 49% transfer of the S2 Albania entity that owned the rights to the contract and thus created a false and/or misleading impression that the turnkey model was thriving, would be the primary driver of OSI's future growth, and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, including revenues in the amount of approximately EUR200 million solely for OSI, they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the actual value, the amount of revenues that would actually go to OSI, the arrangement underlying the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

**M. Third Quarter 2016**

180. On April 27, 2016, OSI held a conference call to discuss and expand upon the Company's 3Q16 financial results. During the call, in an exchange with Brian W.

Ruttenbur of Drexel Hamilton LLC, Defendant Edrick provided revenue estimates for the Albanian contract:

> Ruttenbur: And then, Albania started, you said in the third quarter, how much revenue did that contribute?
>
> Edrick: We don't generate-- talk about revenues by projects, but as you know, ***Albania at full run rate is in the neighborhood of the $12 million to $13 million a year, increasing on an annual basis***.

181. Defendant Chopra further emphasized the success of OSI's turnkey business and boasted that all three contracts (including Albania) were performing well:

> ***On the turnkey services front, Mexico, Puerto Rico and Albania turnkey screening service contracts continue to perform well and we continue to add new opportunities to the turnkey pipeline. We are pleased that the ramp-up in Albania went as expected and by quarter end, all sites are fully operational***.

182. On the April 28, 2016, OSI filed a Form 10-Q with the SEC for 3Q16 signed by Defendants Chopra and Edrick. In the 3Q16 Form 10-Q, Defendants OSI, Chopra, and Edrick touted that the increase in Security division revenues were due, in part, to the implementation of Albania turnkey contract:

> ***Revenues for the Security Division for the three months ended March 31, 2016 increased primarily as a result of*** a $23 million equipment sale to a Middle East customer and ***the implementation of our turn-key screening operations in Albania***.

183. Each of Defendants' statements set forth in ¶¶ 180-82 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendant Edrick's statement that "Albania at full run rate is in the neighborhood of the $12 million to

$13 million a year, increasing on an annual basis," and Defendant Edrick's and Defendant Chopra's statements touting increased revenues for the security division attributable in part to the Albanian contract created the false and misleading impression that the benefits of the contract would inure solely to the benefit of OSI, when in reality 49% of the "significant award" and "profit shar[ing]" rights had been sold to a third party, ICMS, for less than $5;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendant Edrick's and Defendant Chopra's statements touting revenues from the Albanian turnkey contract were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49%

transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, including that purported revenues from the Albanian contract were "$12 million to $13 million a year, increasing on an annual basis," they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

**N. Fourth Quarter 2016**

184. On August 16, 2016, OSI issued a press release announcing its financial results for the fourth quarter of fiscal year 2016 ("4Q16") and annual results, which was attached an exhibit to a Form 8-K signed by Defendant Edrick and filed with the SEC on the same date.

185. On the same day, OSI held a conference call to discuss and expand upon the Company's 4Q16 and annual financial results (the "August 16, 2016 Conference Call"). During the call, Defendant Chopra again trumpeted turnkey as a "key growth driver" and highlighted the performance of the Company's turnkey contracts, including Albania:

> ***In turnkey services, our current programs in Albania, Mexico and Puerto Rico continue to perform well, and contribute significantly to our overall performance. This market represents a key growth driver for us going forward, as the potential turnkey pipeline continues to grow, and we believe we are in excellent position to capture additional turnkey services opportunities***.

186. On the same call, Defendant Chopra had the following exchange with Larry Solow of CJS Securities:

> Solow: Okay. And then on turnkey, it sounds like, without getting into the real specific details, it sounds like your queue of opportunities is big as it has been in some time. And hopefully things start—it's just a matter of when you can close some deals. Is that a good assessment?
>
> Chopra: That's a good assessment. And again, I want to emphasize that most of these deals are—a [majority] of the deals are cargo-based. So, even at the end it becomes a sale of equipment, or it turns into a turnkey.
>
> ***Our pipeline is very robust and strong. And we also, what we feel is, we have demonstrated that this can work. So, we have a big headstart from our competitors***.

187. On the August 16, 2016, Conference Call, in response to questions from Jeff Martin of ROTH Capital Partners, LLC, Defendant Chopra attributed the delay in the Albania turnkey contract to newly elected government:

> Martin: Was wondering if you could give us a little more detail on the turnkey pipeline? I mean, it's understandable that timing is always unpredictable. If I am recalling correctly, Albania was your last win, which was approximately three years ago.
>
> Just curious if you have specific visibility on near-term projects that could close? Or if this is just a long lead cycle that there isn't a ton of visibility on?
>
> Chopra: Jeff, the way you're saying it is right. These are tough things to predict. ***All we can tell you is, with the successes we've had—and keep in mind—Albania is a good example, although it's been three years, it also got sort of stopped when the election happened, and then it got rejuvenated***. We are working for most of these turnkey projects in areas where there is some unpredictability, both volatility in the economy, volatility in their requirements, volatility in just the need for protecting the infrastructure.

188. On October 21, 2016, the Company filed a Form DEF 14A with the SEC which was signed by OSI's Audit Committee. In describing its executive compensation, which was tied to certain performance targets, the Company stated that its "***key achievements***" for fiscal 2016 included the "***[s]ignificant 15-year booking and successful rollout of our turnkey screening solutions program in Albania***."

189. Each of Defendants' statements set forth in ¶¶ 185-88 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations that the Albanian contract was a "success," "key achievement," and "significant 15-year booking" created the false and misleading impression that OSI alone had won the Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality, 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government. Further, Defendant Chopra's representations were misleading because they failed to disclose that the new Albanian government did not simply halt progress on the contract, but did so in part because of OSI's collusive arrangement with ICMS, the corrupt terms and timing of the outgoing Albanian government's authorization of the 49% transfer, and the undisclosed means required to secure the Albanian contract in the first instance;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model,

caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that the contract was a "key growth driver" and a "key achievement" for OSI were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, they had a duty to disclose the material facts in (a)-(c) above, as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, the foreseeable risks associated with the ICMS arrangement, and the reason that the new Albanian government halted progress on the contract.

**O. Second Quarter 2017**

190. On January 26, 2017, OSI held a conference call to discuss the Company's 2Q17 results. During the call, Defendant Chopra touted the Albanian turnkey contract,

stating that "***[i]n turnkey services, our programs in Puerto Rico, Mexico and Albania continue to perform well. Overall, we see the pipeline staying robust and we remain optimistic that OSI will capture new turnkey programs in the near future***."

191. On February 8, 2017, Defendants participated in the Cowen Aerospace/Defense & Industrials Conference. At the conference, Defendant Edrick stated:

> ***One of the really interesting areas of our Security business is what we call turnkey***. So our basic business model in the past for Security had always been, we sell equipment and then we get some recurring revenue through service, spare parts, and maintenance. And we challenged ourselves a few years ago, to say, how can we expand that revenue potential and how can we expand those margins?
>
> And we thought there might be a customer set out there that either didn't have the capital or cash to buy the equipment upfront, or if they did, maybe they don't have the operational expertise to run it.
>
> And we formed this turnkey unit. And what we mean by that is we manufacture the equipment. We place it at the customer's site. We staff it up with our people, and then we charge a fee per scan or a fee per site per month. ***And we enter into a long, multiyear contracts with these customers. And this has been extraordinarily successful for us. In just a few short years, this has gone from 0% of our Security business to about 30% today. So it's been very, very exciting. It's a nice revenue, higher margin business for us of a recurring nature.***
>
> ***We have a strong first-mover advantage. Up to this point, we're really the only company out there with any significant contract wins in turnkey, and we're looking forward to continuing to maintain our leadership in this area***.

192. In response to questions from an audience member, Defendant Edrick lauded the Company's turnkey business and boasted that the business was growing due to the Albanian contract:

> A: So we're talking about number being one or two in that area. ***Within turnkey, we're a clear number one. Where we have the lion's share of that marketplace***.

*   *   *

> ***A: Yeah. So, the turnkey business is growing a little bit organically as Albania became fully ramped up and now it's waiting for our next turnkey wins.***

193. On February 15, 2017, the Company entered into a purchase agreement (the "Purchase Agreement") for the issuance and sale of $250 million of the Company's OSI Bonds. On February 22, 2017, the Company closed the offering. On the same day, the Company filed a Form 8-K explaining the transaction and attaching a copy of the Purchase Agreement and indenture. According to the February 22, 2017, Form 8-K, the Initial Purchasers anticipated selling the OSI Bonds to qualified institutional buyers.

194. In the Purchase Agreement, OSI represented that each of its Subsidiaries was in good standing and that all its subsidiaries were listed:

> The Company does not own or control, directly or indirectly, any corporation, association or other entity other than the subsidiaries listed in Exhibit 21 to the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2016, except as disclosed in the General Disclosure Package and the Final Offering Memorandum and such other subsidiaries none of which, in the aggregate, would constitute a "significant subsidiary" of the Company under Rule 1-02 of Regulation S-X. ***The only Subsidiaries of the Company are the subsidiaries listed on Schedule D hereto***.

Schedule D of the Purchase Agreement listed S2 Albania (Albania) as one of eight "Subsidiaries" referenced in Section 1.a.ix of the Purchase Agreement as the "only Subsidiaries of the Company."

SCHEDULE D

Subsidiaries

American Science and Engineering, Inc. (Massachusetts)
Rapiscan Systems Mexico, S. de R.L. de C.V. (Mexico)
Rapiscan System Limited (UK)
OSI Optoelectronics, Inc. (California)
Spacelabs Healthcare LLC (Washington)
OSI Electronics Pte Ltd (Singapore)
S2 Albania (Albania)
S2 Services Puerto Rico, LLC (Puerto Rico)

195. In the Purchase Agreement, OSI further represented that all of the issued and outstanding stock of each Subsidiary, specifically including S2 Albania, was owned by

the Company "free and clear" of any "security interest, mortgage, pledge, lien, encumbrance, claim or equity":

> Except as otherwise disclosed in the General Disclosure Package and the Final Offering Memorandum, ***all of the issued and outstanding capital stock of each Subsidiary*** has been duly authorized and validly issued, is fully paid and non-assessable and ***is owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity***. None of the outstanding shares of capital stock of any Subsidiary was issued in violation of the preemptive or similar rights of any securityholder of such Subsidiary.

196. Each of Defendants' statements set forth in ¶¶ 190-92, 194-95 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' statements that all of the equity interest in S2 Albania was owned by the Company "free and clear" of any "security interest, mortgage, pledge, lien, encumbrance, claim or equity" was a blatant falsehood. Moreover, Defendants' representations created the false and misleading impression that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, Defendants' statements touting the Albania contract win left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality, it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that "[w]ithin turnkey, we're a clear number one," "we have the lion's share of that marketplace," "[i]n just a few short years, [turnkey] has gone from 0% of our Security business to about 30% today," "[i]t's a nice revenue, higher margin business for us of a recurring nature," and "[w]e have a strong first-mover advantage" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

197. On March 14, 2017, the Company participated in the ROTH Capital Partners Conference (the "March 14, 2017 Conference"). At the conference, Defendant Edrick touted the turnkey model:

> But, again, wherever there happens to be a significant tender taking place, we're generally playing in that tender. ***That brings us to turnkey***. . . . And we were the first ones to do this, and to-date are still the only one to have had any significant contracts on this. ***We've won three deals. These are multi-year deals ranging so far anywhere between 6 and 15 years. And then just four, five short years since we launched this idea, this has already become north of 30% of our security division revenues. So, it's a nice business that has been highly successful for us***. It's a long sales cycle. Our goal is really to try to add one or two a year.
>
> We haven't exactly hit that goal. It tended to take us a little bit longer to add new contracts as with just so many intricacies in order to get these over the finish line. ***But we're very excited and we're working on a number of opportunities on the turnkey side as we sit here today. We really have three main catalysts for growth as we look at it on the security side. Turnkey, which we just talked about, is one of them***.

198. Each of Defendants' statements set forth in ¶ 198 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "won" the Albanian contract, and that the contract was awarded solely and would inure solely to

the benefit of OSI, when in reality, 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality, it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendant Edrick's statements that turnkey "ha[d] already become north of 30% of [OSI's] security division revenues," and referring to turnkey as one of the Company's "three main catalysts for growth" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49%

transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

**P. Third and Fourth Quarter 2017**

199. On May 24, 2017, Defendants participated in the B. Riley & Co. Institutional Investor Conference. At the conference, Defendant Edrick boasted about the benefits of its current turnkey contracts, including Albania, stating:

> ***And to that end, we've landed three significant contracts in Mexico, Puerto Rico, and Albania. These are long-term contracts ranging from 6 to 15 years, and it really provides a nice recurring revenue at a nice margin for us. We're the clear leaders in the turnkey. We think we have a significant first-mover advantage, so we won 100% of the deals today***. While that might not always be the case, we think we'll continue to win a disproportionate share, given our strong leadership position in this area.

200. On June 7, 2017, Defendants participated in the Jefferies Global Healthcare Conference. During the conference, Defendant Edrick touted the turnkey solution and its current turnkey contracts, including Albania, stating:

> A full turnkey solution, whereby, instead of selling them the equipment, we manufacture the equipment, we place it at the customer site, we own it, it sits on our balance sheet. We staff it up with our people, we enter into a long-term contract with the customer. And then we charge them a fee per scan or a fee per site per month. ***We call that turnkey, and it has been an extremely successful opportunity for us. We've landed major contracts in Mexico, Puerto Rico and Albania, we're the clear number one leader in this market space and we're looking to continue to expand it***. So very exciting, the primary focus of this has been at borders and at ports, but can easily be expanded into other venues as well.

201. On June 15, 2017, Defendants participated in the Drexel Hamilton Aerospace & Defense Conference. At the conference, Defendant Edrick again trumpeted the Company's turnkey contracts, stating:

> ***And to this end, we've won three contracts in Puerto Rico, Mexico, and Albania. And it has led to a lot of that substantial increase that you've seen in the service revenue, in the service profit***.
>
> ***It's a very exciting model for us. We're clearly the market leader. In fact, no other company has won any other significant deal in this marketplace***, but it's a long sales cycle. Each of these deals we work on generally take a number of years from start to finish to close the deal, but it's a very exciting area for us and continuing to focus here.

202. During the same conference, Defendant Edrick further touted the Company's turnkey business and its contracts, including in Albania, stating:

> Our first contract that we won was in Puerto Rico, a nice 10-year contract whereby we are screening all the containers that come into the port, into the Puerto Rico Ports Authority in San Juan. And we follow that up with a much larger contract in Mexico and ***a third contract in Albania***.
>
> ***And, in just a short period of time, this has already become a significant part of our overall business. We're excited about it***. We're – in addition to pure turnkeys, we're looking at hybrid models as well where maybe we don't take on the full context of everything that's going on, maybe the customer might continue with some of those responsibilities. But a great area for us, providing excellent recurring revenue at higher margins than our regular business.

203. Each of Defendants' statements set forth in ¶¶ 200-01 was materially false or misleading when made, and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, because:

a. As detailed in Section IV above, the Albanian turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract; thus, Defendants' representations created the false and misleading impression that OSI alone had "won" and "landed" the

Albanian contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality, 49% of the contract rights had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality, it had been awarded the contract only through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government;

b. The secretive arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements with regards to turnkey "in just a short period of time, this has already become a significant part of our overall business," "has led to a lot of that substantial increase that you've seen in the service revenue," "[w]e're clearly the market leader. In fact, no other company has won any other significant deal in this marketplace," "[t]hese are long-term contracts ranging from 6 to 15 years, and it really provides a nice recurring revenue at a nice margin for us," and "[w]e think we have a significant first-mover advantage, so we won 100% of the deals today" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

c. Defendants' statements were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

d. Once Defendants spoke about and affirmatively touted the Albanian contract, they had a duty to disclose the material facts in (a)-(c) above as they were necessary to ensure that investors were not misled regarding the value of the Albanian contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

**Q. First Quarter 2018**

204. On December 6, 2017, shortly after the December 6, 2017 MWR Report was published, OSI issued a response, denouncing Muddy Waters' claims of corruption as "misleading allegations" and represented that the "***turnkey security inspection programs in Mexico and in Albania were the result of public tenders***." The Company also represented that "***ICMS implemented all civil works construction for the program . . . [and] both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares***."

205. Each of Defendants' Class Period statements set forth in ¶ 204 was materially false or misleading when made, and/or omitted material facts, including the following:

a. Defendants' statements denying many of the facts exposed in the December 6, 2017 MWR Report and representing that ICMS made investments "well

beyond" its 49% stake that that the contract was the result of "public tenders" gave investors the false and misleading impression that the contract was procured on the merits and that ICMS was a legitimate construction company that did not expose the Company to undisclosed risks; their statements also concealed the facts later revealed in the January 31, 2018 MWR Report regarding ICMS's actual history and financial records, including that there were "no S2 Albania assets to which ICMS could conceivably have contributed," "substantially all of S2 Albania's capitalization came from OSIS," and there was "nothing on ICMS's CY2016 balance sheet that could resemble a meaningful investment in S2 Albania." Thus, Defendant Chopra's statement trumpeting the success of the turnkey contracts and OSI's statement that "both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares" created the false and misleading impression that ICMS was a legitimate partner in S2 Albania and had earned its 49% stake, when in reality ICMS had not;

b. As detailed in Section IV above, the Albania turnkey contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity in ICMS for $4.50 and provide lucrative "profit shar[ing]" rights in connection with the contract;

c. The arrangement with ICMS combined with undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (i) the contract would be terminated and/or materially reduced once the corrupt nature of the "partnership" was disclosed; and (ii) that the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the

turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the nature of the existence of ICMS were revealed. Thus, Defendants' statements trumpeting the success of the turnkey contracts and indicating a significant investment in the Albanian contract were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement;

d. Defendants' statements above were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be the primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry when, in reality, the contract had not been procured on the merits of the turnkey business but instead had been procured through the 49% transfer and profit sharing arrangement with ICMS. Information about the company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth; and

e. Once Defendants spoke about the Albanian contract and the ICMS arrangement and affirmatively denied the facts set forth in the December 6, 2017 MWR Report, they had a duty to disclose the material facts in (a)-(d) above as they were necessary to ensure that investors were not misled regarding the true nature and history of the arrangement underlying the contract, the actual value, the amount of revenues that would actually go to OSI, the nature and true role of ICMS's involvement, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

## VI. <u>DEFENDANTS HAD A DUTY TO DISCLOSE THE FACTS SURROUNDING THE ALBANIAN CONTRACT AND OSI'S SECRET ARRANGEMENT WITH ICMS WHICH WERE HIGHLY MATERIAL TO OSI INVESTORS</u>

206. At the time of their Class Period representations to the market set forth in Section V above, Defendants' had an affirmative duty to disclose the facts surrounding the Albanian turnkey contract, including the hidden ICMS arrangement and profit sharing agreement, the sale of 49% of the contract entity for $4.50, and the clear foreseeable risks arising from the Albanian deal. Because Defendants chose to *affirmatively* speak about—and repeatedly emphasize—the significance of the Albanian turnkey contract, including that: (i) OSI owned S2 Albania and the contract "free and clear" of any other interest; (ii) the Albanian contract would generate hundreds of millions of dollars in revenue solely for OSI; (iii) the contract demonstrated the viability, sustainability and success of the turnkey model which would "transform" the entire Company from an equipment based sales model to a "service" business; and (iv) the Company owned 100% market share of every turnkey contract in the world (there were only three), they had a duty under the law to disclose information necessary to make their statements made, in the light of the circumstances under which they were made, not misleading. As set forth in detail for each alleged misstatement (*see infra* § V), given the circumstances here—including the fact that Defendants touted the new turnkey model as the primary driver of future growth but had failed to book a new turnkey deal in years—Defendants' failure to disclose the facts surrounding the secret Albanian partnership arrangement (or even the fact that it had a 49% partner at all) was misleading and gave investors a false impression regarding the true nature of the Albanian contract, the purported success of the turnkey business due to that contract, and OSI's ability to book additional turnkey deals in the future (something the Company failed to do for *five years* following the Albania announcement).

207. Further, given the importance of the Albanian contract as the proxy for the success and sustainability of the new turnkey model, the facts surrounding the secret 49% transfer and profit sharing arrangement with ICMS were highly material and significantly

likely to alter the total mix of information available to OSI investors when deciding to purchase or sell OSI Securities. The facts surrounding the Albanian arrangement, and the foreseeable risks arising from the concealed partnership, were necessary for investors to understand the true nature of the Albanian turnkey program, the amount of revenues and profits OSI would *actually* generate under the deal, and the overall success of the new "service" based turnkey model. In addition to the fact that the Albanian contract was touted as generating hundreds of millions of dollars of revenue (and related profits) solely for OSI[13] and was one of only three turnkey contracts in the world, the concealed facts regarding the Albanian arrangement were also qualitatively material because "the misstatement concern[ed] a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150-52. In addition, as evidenced by OSI's Board minutes throughout the Class Period, the Company repeatedly discussed the Albanian contract in detail. Finally, the precipitous stock price declines and negative market reactions to the revelation of the facts and risks surrounding the Albanian arrangement on December 6, 2017 and February 1, 2018, demonstrate the importance of the information to investors in deciding whether the buy or sell OSI Securities.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

208. As described in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that the

---

[13] As set forth in ¶ 180, Defendants represented that the "run rate" for the Albanian contract was $12-13 million in turnkey services revenues per year. Based on OSI's reported yearly services revenues of $252.7 million in FY14, $250.5 million in FY15, $250.3 million in FY16, and $305.1 million in FY17, the $12-13 million per year equated to approximately 4.7% to 5.1% of total services revenue in FY14; 4.8% to 5.2% in FY15; 4.8% to 5.2% in FY16; and 3.9% to 4.3% in FY17. OSI's services revenues were increasingly important to investors as they provided more visibility and higher margins than the traditional product and equipment sales model. Indeed, Defendants repeatedly touted the "turnkey *service* model" and the turnkey "*service* contracts" as transforming the core business and providing increased growth. *See* ¶¶ 143-45, 148, 156, 169, 172-73, 175-78, 180, 185, 190, 201-02, *supra*.

statements identified in Section V above were materially false and misleading and/or omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading. In addition to the specific facts enumerated above, the following facts also support a strong inference of Defendants' scienter.

### A. Top OSI Executives, Including Individual Defendants Chopra and Mehra, Directly Oversaw and Had Actual Knowledge of the Undisclosed Arrangement with ICMS

209. As set forth in Sections III and IV above and corroborated by CW 1, OSI's S2 subsidiary (which operated its turnkey solutions business) was an extremely secretive entity overseen by a small and close-knit group of only three OSI executives, including Defendant Mehra and OSI's Senior Executive Fleming, who founded S2 before it was acquired by OSI. These executives monitored and/or oversaw the negotiations and execution of the Company's turnkey contracts, including for Albania.

210. Moreover, CW 3 recalled that only a small group of individuals, consisting of Defendant Chopra, Defendant Mehra, Defendant Edrick, and OSI General Counsel Victor Sze were privy to the details about the Company's turnkey contracts and participated in meetings regarding the contracts. CW 3 also stated there was a "hands off" attitude toward S2 and the Company was "hush hush" and very protective about S2.

211. The documentary record surrounding the Albanian turnkey contract confirms that Defendant Mehra was directly involved and participated in the corrupt arrangement and 49% transfer of S2 Albania to ICMS. Indeed, to effectuate the transfer, on September 6, 2013, Mehra personally signed the Power of Attorney that expressly authorized an OSI affiliated Albanian lawyer Shijaku, to "***carry out the [] sale***" of 49% of S2 Albania to ICMS for "490 Albanian lekë" or $4.50. In accordance with Mehra's instructions, just six days later, on September 16, 2013, Shijaku executed the formal sales contract transferring 49% of S2 Albania to ICMS for $4.50. Because he himself authorized the transfer and participated in the secret arrangement with ICMS, Defendant Mehra had actual knowledge of the material facts concealed by Defendants during the Class Period.

212. Likewise, CW 3 confirmed that Mehra was directly involved in the negotiation of the Albania turnkey contract. Indeed, according to CW 3, Mehra had a role in the negotiation of the screening contracts as an active, if not the key, negotiator. CW 3 also recalled that Mehra went to Albania before the contract was signed and perhaps once after the Company began experiencing problems with the new Albanian government.

213. Defendant Chopra also utilized a closely-involved approach to management. Indeed, Chopra's practice, according to CW 1, was also to get involved with any "big money" contract—such as the Albanian contract, which was one of only three purportedly highly-profitable turnkey contracts for the entire Company. Given his level of participation during the negotiations and his close familial and executive ties with Mehra, Defendant Chopra either knew, or was deliberately reckless in not knowing about the corrupt arrangement surrounding the Albanian contract, including the undisclosed profit-sharing arrangement with ICMS and transfer of 49% of S2 Albania to ICMS for less than $5.00.

214. Documentary evidence also shows that OSI's Senior Executive Fleming, who became second-in-command of the closely held S2 Global team in 2014, had direct knowledge of and participated in the Albanian turnkey deal. Fleming was designated as the "registered administrator" of S2 Albania upon its formation in 2013, a position that was renewed on numerous occasions, including July 30, 2014; January 4, 2015; March 18, 2015; January 4, 2016; and May 26, 2017.

215. The sole purpose of S2 Albania, according to Company documents, was the implementation of the turnkey contract with Albania as well as any other activity related to or required to enforce that contract. As administrator of S2 Albania, during the Class Period, Fleming executed numerous resolutions and authorizations on behalf of S2 Albania purportedly related to this purpose, including to establish S2 Albania affiliates for border checkpoints, register materials with the Business National Center, and approve submission of financial statements.

216. Based on his position and his duty to execute resolutions on behalf of S2 Albania, Fleming knew or was deliberately reckless in not knowing about the undisclosed profit-sharing arrangement with ICMS and transfer of 49% of S2 Albania to ICMS for less than $5.00. In turn, the fact that Fleming was second in line to Mehra on the closely-held S2 executive team, as well as serving as an OSI executive, supports a strong inference that the Company itself and the Individual Defendants knew, or were deliberately reckless in not knowing or disregarding that their Class Period statements were false and/or misleading and omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading.

### B. Defendants' Repeated Discussions and Oversight of the Albanian Contract During Executive Meetings Reinforces Scienter

217. Throughout the Class Period, the Individual Defendants repeatedly monitored and discussed the Albanian contract in great detail, including the known "challenges" surrounding the contract. The following are based on minutes of OSI Board of Directors meetings during the Class Period as set forth in an unsealed derivative lawsuit filed on March 8, 2019 on behalf of the Company captioned, *Kocen v. Deepak Chopra, et al.*, Case No. 19-cv-01741-VAP-SKx (C.D. Cal.) (Dkt. 2). Defendants Chopra and Mehra were both members of the Board of Directors. Defendant Edrick also attended certain Board meetings and participated in discussion regarding the Albania contract, as set forth below.

- **October 21, 2013**. Minutes from the Board meeting reflect that Defendant Mehra "provided an update on the turnkey security services business . . . [and] discussed the status of the turnkey programs in Puerto Rico and Albania." Defendant Chopra also attended this meeting.

- **April 23, 2014**. Minutes from the Board meeting reflect that Defendant Chopra specifically discussed the status of the Company's turnkey screening program in Albania.

- **August 22, 2014**. Minutes from the Board meeting reflect that Defendant Chopra discussed the status of the Company's turnkey screening program in Albania. Among the materials presented in connection with this meeting was an update which referred specifically to the Albanian contract and which stated prominently, on the bottom border of the document, "Challenging Situation." In addition, the minutes state that the discussion included topics such as: "Operating Start date delayed" and "Government Administration change." Defendant Mehra also attended this meeting.

- **October 21, 2014**. Minutes from the Board meeting reflect that Defendant Mehra "provided an update on the turnkey security services business . . . [and] discussed the status of the turnkey programs in Puerto Rico and Albania." Defendant Chopra also attended this meeting.

- **December 12, 2014**. Minutes from the Board meeting reflect that Defendant Chopra was in attendance and "Mr. Chopra responded to questions from the other directors regarding turnkey scanning programs in Mexico, Puerto Rico and Albania . . . ."

- **April 22, 2015**. Minutes from the Board meeting reflect that Defendant Mehra reported on the status of the Company's turnkey security inspection program in Albania and on "the financial results for the turnkey services business." The materials presented to the Board in connection with this meeting included, among other things, a status sheet with the following bullet points appearing under the heading "Albania": "Significant discussions ongoing to find a resolution" and "Arbitration Process continues." Defendant Chopra also attended this meeting.

- **August 19, 2015**. Minutes from the Board meeting reflect that Defendant Mehra reported on the status of the Company's turnkey security inspection program in Albania and on "the financial results for the turnkey services business." Defendant Chopra also attended this meeting.

- **October 28, 2015**. Minutes from the Board meeting reflect that Defendant Edrick "provided financial results for security turnkey solutions." Then, "[i]n response to a question from Mr. Luskin, Mr. Chopra discussed the Security Division's maintenance

and repair service business" and "Mr. Chopra also discussed the cargo inspection projects and business dynamics in that market." Further, "Mr. Mehra provided the Board with an update on the status of the turnkey screening program in Albania."

218. **December 8, 2015**. The December 8, 2015 Board Meeting minutes reflect that with Defendant Chopra in attendance, Defendant Mehra "provided an update of the turnkey solutions business" and a discussion on the "status of turnkey screening programs" in Albania, Puerto Rico, and Mexico.

219. Defendants' participation in repeated, detailed discussions regarding the Albanian turnkey contract, financial results related to the contract, and challenges surrounding the contract supports a strong inference that they knew, or were deliberately reckless in not knowing or disregarding, that their statements regarding OSI's turnkey business, the Albanian contract, and S2 Albania were false and/or misleading and omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading. The Board's consistent focus on and discussion of the Albanian turnkey contract also confirms its materiality to the Company.

### C. The Individual Defendants' Senior-Level Positions, Micromanagement Styles, and Close-Knit Personal Relationships Reinforce a Strong Inference of Scienter

220. The Individual Defendants' senior-level positions and personal relationships also support a strong inference that they knew, or were deliberately reckless in not knowing or disregarding that their statements regarding OSI's turnkey business, the Albanian contract, and S2 Albania were false and/or misleading and omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading.

221. In particular, throughout the Class Period, Defendant Chopra was the founder and CEO of OSI—the senior-most position within the Company. As CEO, Chopra was responsible for certifying and signing the Company's SEC filings during the Class Period. Moreover, according to CW 3, Chopra was one of a small secretive group of people privy

to details about the Company's turnkey contracts and who participated in meetings regarding the contracts.

222. CW 2 likewise described Defendant Chopra as a micromanager who had a "win at all cost mentality." By way of example, CW 2 recalled that Company executives from all divisions would attend an offsite meeting, once per quarter, typically in Palm Springs. CW 2 attended several such meetings and observed that Chopra drilled down deeply and intensely, and demonstrated his knowledge of the Company's products and processes "inside out."

223. Similarly, CW 1 recalled that Chopra became involved in a foreign military sales project calling for the sale of mobile screening trucks to Iraq through the U.S. Army. The execution of the contract should have fallen to CW 1's team but Chopra became very involved, directing CW 1 on which local agent to use and what tasks the local agent should perform (despite the fact that the agent was unqualified and couldn't perform the tasks required), and directly handling the negotiations. CW 1 recalled that Chopra offered the Iraqi government $500,000 in free X-ray equipment and metal detectors as an inducement to pick up an option to expand the contract. CW 1 also recalled that in 2015, in response to a government RFP that required a certain percentage of equipment to be "made in the USA" under the Trade Agreement Act, despite the fact that OSI's equipment was primarily made in Malaysia and the Company didn't have the capability to make the required equipment, Chopra told her "don't ask how we meet the requirement" and "don't ask the question, we'll take care of it." Based on her personal interactions with Chopra, CW 1 believed Chopra had "extremely low ethics" and that he was never interested in compliance but simply wanted to "check the box." CW 1 also stated her belief that OSI was not an ethical company.

224. Similarly, CW 3 reported that, prior to OSI's compliance problems with the TSA, Chopra did not care about compliance, was sloppy, and did not want to get caught. When describing Chopra's view of compliance CW 3 stated, "the fish stinks from the head down." CW 3 also stated that after OSI's problems with the TSA, Chopra's

compliance approach was that Chopra wanted to do enough to get the company "out of the penalty box" but did not want to necessarily do things right, he just did not want to get caught.

225. Likewise, CW 2, reported that during her last years at the company, CW 2 was uncomfortable with things she saw, was asked to do, or to which she was required to turn a "blind eye." She said company sales personnel in foreign countries did not understand FCPA. Similar to CW 1's account regarding OSI's non-compliance with "Made in the USA" requirements, CW 2 was told to certify a petition document stating that a product was built in the USA even though it meant he would be lying about the conditions under which the equipment was built. The impression CW 2 received from upper management was that such falsification was not a big deal. CW 2 said upper management's view was since the company's competitors did it, so could OSI/Rapiscan. CW 2 stated she was asked to "turn a blind eye" several times regarding where equipment for overseas projects was actually manufactured.

226. Like Chopra, Defendant Mehra was a founding member of the OSI's executive team. Moreover, since 2014, Mehra has been the President of S2 Global, one of three members on S2's executive team, and, according to CW 3, Mehra was one of a handful of people privy to details about the Company's turnkey contracts and who participated in meetings regarding the contracts.

227. Prior to acting as President of S2, during the time of the bidding and securing of the Albanian contract, Mehra was the President of Rapiscan, which was the party to the contract and documentation surrounding the 49% transfer of S2 Albania to ICMS. As discussed in Section IV.E.3 above, as President of Rapiscan, Mehra himself directed and facilitated the transfer of 49% of S2 Albania to ICMS.

228. Moreover, Defendant Chopra and Defendant Mehra are first cousins and are known to have business ties outside of the Company. According to CW 3, because Mehra reported to Chopra, they spoke frequently. In addition, since 1994, Defendants Chopra and Mehra have worked closely together as part of an Indian joint venture called ECIL-

Rapiscan Security Products Limited. Defendant OSI owns a 36% interest, Defendant Chopra owns a 10.5% interest, and Defendant Mehra owns a 4.5% interest in ECIL-Rapiscan Security Products Limited.

229. Defendant Edrick, at all relevant times, held the position of OSI's Executive Vice President and Chief Financial Officer. Like Chopra and Mehra, according to CW 3, Edrick was one of approximately five people privy to details about the Company's turnkey contracts and who participated in meetings regarding the contracts.

230. By virtue of their high-level executive positions, Defendants Chopra, Mehra, and Edrick directly participated and were involved in both the management and day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company's important operations, including S2, its turnkey contracts, the contract with Albania, and the secretive arrangement and transfer of 49% of the Company's interest in S2 Albania to ICMS. Moreover, given their managerial positions and close personal and business relationships, the Individual Defendants would have kept each other apprised of issues within S2, including the profit-sharing arrangement and partnership with ICMS.

## D. The Fraud Involved a Key Contract and Core Operation of the Company—Its Turnkey Business

231. As OSI's most senior executives with direct control and supervision over its business, operations, and public statements, the Individual Defendants were knowledgeable about OSI's core business operations—including its Security division and that division's highly touted turnkey business.

232. OSI's Security division was the Company's single most important division, accounting for 49%, 50%, 50%, and 58% of total revenues for fiscal years 2014, 2015, 2016, and 2017, respectively.

233. Throughout the Class Period, Defendants repeatedly represented that the success of the key Security division was being driven by its turnkey business. As a result, both Defendants and the market were keenly focused on the Company's turnkey business

and its three long-term turnkey contracts, including Albania. Indeed, Defendants consistently reported that turnkey service revenues were driving the Security division's growth and comprised a material portion of its backlog. For instance, during the January 28, 2014 Conference Call, Defendant Edrick touted that "[s]ales from our Security division increased 16% over the same quarter last year, ***led by the year-over-year growth in turnkey services revenue***." Likewise, on the August 20, 2015 Conference Call, Defendant Chopra boasted that "[i]n turnkey services, our current programs continue to contribute strongly to our performance . . . . The turnkey services market represents an outstanding growth opportunity, and as mentioned earlier, ***we have realigned some of our leading resources to focus exclusively on this***."

234. On the same call, Defendant Chopra highlighted the importance of the turnkey business, announcing that Defendant Mehra would exclusively focus on the turnkey "solutions" business:

> ***Ajay Mehra***, who led Rapiscan to strong success over a number of years, ***is now*** focused ***exclusively on the solutions business, reflecting the importance, and the priority we have, on growing our turnkey business***, expanding service and solutions to Security customers, as well as developing service offerings to other markets.

235. Additionally, only three turnkey contracts existed during the Class Period, reinforcing the inference that Defendants were closely monitoring each contractual arrangement. Defendants also repeatedly cited the Albanian contract as one of the primary drivers of the Security division's revenues growth. For instance, comparing fiscal year 2017 with fiscal year 2016, Defendants stated in the FY17 Form 10-K that, "***Revenues for the Security division increased primarily as a result of . . . increased revenue from turnkey scanning operations as a result of a full year of operations in our Albanian program, which commenced in the second quarter of fiscal 2016***," among other factors.

236. The importance of the Security division and its turnkey business model to the Company's success and growth, as well as Defendants' own statements indicating that

they were particularly focused on the turnkey business and the Albanian contract, raise a strong inference that they knew, or were reckless in not knowing or disregarding, that their Class Period statements were false and/or misleading and omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading.

### E. The Small Size and Closely-Held Structure of S2, Combined With the Limited Number of Turnkey Contracts and Defendants' Scrutiny of Foreign Transactions, Reinforces a Strong Inference of Scienter

237. As explained in Sections IV.D and IV.E above, during the Class Period (and to date) OSI only had three turnkey contracts, all run out of its S2 division. Defendants deliberately kept those turnkey contracts and S2's secretive operations tightly controlled by a few individuals, including the Individual Defendants.

238. In carrying out their turnkey business, Defendants also targeted foreign jurisdictions that were known for corruption and obscured certain financial and component details surrounding its turnkey contracts, despite repeated requests from analysts for more information regarding the turnkey deals. *See supra*, Section IV.G. As a result, Defendants were required to, and represented that they did, maintain policies and procedures specifically to monitor corruption and bribery in foreign jurisdictions.

239. For example, Defendants represented that:

> We are required to comply with the U.S. Foreign Corrupt Practices Act, which prohibits United States companies from engaging in bribery or making other prohibited ***payments*** to foreign officials for the purpose of obtaining or retaining business. ***It also requires us to maintain specific record-keeping standards and adequate internal accounting controls***. ***In addition, we are subject to similar requirements in other countries***. ***Bribery, corruption, and trade laws and regulations, and the enforcement thereof, are increasing in frequency, complexity and severity on a global basis***. ***Although we have internal policies and procedures with the intention of assuring compliance with these laws and regulations***, our employees, distributors, resellers and contractors involved in our international sales may take actions in violations of such policies.

240. Furthermore, Defendants repeatedly acknowledged that they scrutinized their operations in "each country." For example, the Company's January 30, 2014 Form 10-Q

stated that the Company "***monitor[ed] [their] operations in each country and seek to adopt appropriate strategies that are responsive to changing economic and political environments*** . . . ."

241. The combination of these factors, including: (i) the small number of turnkey contracts; (ii) the closely-held nature of the S2 and turnkey operations and details surrounding the contracts; (iii) the notoriously high corruption rate in the countries where OSI was operating its turnkey business and related FCPA-mandated monitoring; and (iv) Defendants' close monitoring of foreign operations, support a strong inference that Defendants knew, or were reckless in not knowing or disregarding, that their Class Period statements were false and/or misleading and omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading.

### F. Defendants' Duty Under the Administrative Agreement With the U.S. Government to Implement Compliance Programs and Monitor Their Contractual Arrangements Supports Scienter

242. As set forth in Section IV.A above, OSI's pattern of misconduct surrounding its contracts with the U.S. Government and its proposed "debarment" proceedings, ultimately forced the Company to enter into a detailed Administrative Agreement which required the Company to design and implement comprehensive policies, procedures, and internal control systems, including for the "monitoring and auditing of contracts" and "business ethics" to ensure that its Security business "operates in compliance with all applicable laws [and] regulations." The Administrative Agreement, which notably was executed two months *before* the Class Period (June 21, 2013), stated in relevant part:

> ***Rapiscan agrees to maintain a self-governance program that includes compliance programs for internal controls, designed for the effective monitoring and auditing of contracts*** and ***grants, and a business ethics program that covers all employees. The business ethics program shall be maintained with the goal that Rapiscan and each of its employees maintains the business honesty and integrity required of a government contractor and that Rapiscan operates in compliance with all applicable laws, regulations, and the terms of any contract***. Rapiscan represents that the business ethics program includes the following components;

> A. Rapiscan employees are subject to a Code of Ethics and Conduct (Code of Conduct). The Code of Conduct ***specifically addresses ethical business practices; securities laws; antitrust*** and competition; ***anti-corruption***; export control; political activities; conflict of interest; gifts and gratuities; employment laws; financial reporting; health and safety; and reporting suspected violations of law or the Code of Conduct. This Code of Conduct includes a non-retaliation policy, which prohibits retaliation against employees for reporting suspected violations of the Code. Rapiscan will provide to the DHS SDO a copy of the Code Ethics and Conduct within 30 days following the execution of this agreement.

243. The Administrative Agreement also required Defendants to maintain "robust" compliance, ethics and monitoring programs that would be overseen by the Company's General Counsel under the direct supervision of Defendant Chopra:

> ***Rapiscan has implemented and agrees to maintain a robust and functional program that includes business ethics, compliance programs, and internal controls to ensure that Rapiscan effectively monitors, audits, and communicates about its compliance and ethics obligations and its commitment to the highest standards of integrity and transparency***.
>
> Both prior to and in response to the TSA's Show Cause Letter, Rapiscan took and will maintain the following measures:
>
> * * *
>
> B. ***Development of an OSI Systems ("OSI") wide corporate*** compliance ***program. Corporate Compliance directly reports to OSI's General Counsel, who has and will continue to directly report to the Chief Executive Officer of OSI***. In accordance with the OSI Board Audit Committee Charter, the Audit Committee comprising independent directors are responsible for overseeing the OSI compliance functions and promoting communication with the other board members. OSI's Vice President, Internal Audit reports directly to OSI's Board, and is responsible for assessing the sufficiency and effectiveness of the company's compliance programs.
>
> C. Created new position of Director, Corporate Compliance, with direct access to OSI's Board of Directors on compliance issues and related activities. Christopher Cook is Director of Corporate Compliance for OSI. . . . As Director of Corporate Compliance, Mr. Cook is responsible for, among other things;
>
> 1. ***Designing, implementing and monitoring the compliance program***;
>
> 2. Reporting on a regular basis to the General Counsel;

3. Revising the ***compliance*** program periodically, as appropriate;

4. Developing, ***coordinating*** and participating in compliance training and education;

5. ***Ensuring that contractors and agents are aware of Company compliance requirements; and***

6. ***Independently investigating and acting on compliance matters***.

244. As part of the Administrative Agreement, Defendants were also required to submit written reports to the federal government regarding the implantation of such changes. The Administrative Agreement stated:

> ***Semi-annually, Rapiscan shall submit a written report to DHS describing the measures taken by Rapiscan during the semi-annual period to implement the business ethics program and to ensure compliance with this Agreement***. The reports shall be submitted in time to be received by the DHS SDO within 20 days of the end of the semi-annual period. The final report shall be presented to the DHS SDO no later than one month prior to the final day of this Agreement. The reports shall include the following:
>
> A. ***Any standards of conduct, ethics, or compliance training conducted, subject matter covered, and the number and types of people that attended***;
>
> B. ***Information notifications or initiatives related to the business ethics program***;
>
> C. Information ***required*** by the terms of this Agreement;
>
> D. ***The initiation of and status of any ongoing investigation or legal proceedings involving Rapiscan related to the facts described herein***;
>
> E. A statement by the Rapiscan verifying that the Code of Business Ethics and Conduct is being ***maintained***; and
>
> F. A statement of any problems or weaknesses identified through the Ethics and Business ***conduct*** process, corrective action proposed or initiated, and the status of any corrected action.

245. As a result of the Administrative Agreement, Defendants were required to monitor its contracts—including its all-important Albanian turnkey contract—for any compliance, ethics, or legal issues. Defendants' required monitoring under this agreement, combined with the nature and importance of the Albanian turnkey contract,

gives rise to a further inference that Defendants were aware, or recklessly disregarded, the details of the corrupt arrangement with ICMS relating to the Albanian contract.

### G. Defendants' Contradictory Explanations Regarding the Albanian Arrangement Reinforce a Strong Inference of Scienter

246. As detailed in Section IV.H above, the December 6, 2017 MWR Report revealed certain facts surrounding the Albanian turnkey deal, including reporting that OSI "likely bribed somebody by giving half of" the Albanian contract entity to ICMS for under five dollars. In response, OSI issued a same-day press release, which ***admitted*** the previously hidden "partnership" and "profit share" with ICMS:

> Our Albania turnkey security inspection program is operated ***in partnership with ICMS,*** a local company with civil works construction capabilities in Albania, with a ***profit share*** in accordance with the terms of our ***agreement with ICMS***.

247. Despite these admissions, Defendants continued to mislead the market and omit material facts regarding the details of the Albanian arrangement. In the same December 6, 2017 press release, for example, Defendants denied the December 6, 2017 MWR Report and created a false impression that the Albanian arrangement was above board, implying that the contract would not be subject to further scrutiny: "ICMS implemented all civil works construction for the program. As such, both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares."

248. Notably, however, Defendants did not explain why, if the ICMS arrangement was legitimate based on "significant" investments from an unknown Albanian partner, the Company did not disclose the 49% transfer and profit-sharing arrangement earlier, or why the Company explicitly misrepresented that S2 Albania was a wholly-owned subsidiary.

249. Defendants' explanations on December 6, 2017 are also contradicted by numerous facts relating to S2 Albania and ICMS's disclosures, as set forth in the January 31, 2018 MWR Report. *See supra*, ¶¶ 126-28. In that report, MWR established,

among other things, the inconsistency between OSI's statement that ICMS Construction "made significant capital investments" and the fact that ICMS Construction was not an established construction company, had virtually no tangible assets, and was capitalized for only approximately $850, and that OSI provided virtually all of the funding to S2 Albania. More specifically, MWR Rebuttal stated:

- **We see no S2 Albania assets to which ICMS could conceivably have contributed**. As of December 31, 2015, S2 Albania had total assets of US$10.8 million. Virtually all of the assets – US$9.6 million – were PP&E. According to the footnotes, 98.5% of PP&E (US$9.6 million) were machines (i.e., likely equipment from OSIS) – with no construction or buildings disclosed at all.

- **We see no financial contribution from ICMS to S2 Albania.** S2 Albania's December 31, 2015 liabilities confirm that substantially all of S2 Albania's capitalization came from OSIS. The financials show US$11.7 million in payables to OSIS. (Note that S2 Albania had negative shareholders' equity of US$-1.1 million.)

- **We see no account evidencing investment in S2 Albania by ICMS or ICMS Construction**. We see nothing on ICMS's CY2016 balance sheet that could resemble a meaningful investment in S2 Albania. Of its US$3.06 million in assets as of December 31, 2016, US$2.97 million are current assets. (US$1.8 million – 59.6% – is prepaid expenses; the balance is substantially all cash and receivables.) Of the US$80,000 of non-current assets, 99.99% is PP&E.

250. The timing and circumstances of Defendants' December 6, 2017 press release further supports a strong inference of scienter. Indeed, within hours of the December 6, 2017 MWR Report, Defendants had admitted to a partnership with ICMS and profit-sharing agreement surrounding the Albanian contract. In so admitting, Defendants did not claim that they had been previously unaware of the arrangement but, rather, claimed that even though they had gone to great lengths to hide the arrangement throughout the Class Period, it was entirely legitimate. The fact that Defendants were able to so quickly confirm the arrangement with ICMS, and their failure to deny previous knowledge of that arrangement, further support the inference that they knew, or recklessly disregarded, that their Class Period misleading statements and omissions were false and/or

misleading and omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading.

**H. Defendants SOX Certifications Support an Inference of Scienter**

251. Defendants Chopra, Edrick, and Mehra, as OSI's executive officers and/or directors, controlled the contents of the Company's public statements and SEC filings during the Class Period. Each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance. By virtue of their respective positions and access to material non-public information regarding the Company, each knew or recklessly disregarded that the adverse facts alleged herein concerning the Albanian turnkey arrangement with ICMS had not been disclosed to, and were being concealed from the public, and that the positive representations made were materially false, and misleading. As a result, Defendants Chopra, Edrick, and Mehra were responsible for the accuracy of OSI's public SEC filings, and were therefore responsible and liable for the representations contained therein or omitted therefrom.

252. As alleged herein, throughout the Class Period, Defendant Chopra signed the Company's Form 10-Ks, including the 10-K filed on August 27, 2014, and the Company's Form 10-Qs, including the 10-Q filed on April 28, 2016, which contained the material false and misleading statements alleged herein, as set forth above in Section V above.

253. Additionally, as alleged herein, throughout the Class Period, Defendant Edrick signed the Company's Form 10-Ks, including the 10-K filed on August 27, 2014, and the Company's Form 10-Qs, including the 10-Q filed on April 28, 2016, which contained the material false and misleading statements alleged herein, as set forth above in Section V above.

254. Defendant Mehra signed the Company's Form 10-Ks, including the 10-K filed on August 27, 2014, which contained the misleading statements alleged herein as set forth above in Section V above.

## I. Defendants' Insider Trading and Executive Compensation Structure Reinforce the Strong Inference of Scienter

### 1. Defendants' Stock Dispositions Support Scienter

255. During the Class Period, Defendants Chopra, Edrick, and Mehra collectively dumped over ***$51 million*** in OSI common stock while in possession of adverse material, nonpublic information regarding the Company's turnkey operations and the secret Albanian arrangement with ICMS. As the result of Defendants' materially false and misleading statements and omissions, these stock dispositions were executed at artificially inflated prices under suspicious circumstances.

256. During the Class Period, Defendant Chopra disposed of 338,896 shares of OSI common stock at an average price of $74.38, for a total approximate value of ***$25.2 million***. Defendant Mehra disposed of 226,978 shares at an average price of $74.24, for a total approximate value of ***$17.5 million***. Defendant Edrick disposed of 112,524 shares at an average price of $77.35, for a total value of approximately ***$8.8 million***. The Individual Defendants' trades are set forth in the following charts:

| Deepak Chopra | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price** | **Value Disposed** |
| 9/3/2013 | 7,827 | $72.70 | $569,023 |
| 9/9/2013 | 5,088 | $72.07 | $366,692 |
| 8/11/2014 | 7,284 | $67.16 | $489,193 |
| 9/9/2014 | 5,088 | $68.85 | $350,309 |
| 9/25/2014 | 12,000 | $62.91 | $754,920 |
| 10/15/2014 | 12,000 | $60.69 | $728,280 |
| 11/17/2014 | 12,000 | $68.57 | $822,840 |
| 12/12/2014 | 30,000 | $70.18 | $2,105,400 |
| 12/12/2014 | 5,000 | $69.87 | $349,350 |
| 12/12/2014 | 10,000 | $69.65 | $696,500 |
| 12/12/2014 | 5,000 | $69.24 | $346,200 |
| 12/15/2014 | 12,000 | $68.33 | $819,960 |
| 3/16/2015 | 10,000 | $73.05 | $730,500 |
| 3/16/2015 | 2,500 | $73.05 | $182,625 |
| 4/17/2015 | 10,000 | $74.99 | $749,900 |

| Deepak Chopra | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price** | **Value Disposed** |
| 4/17/2015 | 2,500 | $74.99 | $187,475 |
| 5/18/2015 | 10,000 | $71.43 | $714,300 |
| 5/18/2015 | 2,500 | $71.43 | $178,575 |
| 6/18/2015 | 10,000 | $73.88 | $738,800 |
| 6/18/2015 | 2,500 | $73.88 | $184,700 |
| 9/9/2015 | 3,665 | $74.66 | $273,629 |
| 9/16/2015 | 60,000 | $72.28 | $4,336,800 |
| 11/25/2015 | 36,944 | $94.23 | $3,481,233 |
| 11/25/2015 | 5,000 | $94.30 | $471,500 |
| 11/25/2015 | 3,000 | $94.31 | $282,930 |
| 11/25/2015 | 2,000 | $94.18 | $188,360 |
| 12/7/2016 | 5,000 | $75.71 | $378,550 |
| 12/7/2016 | 50,000 | $75.91 | $3,795,500 |
| **TOTAL** | **338,896** | **$74.38** | **$25,274,044** |

| Ajay Mehra | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price** | **Value Disposed** |
| 9/3/2013 | 1,704 | $72.70 | $123,881 |
| 9/9/2013 | 1,957 | $72.07 | $141,041 |
| 8/11/2014 | 3,758 | $67.16 | $252,387 |
| 9/9/2014 | 1,410 | $68.85 | $97,079 |
| 9/26/2014 | 8,236 | $63.52 | $523,151 |
| 9/26/2014 | 7,666 | $63.52 | $486,944 |
| 10/29/2014 | 30,000 | $69.06 | $2,071,800 |
| 5/20/2015 | 15,461 | $71.87 | $1,111,182 |
| 5/21/2015 | 7,000 | $71.87 | $503,090 |
| 9/9/2015 | 1,410 | $74.66 | $105,271 |
| 9/16/2015 | 10,000 | $77.23 | $772,300 |
| 9/16/2015 | 12,419 | $76.04 | $944,341 |
| 9/17/2015 | 14,279 | $78.47 | $1,120,473 |
| 9/17/2015 | 9,000 | $78.47 | $706,230 |
| 11/20/2015 | 40,052 | $95.61 | $3,829,372 |
| 12/9/2016 | 11,019 | $78.09 | $860,474 |
| 12/12/2016 | 25,000 | $76.62 | $1,915,500 |
| 12/13/2016 | 25,000 | $75.96 | $1,899,000 |
| 8/18/2017 | 1,607 | $78.85 | $126,712 |
| **TOTAL** | **226,978** | **$74.24** | **$17,590,227** |

| Alan Edrick | | | |
|---|---|---|---|
| **Transaction Date** | **Shares** | **Price** | **Value Disposed** |
| 9/3/2013 | 1,410 | $72.70 | $102,507 |
| 9/9/2013 | 1,881 | $72.07 | $135,564 |
| 8/11/2014 | 2,819 | $67.16 | $189,324 |
| 9/9/2014 | 1,410 | $68.85 | $97,079 |
| 12/11/2014 | 13,594 | $73.32 | $996,712 |
| 6/11/2015 | 20,000 | $73.06 | $1,461,200 |
| 9/9/2015 | 1,410 | $74.66 | $105,271 |
| 11/18/2015 | 18,105 | $87.61 | $1,586,179 |
| 11/19/2015 | 11,895 | $92.80 | $1,103,856 |
| 11/20/2015 | 5,000 | $95.51 | $477,550 |
| 3/14/2017 | 35,000 | $73.14 | $2,559,900 |
| **TOTAL** | **112,524** | **$77.35** | **$8,815,141** |

257. Both the amount and timing of Defendants' trades were highly unusual and suspicious. For example, the shares Chopra disposed of during the Class Period represented ***46%*** of his total reported holdings in OSI common stock at the beginning of the Class Period (10/1/2013), and ***56%*** of his average year-end stock holdings during the Class Period. Additionally, only weeks after OSI announced that the Albanian government "halted further progress" on the turnkey contract, on September 11, 2014, the Company abruptly disclosed that Chopra had entered into a "Rule 10b5-1 trading plan" to immediately sell 48,000 shares of OSI common stock for over $3 million in illicit proceeds. The execution of this trading plan while knowingly concealing material adverse information surrounding the Company's turnkey operations and the corrupt arrangement with ICMS reinforces the highly unusual and suspicious nature of Chopra's trading.

258. Likewise, the shares Mehra disposed of during the Class Period represented ***69%*** of his total reported holdings in OSI common stock at the beginning of the Class Period (10/1/2013), and ***88%*** of his average year-end stock holdings during the Class Period. The shares Edrick disposed of during the Class Period represented ***28%*** of his total reported holdings in OSI common stock at the beginning of the Class Period (10/1/2013), and ***30%*** of his average year-end stock holdings during the Class Period.

259. The timing and pricing of these trades further highlight their suspicious nature. Notably, each of the three Individual Defendants had record high sales in 2015—the height of the Class Period—precisely around the time that the Company settled on revised terms with the Albanian government in the fall of 2015.

**2. OSI's Executive Compensation Structure Supports Scienter**

260. OSI's executive compensation was highly contingent on the Company's financial metrics. According to the Company's proxy statements, OSI placed an "emphasis on pay-for-performance principles," such that it believed "that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis." Accordingly, during the Class Period, OSI executives' fixed compensation—i.e., base salary—was a small percentage of the total compensation, while "variable" compensation—i.e., annual cash incentive bonuses or performance-based equity incentive awards–comprised the majority of total compensation.

261. For example, under the Company's Annual Incentive Bonus program, according to the Company's October 17, 2014 proxy statement, "[t]he Company grants annual incentive bonuses based in part on each executive's contribution to enhancing long-term stockholder value." To that end, certain executives received annual incentive bonuses based on the Company's "annual operating achievement and near-term success," and quantitative factors such as "contributions to stockholder value" and "earnings per share and internal metrics."

262. Indeed, stock price, i.e., stockholder value, was a major focus at the Company. For instance, in the November 21, 2013 proxy statement, the Company stated that:

> [U]nder our CEO's leadership, our stock price has increased 132% and 201% over the past three- and five-year periods, respectively, ending in fiscal 2013. We have achieved this growth while continuing to make significant, targeted investments in new product lines and lines of business. Our CEO's pay over the past five-years ending in fiscal year 2013 has been closely aligned with our [total stockholder return] performance.

263. Under this Annual Incentive Bonus program, in addition to their base salaries, Chopra earned $1,323,000 in 2013, $353,000 in 2014, and $700,000 in 2015; Edrick earned $340,000 in 2013, $160,000 in 2014, and $300,000 in 2015; and Mehra earned $325,000 in 2013, $125,000 in 2015, and $245,000 in 2017.

264. As a result of the lucrative financial incentives offered by the Company, the Individual Defendants were highly motivated to artificially inflate the price of OSI stock by making false and misleading statements that concealed material facts surrounding its turnkey operations and the undisclosed Albanian arrangement with ICMS.

### 3. Defendant Mehra's Compensation Was Closely Tied to the Performance of the Turnkey Business

265. In addition to the executive compensation program, as discussed in various Company proxy statements, in 2015, OSI's Compensation Committee established a separate incentive program tied to the annual performance of the Company's turnkey solutions business in order to underscore its importance and to focus Defendant Mehra's attention on developing these opportunities. Incentives under the turnkey incentive program were conditioned on the achievement of certain metrics based on the operating income and bookings of the Company's turnkey business.

266. In 2016, Mehra vested 23,800 Restricted Stock Units ("RSUs") for achieving a bookings target of $225 million. In 2017, Mehra received $705,000 for exceeding the operating income target of $10 million in the turnkey segment.

267. Moreover, in 2017, while it had "determined not to adjust any base salary levels" for any of its executive officers, the Company made an exception for Mehra, "whose salary was increased by approximately 14% to $400,000 to compensate him for taking on ***significantly greater responsibility*** for the oversight and management of the cargo and vehicle inspection ***and turnkey business*** lines within our Security division."

268. Accordingly, Defendant Mehra was highly motivated to conceal the true facts surrounding the Albanian arrangement as they would negatively affect Defendant Mehra's personal compensation.

## VIII. LOSS CAUSATION

269. As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, as alleged herein, OSI Securities traded at artificially inflated prices during the Class Period, including as high as $95.76 per share on October 12, 2017.

270. Relying on the integrity of the market price for OSI Securities and public information relating to OSI, Plaintiffs and other Class members purchased or otherwise acquired OSI Securities at prices that incorporated and reflected Defendants' Class Period misrepresentations and omissions of material fact alleged herein. As a result of their purchases of OSI Securities during the Class Period at artificially inflated prices, and the subsequent significant decline in the value of OSI Securities when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, Plaintiffs and the Class suffered economic loss, i.e., damages under the federal securities laws.

271. Had Defendants been truthful about these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired their OSI Securities at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of OSI Securities, and that the price of OSI Securities would fall when the relevant truth was ultimately revealed to the market.

272. The economic losses, i.e., damages, suffered by Plaintiffs and other members of the Class were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated and/or maintained the price of the OSI Securities, and the subsequent significant decline in the value of OSI Securities when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.

273. These revelations and/or materializations of risk previously concealed by Defendants' fraud occurred through at least two partial corrective disclosures on:

December 6, 2017 and February 1, 2018, as detailed below in Sections VIII.A and B below. The timing and magnitude of the declines in the price of OSI Securities negate any inference that the loss suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to the revelation of facts and/or materialization of the risks previously concealed by Defendants' fraudulent misleading statements and omissions.

**A. December 6, 2017 Partial Disclosure**

274. On December 6, 2017, the relevant truth and/or foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period began to be revealed and/or partially materialized. On that date, MWR issued a detailed report titled, "OSIS: Rotten to the Core," which revealed certain previously undisclosed facts regarding the Company's turnkey operations, including details about the corrupt Albanian arrangement with ICMS and the overall lack of credibility at the Company. As set forth above, the December 6, 2017 MWR Report revealed, *inter alia*, that the Company had transferred 49% of its Albanian contract entity to ICMS for approximately $4.50; OSI's accounts and SEC disclosures did not reflect the transfer; the transfer occurred under suspicious circumstances with a collusive partner; the transfer occurred the same week that the outgoing Albanian government left office; and OSI had been given favorable terms, including an 8% bonus on the contract by the outgoing Albanian government. The December 6, 2017 MWR Report also included a video discussing the details of the ICMS arrangement and revealing translations of previously undisclosed Albanian reports calling the contract the "theft of the century" and a "mafia" concession and raising questions like, "how did the doctor Olti Peçini [buy] 49% of the shares of a concession worth 316 million USD for 490 lekë. Who is hiding behind the ICMS . . . ?" The December 6, 2017 MWR Report concluded that Defendants obtained OSI's Albanian contract "through corruption," which put "at significant risk OSIS's Security Division contracts with the U.S. government and European government agencies."

275. Within hours of the December 6, 2017 MWR Report, after admitting the significant "impact" that the facts and information contained in the December 6, 2017 MWR Report had on OSI's stock price, OSI issued a vague half-page response, admitting several crucial facts set forth in the report, including that OSI had entered into an undisclosed "partnership with ICMS" subject to a previously concealed "profit shar[ing]" agreement regarding the Albanian turnkey operation, S2 Albania.

276. Nevertheless, the Company continued to mislead investors and deny the true facts surrounding the arrangement while continuing to conceal the foreseeable risks surrounding the deal. For example, the Company dismissed the facts disclosed by the December 6, 2017 MWR Report as "misleading allegations" and represented that the Albanian contract was secured as "the result of [a] public tender[]." The Company also vaguely asserted that "ICMS implemented all civil works construction for the program . . . [and] both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares."

277. None of these facts had previously been disclosed to investors during the Class Period. Moreover, no reasonable investor would have been aware of these facts or appreciated their significance given that the obscure documents underlying the December 6, 2017 MWR Report were only published and located in Albania and required both the translation from the uncommon language of Albanian to English, and sophisticated expert forensic analysis piecing together the various details, Albanian financial information, and connections underlying the corrupt Albanian contract, as set forth in Section IV.I above.

278. In addition, as set forth in ¶¶ 105, 193-95, and 278 these statements were still materially misleading and contradicted the Company's own SEC reports and financial reporting, including a February 22, 2017 Form 8-K which listed S2 Albania as 100% owned by OSI "free and clear" of any "security interest, mortgage, pledge, lien, encumbrance, claim or equity." Indeed, MWR issued a second report on January 31, 2018, debunking Defendants' misleading explanations. *See* ¶¶ 126-28.

279. The information revealed in the December 6, 2017 MWR Report, which was partially confirmed by the Company, was proximately caused by, directly related to, and a foreseeable consequence of Defendants' misrepresentations and omissions as alleged herein. Moreover, the December 6, 2017 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' Class Period misstatements and omissions.

280. As a direct and proximate result of these partial disclosures, OSI's common stock price plummeted nearly 30% in a single day—from a close of $84.07 per share on December 5, 2017, to a close of $59.52 per share on December 6, 2017, partially removing a portion of the artificial inflation in OSI's common stock price.

281. Similarly, as a direct and proximate result of these partial disclosures, the price of OSI Bonds dropped precipitously by $162.62 or 15.67%—from a close of $1,037.50 on December 5, 2017, to a close of $874.88 on December 6, 2017, as some of the artificial inflation in the OSI Bonds was removed as a result of these partial disclosures.

282. The market attributed the nearly 30% stock price decline to the facts revealed by the December 6, 2017 MWR Report. For example, in an article entitled, "$canner 'Muddy'ed," the New York Post reported:

> OSI Systems, the maker of airport scanning systems, ***lost nearly a third of its value on Wednesday after short seller Carson Block accused it of underhanded practices***. "We think this company is rotten to the core," Block's firm, Muddy Waters, said in a 19-page report. A potential $250 million contract OSI signed with Albania is tainted by corruption, Muddy Waters claimed. Late Wednesday, the company, based in Hawthorne, Calif., denied any wrongdoing and said its 'turnkey' contract was the result of public tenders.

283. While acknowledging the effect of the December 6, 2017 disclosures on the price of OSI's stock, some analysts clung to Defendants' misleading denouncement of the

December 6, 2017 MWR Report. For example, ROTH issued a report titled, "OSIS: Short Thesis Lacks Perspective," in which it reported that "the 30% decline yesterday is seemingly built on fear instigated by a short report that hypothesizes OSIS's turnkey projects are based on corrupt practices hinged on sophisticated forensics in the company's Albania and Mexico contracts." Based on ROTH's "discussions with [OSI] management," it concluded that "the legal structure of this [Albanian] contract present no risk." On the same day, in an article titled, "In Need of a Security Blanket," Jefferies noted that "[a]s part of the contract, OSI has a local partner that invested funds and performed some of the civil work. The local partnership reduces the overall risk of the contract."

284. Thus, despite the partial disclosure on December 6, 2017, which removed some of the artificial inflation in the price of OSI Securities, the price of OSI Securities remained artificially inflated due to Defendants' continued misrepresentations and omissions.

**B. February 1, 2018 Partial Disclosure**

285. On February 1, 2018, additional adverse facts, relevant truth, and/or foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions were further revealed and/or partially materialized. On that day, OSI issued a press release and SEC Form 8-K announcing the following:

> Following a report by a short seller, the ***Securities and Exchange Commission (SEC) commenced an investigation into the Company's compliance with the Foreign Corrupt Practices Act*** (FCPA). The U.S. Attorney's Office for the Central District of California (DOJ) has also said it intends to request information regarding FCPA compliance matters. ***The SEC and DOJ are also conducting an investigation of trading in the Company's securities, and have subpoenaed information regarding trading by executives, directors and employees, as well as Company operations and disclosures in and around the time of certain trades***. In relation to the matters that are the subject of the trading-related investigation, the Company has taken action with respect to a senior-level employee. At this time, the Company is unable to predict what, if any, action may be taken by the DOJ or SEC as a result of these investigations, or any penalties or remedial measures these agencies may seek. The Company places a high priority on compliance with its anti-corruption and securities

> trading policies, and is cooperating with each of the government investigations.

286. The information released by the Company on February 1, 2018, was proximately caused by, directly related to, and a foreseeable consequence of Defendants' Class Period misrepresentations and omissions. Furthermore, the SEC and DOJ's decisions to commence investigations into the Company's compliance with the FCPA and executives' stock trading were proximately caused by, directly related to, and a foreseeable consequence of Defendants' misrepresentations, omissions, and deceptive course of conduct during the Class Period. Thus, the February 1, 2018 disclosure revealed the materialization of the known foreseeable risks proximately caused by, and directly connected to, Defendants' Class Period misrepresentations and omissions.

287. As a direct and proximate result of these partial disclosures, the price of OSI's common stock declined 18% from a close of $66.60 on February 1, 2018, to a close of $54.60 on February 2, 2018, thereby removing artificial inflation in OSI's common stock.

288. Similarly, as a direct and proximate result of these partial disclosures, the price of OSI Bonds dropped by 5.94% or $54.57—from a close of $919.01 on February 1, 2018, to a close of $864.44 on February 2, 2018, as further inflation in the OSI Bonds was removed as a result of Defendants' disclosures.

289. Analysts latched on to the negative implications of the SEC and DOJ investigations and attributed the February 1, 2018 stock drop to the Company's disclosures. For example, in an article titled, "Fundamentals Solid, but Investigation May Act as Overhang; D/G to Hold," Jefferies reported:

> Downgrading to Hold based on the overhang from investigations. After the close on Feb 1st, with the release of earnings, OSIS filed an 8-K disclosing that the SEC is investigating FCPA compliance, and the U.S. Attorney's Office for the Central District of California intends to request information on this matter. Separately, the SEC and DOJ are also conducting inquiries into the trading of the company's securities. Given these two investigations, we believe shares will be range bound until there is a final outcome. In our opinion, resolutions can take over a year and could weigh on valuation.

290. Similarly, on February 6, 2018, ValueWalk issued a report, stating:

> Activist shorts update Shares in electronic system manufacturer ***OSI Systems traded down more than 18% Thursday after the company announced that it is under investigation by the U.S. Securities and Exchange Commission (SEC) and the Department of Justice (DOJ) following the publication of two short reports by Muddy Waters Research***. In December, the short seller accused OSI of obtaining a major turnkey contract in Albania through corruption and on Thursday it published a follow-up report building on its previous allegations. Hours after the second report hit the wire, OSI announced that the SEC had commenced a probe into the company's compliance with the Foreign Corrupt Practices Act (FCPA). The company also said the SEC and DOJ are examining the trading of OSI's securities and have 'subpoenaed information regarding trading by executives, directors and employees, as well as company operations and disclosures in and around the time of certain trades.' 'We applaud the @TheJusticeDept and @SEC_Enforcement for moving quickly to investigate $OSIS for bribery. It's always good to see that FCPA matters,' Muddy Waters tweeted in response.

## IX. <u>CLASS ACTION ALLEGATIONS</u>

291. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded OSI Securities and were damaged thereby. Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

292. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the proposed Class. At the end of the Class Period, OSI had approximately 19 million shares of

common stock issued and outstanding, owned by thousands of persons, and actively traded on the NASDAQ. Similarly, at the end of the Class Period, OSI had more than 470 million of outstanding bonds and other debt. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Record owners and other members of the Class may be identified from records maintained by OSI or its transfer agent, and may be notified of the pendency of this action by a combination of published notice and first-class mail, using the techniques and form of notice similar to that customarily used in class actions arising under the federal securities laws.

293. There is a well-defined commonality of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

a. whether Defendants' actions as alleged herein violated the federal securities laws;

b. whether Defendants' statements and/or omissions issued during the Class Period were materially false and misleading;

c. whether Defendants knew or were deliberately reckless in not knowing that their statements were false and misleading;

d. whether and to what extent the market prices of OSI publicly traded common stock and OSI Bonds were artificially inflated and/or distorted before and/or during the Class Period due to the misrepresentations and/or omissions of material fact alleged herein; and

e. whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

294. Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired OSI Securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct as alleged herein.

295. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intend to prosecute this action vigorously. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

296. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## X. PRESUMPTION OF RELIANCE

297. Plaintiffs and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. OSI Securities traded in an efficient market;

d. the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of OSI Securities; and

e. without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired OSI Securities between the time that Defendants made material misrepresentation and omissions and the time the concealed risks materialized or the true facts were disclosed.

298. At all relevant times, the market for OSI Securities was efficient for the following reasons, among others:

a. OSI common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, OSI filed periodic public reports with the SEC and the NASDAQ;

c. OSI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. OSI was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

299. As a result of the foregoing, the market for OSI Securities promptly digested current information regarding OSI from all publicly available sources and reflected such information in the price of OSI Securities. Under these circumstances, all purchasers of OSI Securities during the Class Period suffered similar injury through their purchase of OSI Securities at artificially inflated prices and a presumption of reliance applies.

300. Further, at all relevant times, Plaintiffs and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other members of the Class would not have purchased or otherwise acquired OSI Securities at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

301. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

302. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

303. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

304. To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of OSI who actually knew that such statement was false when made.

305. Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## XII. CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

### Asserted Against All Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

306. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and all other members of the Class against OSI and the Individual Defendants.

307. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, regarding the intrinsic value of OSI Securities, as alleged herein; (ii) artificially inflate the price of OSI Securities; and (iii) cause Plaintiffs and other members of the Class to purchase OSI Securities at artificially inflated prices that did not reflect their true value. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

308. Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company’s securities in an effort to maintain the artificially inflated price of OSI Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

309. Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of OSI's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business, which operated as a fraud and deceit upon the purchasers of OSI Securities during the Class Period.

310. Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in press releases, conference calls, SEC filings, news media, blogs, and OSI's website.

311. Defendants are further liable for the false and misleading statements made by OSI's officers, management, and agents in press releases, conference calls, conferences with investors and analysts, news media, blog reports, and OSI's website, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

312. Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of OSI Securities. By concealing material facts from investors, Defendants maintained the Company's artificially inflated securities prices throughout the Class Period.

313. Without knowledge of the fact that the price of OSI Securities was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class

purchased or acquired OSI Securities during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of OSI Securities.

314. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the intrinsic value of OSI Securities, Plaintiffs and other members of the Class would not have purchased or acquired their OSI Securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices they paid.

315. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

316. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of OSI Securities during the Class Period.

## COUNT II

### Asserted Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

317. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiffs and all other members of the Class against the Individual Defendants.

318. At all relevant times during the Class Period, as set forth in Section III.B.2 above, Chopra was the Company's CEO and a member of the Company's Board of Directors; Edrick was the Company's CFO; and Mehra was an Executive Vice President of OSI and a member of the Company's Board of Directors. As such, the Individual Defendants had regular access to non-public information about OSI's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers

and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

319. The Individual Defendants acted as controlling persons of OSI and the other Individual Defendants within the meaning of 20(a) of the Exchange Act as alleged herein, as they possessed direct or indirect power to direct or cause the direction of the management and the policies of the Company and persons who engaged in the unlawful conduct complained of herein in violation of Section 10(b). Due to their control, the Individual Defendants are jointly and severally liable for any false and misleading statements, omissions, or conduct alleged herein that are attributable to OSI or other person they controlled.

320. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

321. In particular, each of these Individual Defendants had direct and supervisory involvement in and control of the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

322. As set forth above, OSI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements, and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of OSI Securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Plaintiffs and the members of the Class damages and interest thereon;

C. Awarding Plaintiffs and the Class's reasonable costs, including attorneys' and experts' fees; and

D. Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XIV. JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: June 13, 2019

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

/s/ Eli R. Greenstein
ELI R. GREENSTEIN (Bar No. 217945)
egreenstein@ktmc.com
STACEY M. KAPLAN (Bar No. 241989)
skaplan@ktmc.com
JENNY L. PAQUETTE (Bar No. 321561)
jpaquette@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff Arkansas Teacher Retirement System and Plaintiff John A. Prokop and Lead Counsel for the Putative Class*

**KIESEL LAW LLP**
PAUL R. KIESEL (Bar No. 119854)
kiesel@kiesel.law
JEFFREY A. KONCIUS (Bar No. 189803)
koncius@kiesel.law
CHERISSE HEIDI A. CLEOFE (Bar No. 290152)
cleofe@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

*Liaison Counsel for the Putative Class*